

**EXHIBIT A**

# CONTRACT FOR PURCHASE AND SALE
# OF CROWNE PLAZA SUITES HOUSTON,
# TEXAS

―――――――――――――――――

THIS DOCUMENT IS MORE THAN A RECEIPT FOR MONEY.  IT IS INTENDED TO BE A LEGALLY BINDING AGREEMENT.  READ IT CAREFULLY.

**Crowne Plaza Suites, Houston, Texas**
**9090 Southwest Freeway**
**Houston, Texas [hereinafter collectively, the "Hotel") together with all related items to the Property as set forth in Section 1 below.]**

**TERMS AND CONDITIONS**
Seller's Court appointed Receiver Michael S Udayan agrees to sell the Property on behalf of Seller, and Purchaser agrees to purchase the Property, on the following terms and conditions: Herein all reference in the PSA 'Seller' is referred as "Seller's Court appointed Receiver

**THIS CONTRACT FOR PURCHASE AND SALE** ("**Agreement**" or "**Contract**"), made and entered into as of January 11, 2021, by and between Crowne Plaza Suites Houston, LLC having an address at 207 West 25th Street, New York, New York (hereinafter the "**Purchaser**") and **Dongtai Investment Group, LLC,**(hereinafter collectively, the "**Seller**") **Or its rightful lenders** having a mailing address at 9090 Southwest Freeway, Houston Texas 77074. The powers entrusted in Michael S Udayan, the Court appointed Receiver assigned to  Dongtai Investment to protect and serve all parties, including Lenders, creditors both State and Federal, has decided to authorize the Purchase and Sale agreement after carefully evaluating all present circumstances. The receiver has provided all the Accounts Payable information available to the buyer to the  best of his ability, knowledge, however, since the Property has been closed for two months and  the Property Management System has been shut down, Receiver will be unable to calculate  any additional levies or Fines primarily on Property Taxes and City & State Taxes etc. If any, and Receiver Indemnifies and holds himself harmless for any such unforeseen errors. The Receiver shall provide the final accurate numbers during the Due diligence period.
The receiver will also diligently negotiate reduced payments from several vendors.

**NOW, THEREFORE**, for and in consideration of the deposit hereinafter referred to, as well as the mutual covenants, conditions and undertakings hereinafter contained, it is agreed by and between the parties hereto as follows:

      1.    <u>Recitals and Description of Property</u>.  The foregoing recitals are true and correct and are a part of this Agreement as if set forth herein at length. The Seller's Receiver

agrees to sell and convey to Purchaser, and the Purchaser agrees to purchase from Seller all of Seller's right, title and interest in and to the following (collectively, the "**Property**"):

(a)     The land and improvements upon which the Hotel is located more particularly described on Exhibit "A" attached hereto and made a part hereof (the "Land");

(b)     the Hotels;

(c)     the Leases and Contracts (as defined below);

(d)     any and all trade names used by Seller solely in connection with the Hotel, to the extent the same can be transferred, excluding the following and any variation thereof, which are not transferred or assigned to Purchaser: (i) Crowne Plaza Suites, Houston, Texas Purchaser acknowledges and agrees that the Seller's Intercontinental Franchises for the Hotel (the "**Franchise**"), is not assignable and that Seller will be terminating such Franchise at or prior to Closing, at Seller's sole cost and expense;

(e)     All fixtures (other than those which constitute Improvements), furniture, furnishings, equipment, machinery, tools, vehicles, appliances, art work and other items of tangible personal property which are located at the Hotel, or ordered for future use at the Hotel as of the Closing, other than the Supplies, IT Systems, F&B, Retail Merchandise, Books and Records and Plans and Specifications and expressly excluding any personal property owned by Hotel guests or otherwise listed on **Exhibit "B"** attached hereto (the "**FF&E**");

(f)     All china, glassware and silverware, linens, uniforms, engineering, maintenance, cleaning and housekeeping supplies, matches and ashtrays, soap and other toiletries, stationery, menus, directories and other printed materials, and all other similar supplies and materials, which are located at the Hotel or ordered for future use at the Hotel as of the Closing (the "**Supplies**");

(g)     All computer hardware, telecommunications and information technology systems located at the Hotel, including all telephone exchanges located at the Hotel, and all computer software used at the Hotel, subject to the terms of the applicable license agreement(s), to the extent the same are transferable or Seller obtains any consent necessary to effectuate such a transfer (the "**IT System(s)**");

(h)     All food and beverages (alcoholic and non-alcoholic) which are located at the Hotel, whether opened or unopened, or ordered for future use at the Hotel as of the Closing, including, without limitation, all food and beverages located in the guest rooms, but expressly excluding any alcoholic beverages to the extent the sale or transfer of the same is not permitted under applicable law (the "**F&B**");

(i)      All merchandise located at the Hotel and held for sale to guests and customers of the Hotel or ordered for future sale at the Hotel as of the Closing, including, without limitation, the inventory held for sale in any gift shop or newsstand operated by or on behalf of Seller at the Hotel, but expressly excluding the F&B (the "**Retail Merchandise**");

(j)      Any/all lease(s) and/or purchase money security agreement(s) for any equipment, machinery, vehicles, furniture or other personal property located at the Hotel which are held by or on behalf of Seller and used exclusively at the Hotel, together with any/all deposit(s) made by or on behalf of Seller, to the extent the same and such deposits are transferable or the Seller obtains any consent necessary to effectuate such a transfer (the "**Equipment Lease(s)**");

(k)      All licenses, permits, consents, authorizations, approvals, registrations and certificates issued by any Governmental Authority which are held by or on behalf of Seller or Operating Tenant with respect to any/all Hotel(s), including, without limitation, the construction, use or occupancy of any/all Hotel(s) or the Business, together with any deposits made by or on behalf of Seller or Operating Tenant thereunder, to the extent the same and such deposits are transferable or the Parties obtain any consent necessary to effectuate such a transfer (the "**Licenses and Permits**");

(l)      All books and records located at the Hotel which relate exclusively to the Hotel, (i) including, without limitation, all (A) internal financial analyses, appraisals, tax returns, financial statements, (B) corporate or other entity governance records, (C) employee personnel files, and (D) any work papers, memoranda, analysis, correspondence and similar documents and materials prepared by or for Seller, but (ii) expressly excluding (x) all guest or customer profiles, contact information (e.g., addresses, phone numbers, facsimile numbers and/or email addresses), histories, preferences, and any other guest or customer information in any database of Seller, whether obtained or derived by Seller from guests or customers of the Hotel, and (y) all documents and other materials which (1) are legally privileged or constitute attorney work product, (2) are subject to an applicable law or a confidentiality agreement prohibiting their disclosure, or (3) constitute confidential internal assessments, reports, studies, memoranda, notes or other correspondence prepared by or on behalf of any officer or employee of Seller (the "**Books and Records**");

(m)      All plans and specifications, blueprints, architectural plans, engineering diagrams and similar items located at the Hotel and/or which relate exclusively to the Hotel, to the extent the same are transferable (the "**Plans and Specifications**");

(n)      All warranties and guaranties held by Seller with respect to the Hotel or any other Property, to the extent the same are transferable or Seller obtains any consent necessary to effectuate such a transfer (the "**Warranties**");

(o)      All bookings and reservations for guest, conference and banquet rooms or other facilities at the Hotel as of the Closing, together with all deposits held by or on behalf of Seller with respect thereto (the "**Bookings**"); and

(p)    All amounts which Seller is entitled to receive from the lodging business and all activities related thereto at the Hotel which are not paid as of Closing, including, without limitation, charges for the use or occupancy of any guest, conference or banquet rooms or other facilities at the Hotel, any restaurant, bar or banquet services, or any other goods or services provided by or on behalf of Seller at the Hotel (the "**Accounts Receivable**"), including all charges accrued to the open accounts of any guests or customers at the Hotel as of the Cut-Off Time (as defined below) for the use or occupancy of any guest, conference or banquet rooms or other facilities at the Hotel, any restaurant, bar or banquet services, or any other goods or services provided by or on behalf of Seller at the Hotel.

2.    <u>Subject Clauses</u>.  Such Property is sold and is to be conveyed and transferred in fee simple, subject to the following (collectively, the "**Permitted Exceptions**"):

(a)    State of facts as shown on an accurate survey.

(b)    To covenants, easements, rights-of-way, conditions, and tenancies as set forth in **<u>Exhibit "C"</u>**, annexed hereto and made a part hereof.

(c)    Zoning and building regulations and ordinances of the town, county and other governmental agency or division of Texas, as now or hereafter in force.

(d)    Real estate taxes for the current year (or portion of a year if tax bills are payable in more than one annual payment) and subsequent years, subject to adjustment as provided in <u>Section 6(a)</u> hereof.

(e)    Leases, contracts and agreements set forth in **<u>Exhibit "B"</u>** ("**Leases and Contracts**") that are to be assigned by Seller to and assumed by Purchaser at Closing (subject to the provisions of <u>Section 4</u>).  Purchaser will also assume all reservations for guest rooms and events at the Hotel made through the Hotel's reservation system and any other written contracts for guest rooms or banquet events booked by Seller.[1]

3.    (a) The "**Effective Date**" of this Agreement is defined as the date that the last of the Purchaser and Seller have signed this Agreement.

(b). Seller agrees to cancel its management agreement with its current manager as of the date of Closing.

(c) Purchaser shall have the obligation, at its sole cost and expense, to update any existing survey (or obtain a new survey), and Purchaser shall, at its sole cost and expense, obtain a title insurance commitment and title insurance policy, as may be needed by Purchaser. Seller shall, if it has not already done so, furnish Purchaser with copies of any of the following it may have in its possession, if any, within five (5) days from the date of this Agreement: (i)

---

[1] Note:  Items on Exhibit "C" should capture anything set forth on a title commitment that is not objected to by Purchaser.

a prior existing title insurance policy or commitment in favor of Seller's Receiver on behalf of Dongtai Investment Group  and (ii) a prior existing survey. Purchaser shall arrange with its surveyor the wording of any certification to appear on the new survey, which shall include the name of the Seller as well as the names of  title insurer and the Purchaser. Seller is conveying title subject to the Permitted Exceptions and any agreements or matters created by Purchaser in connection with the Closing. If there is any other matter of record affecting title which prevents use of the property as a hotel as currently existing or which renders title unmarketable, Purchaser shall give Seller written notice of the same Ten (10) days prior to the expiration of the Due Diligence Period, Due to the Present financial situation, Seller will need Buyers assistance in curing all Liens from any City , State or Mechanics liens. to expedite the Closing process and a clean title Any such amount will be prorated and returned to Buyer at the close of the sale if applicable. Purchaser shall have the right as its sole remedy to terminate the Agreement prior to the expiration of the Due Diligence Period and receive a full refund of the entire Deposit.

(d) The provisions of this Section 3 shall not survive the Closing.

(e) Due Diligence Period. Purchaser is hereby granted a due diligence period commencing on the Effective Date through 5:00 PM local time in Houston, Texas on the date which is Thirty (30)   days after the Effective Date, (the "**Due Diligence Period"),** within which to inspect the Property and make whatever investigations it deems necessary, at Purchaser's sole cost and expense, without damage to the Property or interference with the business of the Seller and on a lien free basis, to determine if Purchaser desires to proceed with the Closing or to terminate this Agreement for any reason by written notice from Purchaser to Seller. Seller shall furnish to Purchaser such information in Seller's possession which Purchaser may reasonably request. The Deposit thereon shall be fully refundable to Purchaser during the Due Diligence Period.  In the event Purchaser determine in its sole discretion that it does not wish to complete and Close the transaction, it may terminate the Agreement by written notice to Seller to be received by Seller before the expiration of the Due Diligence Period. Within five (5) business days thereafter, Escrow Agent (as such term is hereafter defined) shall make a refund to Purchaser of the Deposit received from Purchaser, in which event the Agreement shall be terminated except for any terms and conditions set forth herein to survive the Closing or termination of the Agreement. If Seller does not receive any notice of termination from Purchaser prior to the end of the Due Diligence Period as set forth in this Section 3(e), subject to the further terms hereof, the right of Purchaser to terminate the Agreement and receive a refund of its Deposit shall be deemed to have expired and waived by Purchaser and,  Deposit shall be "hard" and non-refundable to Purchaser and Purchaser shall be required to Close the transaction pursuant to this Agreement.

4.    Delivery of Supporting Documents.  The Leases and Contracts shall be provided to Purchaser at least Ten (10) days from the Effective Date of this Agreement prior to the expiration of the Due Diligence Period which shall, at Closing of the transaction contemplated by this Agreement, be assigned by the Seller and be assumed by the Purchaser, as of the Date of Closing. If the consent to any such assignment and assumption

is required by any party to such Leases and Contracts, such application for consent and/or the obtaining of such consents may, at the option of Seller, be treated on a post-closing basis and shall not delay the closing, however, from and after closing, with title to the Hotel and Land passing to Purchaser, the Purchaser shall be solely responsible for all payments and other obligations under the Leases and Contracts it has assumed for amounts due for events or actions occurring subsequent to Closing, and Purchaser agrees, to the extent permitted by law, to indemnify, save harmless and defend Seller and its affiliates and their employees, partners, members, officers, managers, licensors, consultants, lenders, successors and assigns (collectively, the "**Indemnified Parties**" or "**Seller Indemnified Parties**") from and against any and all claims for damages, payments, costs, expenses, liabilities, including, but not limited to, reasonable attorneys' fees, paralegal fees, costs and expense related thereto. Seller agrees, to the extent permitted by law, to indemnify, save harmless and defend Purchaser, and its affiliates and their employees, partners, members, officers (collectively, the "**Purchaser Indemnified Parties**") from and against any and all claims for damages, payments, costs, expenses, liabilities, including reasonable attorneys' fees, paralegal fees and costs and expenses, related to the Leases and Contracts and events which were due or took place during the time the Seller was the owner of the Hotel prior to Closing but not for any events or actions occurring thereafter. The provisions of this <u>Section 4</u> shall survive the Closing.   Seller shall use commercially reasonable effort to provide to Purchaser all documents and information reasonably requested by Purchaser which are in the possession of Seller in order for Purchaser to conduct its due diligence on the Property.

5.       <u>Purchase Price</u>        **The purchase price is Eleven Million Eight Hundred Thousand Dollars ($11,800,000.00) ("Purchase Price") was determined based on the Documents provided by the Receiver that included all Creditors, including the  Lenders portion. The Court appointed receiver for he Seller will instruct and endorse distribution to all creditors after providing all backup documents Due to the additional fines that may have been levied, the Receiver openly discloses that these numbers, especially the tax burden may not be fully accurate.  The Purchase Price shall be paid by Purchaser to Seller as follows. The Seller Receiver & agrees to pay Three point seven five( 3.50%) Percent commission to Marcus and Millichap or its affiliates and One Point Seven five(1.50 %) percent to Viral Amin with Amin Reality Group based on the total purchase price of $11.8 Million USD.**

6.       <u>Escrow & Deposit</u>  Within  (5) calendar days after the Effective Date (as defined in Paragraph 37 below) Purchaser   shall open escrow with


**Fidelity National Title**
**Attn: Kristy Tomasello,**
**Manager, National Commercial Underwriter**
**601 Riverside Avenue, Building 5, 7th Floor**
**Jacksonville, Florida  32204**

Tel: (904) 701-6084
Email: kristy.tomasello@fnf.com

(the "Escrow Holder") by the deposit of a copy of this Agreement with the Escrow Holder. Purchaser agrees to wire directly to escrow a deposit in the amount of Two Hundred Thousand and 00/100 Dollars ($200,000.00) and will be held in an escrow. Seller's Receiver and Purchaser agree to prepare and execute such escrow instructions as may be necessary and appropriate to close the transaction.  Should said instructions fail to be executed as required, Escrow Holder shall and is hereby directed to close escrow pursuant to the terms and conditions of this Agreement.  Close of escrow (or the "Closing Date", which shall mean the date on which the deed transferring title is recorded) shall occur on or before and Sixty (60)days from the conclusion of the Due Diligence Period.  Escrow fee shall be paid by Seller and Purchaser (50/50 split), with an extension period as hereinafter defined and agreed to in paragraph 37.  All other closing costs shall be paid in accordance with the custom in the county in which the Property is located. Because Purchaser and seller are not placing the funds with the broker and the earnest money or other funds are being placed with someone other than the broker, the broker hereby advises all parties in writing that (1) the broker has not receipted for any funds, (2) the broker has no control over the funds, (3) the transaction is being handled in a manner contrary to standard practice, and (4) the parties are fully responsible for the deposit and access to the funds.  The Escrow Agent has fiduciary duties with respect to the Deposit and if a dispute results hereafter as to entitlement to the Deposit, the Escrow Agent agrees to release or disburse the said escrowed funds as provided herein. Purchaser hereby gives Escrow Agent the irrevocable direction to release the Deposit to Seller in the event Seller is entitled to receive same pursuant to this Agreement as liquidated damages in the event of a breach or default by Purchaser.  Subject to the further terms hereof, the Deposit (including without limitation the Second Deposit which the Purchaser is obligated to deposit as set forth above) will be "hard" and be non-refundable to Purchaser on the expiration of the Due Diligence Period.  If the Purchaser has not exercised its right to terminate this Agreement prior to the expiration of the Due Diligence Period by giving written notice of such termination to Seller, then, within five (5) days of the expiration of the Due Diligence Period, Purchaser shall deliver to Escrow Agent an additional sum of Two Hundred Thousand Dollars ($200,000.00), thereby making the Deposit Four Hundred Thousand Dollars ($400,000.00), which sum remain in Escrow with Escrow Agent until Closing, as a credit towards the Purchase Price.

Purchaser understands that it shall rely entirely upon its own due diligence in completing the purchase. Purchaser shall be afforded until the expiration of the Due Diligence Period as set forth in Section 3(e) to complete its inspection of the Property. If no such notice of termination is given, the Due Diligence Period shall expire and subject to the further terms hereof, the Deposit (including without limitation the Second Deposit which the Purchaser is obligated to deposit as set forth above) shall be "hard" and non-refundable and shall serve as agreed to liquidated damages to Seller in the event of a breach or default by Purchaser, including any failure to Close as required by this Agreement on the Closing Date (as such term is hereafter defined).

(B) After applying the Deposit, the balance of the Purchase Price, subject to proration and closing adjustments, shall be paid by Purchaser, without contingencies, at Closing, by wire transfer of funds immediately available to Escrow Agent, pursuant to written wire instructions given by Seller's receiver to Escrow Agent.

The sum referred to in Section 5(a) hereof shall be held in escrow by the Escrow Agent and shall be invested in an interest bearing, federally insured bank account. Said funds and any interest earned thereon shall be paid to the party entitled to finally retain the same in accordance with the provisions elsewhere set forth herein.

7.      TITLE:  Within   FIFTEEN (15) business days after the Effective Date of this Agreement, Purchaser shall procure and cause to be delivered to Purchaser a preliminary title report issued by Fidelity National Title (the "Title Company") on the Property.  Within TEN (10) calendar days following receipt thereof, Purchaser shall either approve in writing the exceptions contained in said title report or specify in writing any exceptions to which Purchaser reasonably objects.  If Purchaser objects to any exceptions, Seller shall, within FIFTEEN (15) calendar days after receipt of Purchaser's objections, deliver to Purchaser written notice that either (i) Seller will, at Seller's expense, attempt to remove the exception(s) to which Purchaser has objected before the Closing Date or (ii) Seller is unwilling or unable to eliminate said exception(s).  If Seller fails to so notify Purchaser or is unwilling or unable to remove any such exception by the Closing Date, Purchaser may elect to terminate this Agreement and receive back the entire Deposit, in which event Purchaser and Seller shall have no further obligations under this Agreement; or, alternatively, Purchaser may elect to purchase the Property subject to such exception(s).    Purchaser shall provide Seller with written notification of Purchaser's election within THREE (3) calendar days of receipt of Seller's notice.  Purchaser's failure to provide any written notification of election within such time shall be deemed an election by Purchaser to purchase Property, subject to such exception(s).

Seller shall convey by warranty deed to Purchaser (or to such other person or entity as Purchaser may specify) marketable fee title subject only to the exceptions approved by Purchaser in accordance with this Agreement.  Title shall be insured by a standard owner's policy of title insurance issued by the Title Company in the amount of the purchase price with premium paid by Seller.

8.      Apportionments and Additional Payments.  The following apportionments and payments are to be made as of 11:59 p.m. on the day preceding the Closing Date (the "**Cut-Off Time**") and shown on the Settlement Statement. Final readings will be made in all instances where applicable and available. Any amounts that would be payable by the Seller pursuant to the following shall be credited to Purchaser as a reduction of the Purchase Price at Closing, such that the Seller shall have no obligation to advance funds to satisfy any of the following obligations.

(a)      Taxes on the basis of the fiscal year for which assessed.  If the Closing of title shall occur before the real estate and personal property tax rate is fixed, the

Apportionment of such taxes shall be upon the basis of the tax rate of the year preceding applied to the latest assessed valuation and shall be readjusted by the parties after Closing when the tax rate for the current tax period is fixed. Taxes for the day of Closing shall be a Purchaser expense.

(b)     Water and sewer charges on the basis of the current calendar year.  If there is a water meter on the Property, the unpaid meter charge and the unpaid sewer rents for the time intervening between the date of the last reading thereof and the date of  Closing hereunder shall be apportioned on the basis of such last reading.

(c)     All rents and charges payable under the Leases and Contracts.

(d)     Intentionally Omitted

(e)     At the Closing the Purchaser shall pay to the Seller, in cash or by certified check, over and above the Purchase Price, a sum equivalent to all monies in cash registers (however, Purchaser is not required to purchase any IOUs or payment slips). Such cash registers shall be counted jointly by representatives of the Seller and the Purchaser on the day of the Closing.

(f)     Postage meter rental, and unused meter postage.

(g)     Tour agents' commissions, if any.

(h)     Diners Club commissions,  and commissions  of other credit organizations, if applicable.

(i)     Hotel Revenues.

(i)     Room revenues for the night prior to the day of the Closing Date shall be divided equally between Purchaser and Seller pursuant to the closing statement to be mutually approved in writing by the Seller and Purchaser.  Other revenues for the night of the Closing Date shall belong solely to Purchaser.

(ii)     Purchaser will honor, for its account, the terms and rates of all pre-closing reservations confirmed by Seller for dates after the Closing Date. Purchaser authorizes Seller to continue to accept reservations for periods after the Closing Date in the ordinary course of Seller's business. Purchaser shall receive a credit for all prepaid deposits for Bookings scheduled to occur on or after the Closing Date, except to the extent such deposits are transferred to Purchaser.  Any post-Closing Date deposits received by Seller with respect to confirmed reservations for dates after the Closing Date will be forwarded to Purchaser upon receipt.

Purchaser will honor, for its account, all of Seller's room allocation agreements, events and banquet facility and service agreements which have been granted to groups, persons or other customers for periods after the Closing Date at the rates and terms provided in such agreements.

(iii)     Seller shall receive a credit for all Retail Merchandise and unopened items of F&B (including, without limitation, all F&B in any "mini bars" in the guest rooms) based on the applicable Seller's cost for such items.

(iv)     Seller shall close out the transactions in the restaurants and bars in the Hotel as of the regular closing time for such restaurants and bars as of the day immediately prior to the Closing Date and retain all monies collected as of such closing, and Purchaser shall be entitled to any monies collected from the restaurants and bars thereafter.

(v)     Seller shall remove all monies from all vending machines, laundry machines, pay telephones and other coin operated equipment as of the Cut-Off Time and shall retain all monies collected therefrom as of the Cut-Off Time, and Purchaser shall be entitled to any monies collected therefrom after the Cut-Off Time.

(vi)     Except to the extent an adjustment or proration is made under another subsection of this Section 6.1, (i) Seller shall pay in full prior to the Closing all amounts payable to vendors or other suppliers of goods or services for the Hotel (the "**Trade Payables**") which are due and payable as of the Closing Date for which goods or services have been delivered to the Hotel prior to Closing, and (ii) Purchaser shall receive a credit for the amount of such Trade Payables which have accrued, but are not yet due and payable as of the Closing Date, and Purchaser shall pay all such Trade Payables accrued as of the Closing Date when such Trade Payables become due and payable; provided, however, Seller and Purchaser shall re-prorate the amount of credit for any Trade Payables and pay any deficiency in the original proration to each Party to which such deficiency is owed promptly upon receipt of the actual bill for such goods or services. Seller shall receive a credit for all advance payments or deposits made with respect to FF&E, Supplies, F&B and Retail Merchandise ordered, but not delivered to the Hotel prior to the Closing Date, and Purchaser shall pay the amounts which become due and payable for such FF&E, Supplies, F&B and Retail Merchandise which were ordered prior to Closing but are delivered to the Hotel on or after the Closing Date.  This Section 6(i)(vi) shall survive the Closing.

(vii)     Revenues from conferences, receptions, catering, meetings and other functions occurring in any conference, banquet or meeting rooms in the Hotel, or in any adjacent facilities owned or operated by Seller, including usage charges and related taxes, food and beverage sales, valet parking charges, equipment rentals and telecommunications charges (collectively, "**Function Revenues**"), shall be allocated between Seller and Purchaser, based on when the function therein commenced, with (x) one-day functions commencing prior to the Cut-Off Time being allocable to Seller, (y) one-day functions commencing after the Cut-Off Time being allocable to Purchaser and (z) multi-day functions being allocated between Seller and Purchaser according to the number of days of the function occurring before the Cut-Off Time and the number of days of the function occurring after the Cut-Off Time.

(viii)    Accounts Receivable.

(A)    At Closing, Seller shall receive a credit in an amount equal to: (i) all amounts charged to the Guest Ledger for all room nights up to (but not including) the night during which the Cut-Off Time occurs, and (ii) one half (½) of all amounts charged to the Guest Ledger for the room night which includes the Cut-Off Time (other than any restaurant or bar charges on the Guest Ledger, which shall be prorated in accordance with Section 6(i)(iv), and any Function Revenues, which shall be prorated in accordance with Section 6(i)(vii)), and Purchaser shall be entitled to retain all deposits made and amounts collected with respect to such Guest Ledger.

(B)    At Closing, Seller shall receive a credit for all Accounts Receivable (other than the Guest Ledger which is addressed in the preceding clause (A)), and Purchaser shall be entitled to all amounts collected for such Accounts Receivable.

(k) All prepaid unapplied room rentals, and all deposits for advance reservations, banquets, or future services shall be delivered to the Purchaser. The Purchaser shall then expressly assume liability therefor and, to the extent permitted by law, defend, save harmless and indemnify the Seller and other Seller Indemnified Parties from all claims arising with respect to such prepaid amounts after the Closing. This provision shall survive the Closing.

(l) Utilities; Meter Readings. At closing, the parties shall cause meter readings to be taken for the consumption of electricity, steam, water, gas, and telephone services. Charges for such items prior to Closing shall be paid for by Seller and charges for such items after closing shall be the responsibility of the Purchaser.

During the period after the Due Diligence Period through the Closing Date, the parties and their respective accountants shall cooperate to review all proration made under this Section 6 as more accurate data becomes available, and the Seller and the Purchaser shall prepare a final accounting of proration and adjustments as of the date of the Closing.  Within ten (10) days after the accounting is completed, the Seller or the Purchaser, as the case may be, shall pay to the other the amount as may be required by the final accounting.  The final accounting shall re-calculate and re-apportion any items that (i) were not apportioned on the settlement statement because of the unavailability of information, (ii) which were apportioned on the settlement statement based upon estimated or incomplete information, or (iii) for which errors existed on the settlement statement.  The final accounting shall be final, and there shall be no further adjustment between the Seller and the Purchaser for apportionment items.

9.    Warranties.

9.1     The Seller hereby represents and warrants that the following are true and will be true as of the Closing Date:

(a)     Seller has good and marketable title to the Land and the Hotel, and title to all of the other Property to be purchased, sold and assigned under the terms of this Agreement, and the same are not subject to any liens, charges or encumbrances of any type, except for Permitted Exceptions;

(b)     To the best of Seller's Receivers knowledge there are no outstanding written notices or written orders from any governmental authority with respect to the condition of the Land, buildings and improvements comprised as part of the Property or the repair of the same, or with respect to any claim to violation of laws, ordinances, statutes, building codes, regulations and orders applicable thereto.  Any written notices of violation issued by any governmental authority prior to closing shall not be deemed an objection to title provided, however, that if the cost of correction (in excess of any penalties levied against the Seller) exceeds $10,000.00  and the Seller is unwilling to cure such violation without a corresponding increase in the purchase price, then the Purchaser may elect, as its sole and exclusive remedy, either: (i) to terminate this Agreement whereupon the Deposit held by the Escrow Agent shall be returned to the Purchaser and neither party shall have any further recourse or legal rights against the other, other than those obligations which specifically survive termination of this Agreement, or (ii) close the purchase of the Property subject to the above described violation and reduce the purchase price by the cost of the cure of the violation up to a maximum of $10,000.00  If the cost to cure any violations is less than $10,000.00, the Seller will cure such violation or credit the amount needed to cure such violation to the Purchase Price, at Purchaser's option. Seller has no knowledge of any pending or threatened actions or proceedings regarding condemnation of or encumbrances on the ownership, use or possession of the Property or any part thereof; Seller has received no written notice from any insurance company terminating or threatening to terminate any policy of hazard or public liability insurance, or increasing or threatening to increase the premiums therefor, as a result of defects or inadequacies in the Property;

(c)     To the best of Seller's and Receiver's knowledge, there are certain legal actions, such as liens on the property or other legal or administrative proceedings pending or threatened against the Property or the Seller not covered by insurance, copies of which proceedings will be delivered to Purchaser with the title report.  In the event there is information to Seller's or Receiver's knowledge that may not be within the title report, Receiver shall deliver copies of all relevant documents for such legal or administrative proceedings within five (5) days of receipt of the title report.

(d)     Seller' Receiver has the full power, legal right and authority to enter into, execute, and deliver this Agreement and to consummate the transactions contemplated in this Agreement, and that this Agreement has been duly executed and delivered by Seller's Receiver and is a valid and legally binding obligation of Seller, enforceable in accordance with its terms except as its validity and enforceability may be limited by bankruptcy,

insolvency, or similar laws of general application affecting the enforcement of creditors' rights generally.  For ease of reference, Seller's Receiver shall deliver the relevant documents to Purchaser evidencing their legal right and authority. To the best of Seller's knowledge and except for termination of Seller's existing franchise and any consents or approval with respect to the Leases and Contracts, neither the execution and delivery nor the performance of this Agreement by Seller will violate the terms of any agreements between Seller and third parties, or would with the passage of time or giving of notice constitute a default under any judgment, order, law, regulation or agreement of any nature.

(e)     There are no labor or union contracts or bargaining agreements in effect with respect to the Hotel.   As of Closing, Seller shall terminate (i) except as otherwise approved by Purchaser in writing in Purchaser's sole and absolute discretion, the coverage of all employees (whether Retained Employees, as hereinafter defined, or otherwise) as active participating employees of Seller, in all of Seller's retirement plans, welfare plans, supplemental retirement plans, deferred compensation plans and severance plans, if any, and (ii) all employment contracts between all employees, whether Retained Employees or otherwise.

(f)     Seller's Receiver is a "United States person" (as defined in Section 7701(a)(30)(B) or (C) of the Internal Revenue Code of 1986 (the "**Code**")) for the purposes of the provisions of Section 1445(a) of the Code.

7.2     The Purchaser hereby represents and warrants, which shall be effective as of the Closing Date, that:

(a)  Purchaser has the full power, legal right and authority to enter into, execute, and deliver this Agreement and to consummate the transactions contemplated in this Agreement, and that this Agreement has been duly executed and delivered by Purchaser and is a valid and legally binding obligation of Purchaser, enforceable in accordance with its terms except as its validity and enforceability may be limited by bankruptcy, insolvency, or similar laws of general application affecting the enforcement of creditors' rights generally. To the best of Purchaser's knowledge and except for termination of Seller's existing franchise and any consents or approval with respect to the items referred to on **Exhibit "B"** hereof, neither the execution and delivery nor the performance of this Agreement by Purchaser will violate the terms of any agreements between Purchaser and third parties, or would with the passage of time or giving of notice constitute an default under any judgment, order, law, regulation or agreement of any nature.

(b)     Purchaser will carry out and perform all of its obligations under the Agreement in a prompt and diligent manner, including, but not limited to, payment when due of all costs and expenses of Purchaser under this Agreement.

(c)     Purchaser represents and warrants to the best of its knowledge that Purchaser has the funds necessary to Close the sale pursuant to this Agreement.

(d) Purchaser does intend to obtain a mortgage loan in connection with Closing, however, the obligations of the Purchaser under this Agreement are not in any manner contingent upon the Purchaser's loan arrangements.

(e)  The representations and warranties of Purchaser in this Section 7.2 shall survive the Closing.

10.    DUE DILIGENCE/CONDITION OF PROPERTY:

(a)    Subject to Section 17(b) hereof, at the time of Closing, the Property shall be in the same condition as it is now, reasonable use and wear thereof excepted.  Purchaser acknowledges and agrees that Purchaser shall have full opportunity to investigate each and every aspect of the Condition of the Property during the Due Diligence Period (provided that the Purchaser shall not conduct any soil tests or sampling or any boring, digging, drilling or other physical intrusion of the Property without the express written consent of Seller, which may be withheld in Seller's sole discretion) including:

(i)    All matters relating to title, together with all governmental and other legal requirements such as taxes, assessments, zoning, use permit requirements and building codes.

(ii)    The physical condition of the Real Property and other assets being acquired hereunder, including without limitation, the interior, exterior, the size of any improvements, the paving, the utilities and all other physical and functional aspects of the Real Property. Such examination may include an examination for the presence or absence of Hazardous Materials, as such term is listed or regulated in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended to date and other related federal or state laws, statutes or regulations relating to environmental contamination.

(b)    Except as otherwise specifically set forth in this Agreement, Purchaser acknowledges that Seller has not made and Seller specifically disclaims any warranty, guaranty or representation, oral or written relating to (i) the nature and condition of the Real Property and other assets or (ii) compliance of the Real Property or Improvements with any law, ordinance or other order, rule or regulation of any governmental body.

(c)    Purchaser acknowledges that it is and will rely solely on its own investigation of the Property made before and during the Due Diligence Period and therefore will accept the Property in an "as is, where is and with all faults basis" existing on the Closing Date.

(d)    Purchaser hereby agrees to protect, defend, indemnify and hold harmless Seller, its employees, agents, successors and assigns from and against any and all loss, cost, injury, damage, lien (including, but not limited to, mechanics' liens), suit, action, proceeding, investigation, claim, demand, counterclaim, judgment, liability, fine, penalty, and

expense, including, but not limited to, reasonable attorneys' fees, court costs, costs of investigation, remediation costs and disbursements (collectively, "**Losses**") of any nature whatsoever suffered or incurred by or made against Seller (including without limitation for property damages or bodily and/or personal injuries), its employees, agents, successors or assigns, arising out of or in any way relating to the acts or omissions of Purchaser or its Affiliates, employees, contractors, subcontractors, engineers and agents in conducting the Purchaser's due diligence, the inspection, investigation, testing and/or any other activities by or on behalf of Purchaser its affiliates, employees, contractors, subcontractors, engineers and agents in connection with the Property.  In no event shall Purchaser be liable hereunder for Losses arising from the gross negligence or willful misconduct of Seller or its affiliates, agents, contractors, representatives or employees or for any Losses resulting from the mere discovery of a pre-existing condition.  Any inspection, investigation and/or Testing shall be at Purchaser's sole cost and expense.  Purchaser shall promptly restore at Purchaser's sole cost and expense any physical damage to the Property caused by any such inspection, investigation and/or testing of the Property.   Purchaser shall, upon completion of any inspection, investigation, or testing, restore promptly, at Purchaser's sole cost and expense, the Property to substantially the same condition as existed prior to such inspection, investigation, or testing.

(e)   In conducting any inspections, tests, investigations or studies of the Property, Purchaser and its agents and representatives shall:  (i) not unreasonably disturb the tenants or guests  or interfere with their use of the Property; (ii) not interfere with the operation and maintenance of the Property; (iii) not damage any part of the Property or any personal property owned or held by any tenant or any third party; (iv) not injure or otherwise cause bodily harm to Seller, the tenant under the Lease, or their agents, guests, invitees, contractors and employees or any tenants or their guests or invitees; (v) comply with all applicable laws; (vi) promptly pay when due the costs of all inspections, tests, investigations, and studies done with regard to the Property; (vii) not permit any liens to attach to the Property by reason of the exercise of its rights hereunder; (viii) promptly repair any damage to the Property and restore any areas disturbed resulting directly or indirectly from any such inspections, tests, investigations or studies to their condition prior to the performance of such tests or studies; and (ix) not reveal or disclose any information obtained concerning the Property and the certain items and information pertaining to the Property.

(f)   In the event the Closing does not occur for any reason, Purchaser shall return to Seller all materials, documents, information, or items made available or otherwise disclosed in writing with respect to the Property provided to Purchaser by Seller or Seller's agents or which were prepared for Purchaser by third parties, including any photocopies thereof.  In any event, Purchaser shall, until the Closing, (i) maintain the confidentiality, of (x) all materials delivered by Seller or an affiliate or representative of Seller and (y) the results of Purchaser's due diligence investigation including, but not limited to, all drafts or final engineering and architectural reports, environmental reports and lab analyses, appraisals, construction and renovation estimates, as applicable, commissioned and received from third parties by Purchaser, and (ii) disclose such materials only (A) to its employees, agents, affiliates, prospective investors, partners, prospective lenders, attorneys, consultants and advisors who need to review such materials in connection with the transaction contemplated

hereby, (B) to any governmental authority in connection with any judicial, administrative or other legal proceedings, suits or actions, to the extent Purchaser is advised by counsel that it is required to do so; *provided*, that Purchaser or its counsel shall deliver notice to Seller as to the nature and scope of such disclosure prior to it making such disclosure.

11. <u>Seller's Covenants</u>.  After the date hereof and prior to Closing, Seller covenants (which covenants shall not survive closing except as expressly indicated below) that:

(a)     During the period between the date hereof and the Closing, the Seller shall continue to operate the Property in the same manner as previously operated including maintaining operating inventory levels, advertising programs and maintenance. It is the intention of the parties that the general operation of the Property shall not be changed in any material respect between the date hereof and the Closing Date other than the termination of the Franchise.

(b)     All taxes, with the exception of sales tax obligations to the applicable governmental agencies of the State of Texas for the month of Closing, have been paid.  The Seller shall remain responsible after Closing for the sales taxes due through the date of Closing, but not paid at the time of Closing.

(c)     Seller shall terminate the Franchise any management agreement in effect for the Hotel at or prior to the closing without liability to Purchaser.

(d)     Seller shall not amend or modify any of the Leases and Contracts without the prior written consent of Purchaser, which may be given or withheld in its sole discretion, other than to have Seller (and its principals, if guarantors) released from liability upon Closing.

12. <u>Survival and Limitation</u>.  The representations, warranties and covenants of Seller set forth in or made pursuant to this Agreement shall survive the Closing for a period of three months and shall not be deemed merged into any instrument of conveyance delivered at the Closing; *provided*, that no action or proceeding thereon shall be valid or enforceable, at law or in equity, if not commenced on or before three months after Closing; and *provided*, *further* that (i) Seller shall in no event have any liability for any consequential, indirect, exemplary or punitive damages, (ii) in no event shall the total liability of Seller under this Agreement exceed, in the aggregate,  $50,000.00 (the **"<u>Cap Limitation</u>"**), and (iii) Seller shall have no liability for any claims by Purchaser unless such claims, in the aggregate, are in excess of $50,000.00 and in such case, liability is from first dollar; provided, however, that the Cap Limitation shall not be applicable to any liability that Purchaser may have with respect to Seller's power and authority (or lack thereof) to enter into and perform this Agreement and each other agreement contemplated hereby to which it is a party.   Notwithstanding the foregoing, if, prior to the Closing, Purchaser obtains actual knowledge that any representation and/or warranty of Seller is inaccurate or incorrect or breach of any covenant and Purchaser nonetheless proceeds with the Closing, then Seller shall have no liability for any such inaccurate or incorrect representation or warranty or such breached covenant.

13.     Employees.     Seller or its affiliate will terminate the employment of all employees at the Hotel as of the Closing. If this Agreement has not been terminated prior to the expiration of the Due Diligence Period, the Seller shall provide to Purchaser within five (5) business days after the expiration of the Due Diligence Period, a list of all persons employed by the Seller or its affiliate in connection with the Hotel which sets forth their name, position, salary/wages, employment date, average hours of scheduled work per week, none of which is pursuant to an employment contract or other agreement for ongoing employment obligations.

The Seller also hereby agrees to indemnify and hold the Purchaser harmless from any and all claims arising out of employment contracts in effect prior to the Closing, except for claims arising out of any such contracts which have been assumed by Purchaser and which claims first arise after the date any such contracts are so assumed, including reasonable attorneys' fees incurred in connection therewith.

Purchaser hereby covenants and agrees to make offers to a sufficient number of employees at the Hotel to avoid applicability of the Worker Adjustment Retraining and Notification Act and any so-called state mini-WARN Acts (collectively, the "**WARN Act**"). Purchaser agrees to indemnify, defend and hold harmless Seller and its affiliates from and against any loss, damage, liability, claim, cost or expense (including reasonable attorneys' fees, and also including any amounts payable by Seller or its affiliates, whether by contractual indemnity or otherwise) that may be incurred by, or asserted against, Seller or its affiliates arising out of or relating to Purchaser's failure, if any, to comply with the WARN Act with respect to the employees working at or for the Hotel.

14.     Safe Deposit Boxes.  The Seller shall send written notice to guests who have safe deposit boxes advising of the sale of the Property to the Purchaser and requesting the removal and verification of the contents not later than five (5) days prior to Closing.  All boxes shall be opened on the Closing Date in the presence of representatives of Seller and Purchaser and the contents thereof shall be recorded.   On the Closing Date, Seller shall deliver to Purchaser all keys for such safe deposit boxes.  Any property contained in the safe deposit boxes and so recorded and thereafter remaining in such safe deposit box shall be the responsibility of Purchaser, and Purchaser hereby agrees to indemnify and save and hold Seller and the manager of the Hotel harmless from and against any claim or obligation with respect to such property.  Any claim with respect to property that is not recorded and that was allegedly in the safe deposit boxes prior to the recording of the inventory shall be the sole responsibility of Seller, and Seller hereby agrees to indemnify and save and hold Purchaser harmless from and against any such claim.

15.     Baggage Inventory.  On the Closing Date, employees, agents or representatives of Seller and Purchaser jointly shall make a written inventory of all baggage, boxes and similar items checked in or left in the care of Seller at the Hotel, and Seller shall deliver to Purchaser the keys to any secured area which such baggage and other items are stored (and thereafter such baggage, boxes and other items inventoried shall be deemed the "**Inventoried**

**Baggage**"). Purchaser shall be responsible for, and shall indemnify and hold harmless the Seller Indemnified Parties in accordance with Section 39 from and against any loss incurred by the Seller Indemnified Parties with respect to any theft, loss or damage to any Inventoried Baggage from and after the time of such inventory, and any other baggage, boxes or similar items left in the care of Purchaser which was not inventoried by Seller and Purchaser. Seller shall be responsible for, and shall indemnify and hold harmless the Purchaser Indemnified Parties in accordance with Section 39 from and against, any loss incurred by any Purchaser Indemnified Party with respect to any theft, loss or damage to any Inventoried Baggage left in the care of Seller prior to the time of such inventory and any other baggage, boxes or similar items left in the care of Seller which was not inventoried by the Seller and Purchaser..

16.    Security Deposits.  At the Closing, the Seller shall turn over to the Purchaser any security deposits, if any, (where not prohibited by the terms of the lease) and in connection with the receipt thereof, the Purchaser agrees that after the receipt thereof it will hold and apply the security for the purposes set out in the lease and indemnify the Seller against any liability in connection therewith.

17.    Special Assessments.  If, at the time of the Closing, the Property, or any part thereof, shall be or shall have been affected by a special real estate tax or assessment or assessments, any installments that may be due prior to closing shall be paid for by Seller and any installments that may be due after closing shall be paid for by Purchaser.  If at the time of closing there are any past due assessment that relate to the period prior to Closing, those past due assessments shall be paid by Seller, at its cost and expense.

18.    Conveyance.  Seller shall convey insurable title to the Land and the Hotel pursuant to the  Deed (as defined below) and the other Property pursuant to the Bill of Sale and Assignment (as such terms are defined below) so as to vest Seller's title to the Property in the Purchaser or Purchaser's nominee. Seller and Purchaser shall each pay one-half of:  (a) any transfer tax, documentary stamp tax, conveyance tax, sales tax or any other similar taxes relating to the conveyance of the Property to Purchaser; and (b)  any escrow fees charged by Escrow Agent in connection with the consummation of the transaction contemplated by this Agreement.  Purchaser shall pay expenses, fees, recording, survey and other costs due from and after the Closing related to the transfer and assumption of the Leases and Contracts (including closing costs and lease transfer costs incident to the transfer of any title to any motor vehicle) and for recording of the Deed, any title and survey charges.  Seller shall pay any transfer or assignment fees assessed by the third parties with respect to the Leases and Contracts, and the costs of recording of any documents required to convey title to the Property as required hereunder. The parties agree to reasonably cooperate with each other to bring about the transfer and shall execute any vendor forms, provided they do not change the intent of the parties for the transaction which is the subject to this Agreement.

19    Reserved. [2]

---

[2] NTD:  Now covered in definition of "Property" and covered by Section 15 above.

20.     Risk of Loss; Destruction or Taking of Property by Casualty and/or Eminent Domain.

(a)     Notice to Purchaser.  The Seller agrees to give the Purchaser prompt notice of any fire or other casualty costing more than $50,000.00  to repair and occurring at the Property between the Effective Date of this Agreement and the Closing Date, and of any written notice received by Seller's officers or directors of any actual or threatened condemnation of all or any part of the Property.

(b)     Casualty or Taking.  If, prior to the Closing, there shall occur: (i) damage to or destruction of the Property caused by fire or other casualty which would cost $1,000,000.00 or more to repair, or (ii) a taking by condemnation or eminent domain proceedings of a material part of the land and/or improvements, then, and in either such event, the Purchaser may terminate its obligations under this Agreement (other than those obligations which survive any termination of this Agreement) by written notice given to the Seller within five (5) days after the Seller has given the Purchaser the notice referred to in Section 17(a) hereof or at the Closing, whichever is earlier and receive a full refund of the  Deposit held by Escrow Agent.  If the Purchaser does not so elect to terminate its obligations under this Agreement, then the Closing shall take place as herein provided without abatement of the purchase price, and the   Seller shall assign to the Purchaser at the Closing, by written instrument, all of Seller's interest in any insurance proceeds (except use and occupancy insurance and business interruption insurance for the period ending with the Closing Date) and any deductible for the loss or condemnation awards which may be payable to the Seller on account of any such fire, casualty or condemnation, or the amount thereof not expended for or required to reimburse the Seller for reasonable expenditures made by the Seller on account of obtaining such proceeds or awards or on account of paying for such restoration shall be credited against the Purchase Price.  If, prior to Closing, there shall occur: (i) damage to or destruction of the Property caused by fire or other casualty which would cost less than Six Million and 00/100 Dollars ($6,000,000.00) to repair, or (ii) a taking pending or threatened by condemnation or eminent domain proceeding of any part of the Property which does not include a material part of the land and/or improvements, then, and in any such event, neither party shall have the right to terminate its obligations under this Agreement by reason thereof and the Closing shall take place without abatement of the Purchase Price, but the Seller shall assign to Purchaser at the Closing, by written instrument all of Seller's interest in any insurance proceeds (except use and occupancy insurance and business interruption insurance for the period ending with the Closing Date) and any deductible for the loss or condemnation awards which may be payable to Purchaser by Seller on account of any such fire, casualty or condemnation, or the amount thereof not previously expended for or required to reimburse Seller for reasonable expenditures made by Seller on account of obtaining such proceeds or awards or on account of paying for such restoration shall be credited against the Purchase Price.

      (c)     Definition of Material Taking.  For purposes of this <u>Section 17</u>, a taking by condemnation or eminent domain proceedings of a material part of the land and/or improvements shall mean any taking by condemnation which is more than $6,000,000.00.

     22.     OTHER BROKERS: Purchaser and Seller agree that, in the event any broker other than Agent or a broker affiliated with Agent is involved in the disposition of the Property, Agent shall have no liability to Purchaser or Seller for the acts or omissions of such other broker, who shall not be deemed to be a subagent of Agent.

     23.     LIMITATION OF LIABILITY:  Except for Agent's gross negligence or willful misconduct, Agent's liability for any breach or negligence in its performance of this Agreement shall be limited to the greater of $25,000 or the amount of compensation actually received by Agent in any transaction hereunder.

     24.     SCOPE OF AGENT'S AUTHORITY AND RESPONSIBILITY:  Agent shall have no authority to bind either Purchaser or Seller to any modification or amendment of this Agreement.   Agent shall not be responsible for performing any due diligence or other investigation of the Property on behalf of either Purchaser or Seller, or for providing either party with professional advice with respect to any legal, tax, engineering, construction or hazardous materials issues.  Except for maintaining the confidentiality of any information regarding Purchaser or Seller's financial condition and any future negotiations regarding the terms of this Purchase Agreement, Purchaser and Seller agree that their relationship with Agent is at arm's length and is neither confidential nor fiduciary in nature.

     25.     BROKER DISCLAIMER:  Purchaser and Seller acknowledge that, except as otherwise expressly stated herein, Agent has not made any investigation, determination, warranty or representation with respect to any of the following:  (a) the financial condition or business prospects of any tenant, or such tenant's intent to continue or renew its tenancy in the Property;  (b) the legality of the present or any possible future use of the Property under any federal, state or local law; (c) pending or possible future action by any governmental entity or agency which may affect the Property; (d) the physical condition of the Property, including but not limited to, soil conditions, the structural integrity of the improvements, and the presence or absence of fungi or wood-destroying organisms; (e) the accuracy or completeness of income and expense information and projections, of square footage figures, and of the texts of leases, options, and other agreements affecting the Property; (f) the possibility that lease, options or other documents exist which affect or encumber the Property and which have not been provided or disclosed by Seller; or (g) the presence or location of any hazardous materials on or about the Property, including, but not limited to, asbestos, PCB's, or toxic, hazardous or contaminated substances, and underground storage tanks.  Agent has no expertise with respect to hazardous or contaminated substances.  Purchaser is strongly advised by Agent to seek advice and inspections from competent hazardous materials experts.

     Purchaser agrees that investigation and analysis of the foregoing matters is Purchaser's sole responsibility, and that Purchaser shall not hold Agent responsible therefor.  Purchaser

Further agrees to reaffirm its acknowledgment of this disclaimer at close of escrow and to confirm that it has relied upon no representations of Agent in connection with its acquisition of the Property.

26.     ARBITRATION OF DISPUTES AND WAIVER OF JURY TRIAL:   All disputes arising between the Parties with respect to the subject matter of this Purchase Agreement or the transaction contemplated herein (including but not limited to the parties' rights to the Deposit or the payment of commissions as provided herein) shall be settled exclusively by final, binding arbitration.   The judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction.

The arbitration will proceed in the county where Agent's office is located and be conducted by the American Arbitration Association ("AAA"), or such other administrator as the parties shall mutually agree upon, in accordance with the AAA's then-applicable Commercial Arbitration Rules (the "Rules"). Any party who fails or refuses to submit to arbitration following a demand by the other party shall bear all costs and expenses, including attorneys' fees, incurred by such other party in compelling arbitration.

Any arbitration will be decided by a single arbitrator selected according to the Rules. The arbitrator will decide any pre-hearing motions which are similar to motions to dismiss for failure to state a claim or motions for summary adjudication and may grant any remedy or relief that a court could order or grant on similar motions.  The arbitrator shall apply the provisions of this Purchase Agreement without varying therefrom, and shall not have the power to add to, modify, or change any of the provisions hereof.

In any arbitration proceeding discovery will be permitted only in accordance with the terms of this paragraph.  Discovery by each party shall be limited to:  (i) a maximum number of five (5) depositions limited to four hours each; (ii) requests for production of documents; (iii) two interrogatories:  one inquiring into the amount of damages sought by the other party and another into the calculation of those damages; and (iv) subpoenas upon third parties for production of documents, depositions, and to appear at a hearing.  The scope of discovery may be expanded only upon the mutual consent of the parties. Discovery not set forth in this paragraph shall not be permitted.

The Parties understand and agree that they are entering into this arbitration agreement voluntarily, and that by doing so they are waiving their rights to a jury trial or to have their claims otherwise litigated in court.

27.     SUCCESSORS & ASSIGNS:  This Agreement and any addenda hereto shall be binding upon and inure to the benefit of the heirs, successors, agents, representatives and assigns of the parties hereto

28.     Intentionally Deleted.

29.     NOTICES:  All notices required or permitted hereunder shall be given to the parties in writing (with a copy to Agent) at their respective addresses as set forth below. Should the date upon which any act required to be performed by this Agreement fall on a Saturday, Sunday or holiday, the time for performance shall be extended to the next business day.

30.     FOREIGN INVESTOR DISCLOSURE:  Seller's Receiver and Purchaser agree to execute and deliver any instrument, affidavit or statement, and to perform any act reasonably necessary to carry out the provisions of this Foreign Investment in Real Property Tax Act and regulations promulgated thereunder.  Seller's Receiver hereby declares that he is not a foreign person as that term is defined by the United States Internal Revenue Code.

31.     ADDENDA:  Any addendum attached hereto and either signed or initialed by the parties shall be deemed a part hereof.   This Agreement, including addenda, if any, expresses the entire agreement of the parties and supersedes any and all previous agreements between the parties with regard to the Property.  There are no other understandings, oral or written, which in any way alter or enlarge its terms, and there are no warranties or representations of any nature whatsoever either express or implied, except as set forth herein. Any future modification of this Agreement will be effective only if it is in writing and signed by the party to be charged.

32.     ACCEPTANCE AND EFFECTIVE DATE:  Purchaser's signature hereon constitutes an offer to Seller to purchase the Property on the terms and conditions set forth herein.   Delivery shall be effective upon personal delivery to Purchaser or Purchaser's agent or, if by mail, on the next business day following the date of postmark.  The "Effective Date" of this Agreement shall be the later of (a) the date on which Seller executes this Agreement, or (b) the date of or written acceptance (by either Purchaser or Seller) of the final counter-offer submitted by the other party.

33.     GOVERNING LAW:  This Agreement shall be governed by and construed in accordance with the laws of the State of Texas.

34.     Responsible Broker:  Responsible broker in this transaction shall be Marcus & Millichap Real Estate Investment Services of Texas and Viral Amin of Amin Realty.

35.     Waiver, Change, or Modification.  This Agreement may not be changed orally, but only by an agreement in writing signed by both parties.

36.     Entire Agreement.  This Agreement and Exhibits attached hereto constitutes the entire agreement between the parties hereto and shall survive closing except as expressly provided herein to the contrary.  At Closing the Property shall be conveyed "as is" and the Seller is not liable or bound in any manner by expressed or implied warranties, guaranties, promises, statements, or representations pertaining to the Property or to the personal property,

the condition thereof, the rentals, or any other matter whatsoever, made or furnished by any real estate broker, agent, employee, servant, or other person representing or purporting to represent the Seller, unless such warranties, guaranties, promises, statements, or representations are expressly and specifically set forth herein.

37.    Closing.  The closing ("**Closing**") of the transaction which is the subject of this Agreement shall take place by mail or at the office of the Escrow Agent set forth in Section 5(a) above at 11:00 am local time in Houston, Texas, or such other place as the parties may mutually agree, or via mail with an escrow letter of instructions mutually acceptable in writing by both parties, on the date that set forth within this Agreement, which is One Hundred Twenty (120) days after the expiration of the Due Diligence Period, subject to the extensions to be delivered, if necessary, as provided for in the paragraph below (the "**Closing Date**").

Seller and Seller's Court Appointed Receiver agree to give Purchaser Two (2), Thirty (30) Day extensions to close, only if Purchaser experiences delays in acquiring approvals from the local municipality.   Purchaser shall deliver to Seller an additional non-refundable deposit in the amount of Ten Thousand ($10,000.00) for each such 30-day extension period, which  additional deposit will then be applied to the Purchase Price as a credit to Purchaser at Closing.

38.    Seller's Documents at Closing.  At the Closing the Seller shall deliver to the Purchaser, the following:

(a)    Special Warranty Deed to Property in the form attached hereto as **Exhibit "I"** (the "**Deed**")

(b)    Bill of Sale for the FF&E and any other articles of personal property to be conveyed in the form attached hereto as **Exhibit "J"** (the "**Bill of Sale**")

(c)    Assignment of Leases, Contracts, Permits and Licenses and Warranties in the form attached hereto as **Exhibit "K"** (the "**Assignment**").

(d)    Owners' Affidavit in the form attached hereto as **Exhibit "L"**.

(e)    Any transfer tax affidavits and/or forms required in connection with the Deed;


Intentionally Omitted.

(f)    Seller's entity resolution authorizing the sale of the Hotel to Purchaser.

(g)    Certificates of Good Standing for Seller and Lender

(h)    Affidavit required by the Foreign Investment in Real Property Tax Act in the form attached hereto as **Exhibit "M"**.
.

(i)      Such other documents as Purchaser or Escrow Agent may reasonably request in order to carry out the terms hereof.

39.    <u>Purchaser Documents at Closing</u>.   At the closing, the following shall be delivered and paid by the Purchaser:

(a)     The consideration set forth in <u>Section 5</u> hereof, including the balance of the Purchase Price.

(b)     The Assignment.

(c)      Intentionally Omitted..

(d)     Intentionally Omitted.

(e)     Purchaser's entity resolution authorizing the purchase of the Hotel from Seller.

(e)     Certificates of Good Standing for Purchaser.

(f)     Such other documents as Escrow Agent may reasonably request in order to carry out the terms hereof.

39.    <u>Expenses</u>.

(a) The following expenses are to be paid by Seller:

(i)      One-half of any escrow fees charged by Escrow Agent in connection with the consummation of the transaction contemplated by this Agreement; and

(ii)     Preparation of the Special Warranty Deed and Seller transfer documents

(iii)    Any transfer tax, documentary stamp tax, conveyance tax, sales tax or any other similar taxes relating to the conveyance of the Property to Purchaser.

(b) The following expenses are to be paid by Purchaser:

(i)      One-half of any escrow fees charged by Escrow Agent in connection with the consummation of the transaction contemplated by this Agreement;

(ii)     Deed recording;

      (iii)        The costs of and related to an owner's and lender's title insurance commitment, policy (and endorsements, if any required by Purchaser) and the costs related to title searches, abstracts, and continuations;

      (iv)       Purchaser shall have bonds or security deposits in an adequate amount to transfer all utilities as of the date of Closing; and

The agreements set forth in this <u>Section 35</u> shall survive Closing or any termination of this Agreement.

40.    <u>Titles</u>.  The titles of the sections in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, or describe the scope of this Agreement or the intent of any provision hereof.

41.    <u>Default</u>.  If Purchaser fails to close within the time specified and defaults, the Deposit shall be retained by or for the account of the Seller as agreed to liquidated damages and not as a penalty and this shall be the Seller's sole remedy at law or in equity. The parties agree that actual damages for such breach would be difficult to ascertain and hereby agree that the mutually agreed to liquidated damages provisions of this Agreement are fair and reasonable and should apply.

If the Seller refuses to perform this Agreement (provided Purchaser is not in default and is ready, willing and able to close this transaction) the Purchaser may have any one of the following remedies: (i) seek specific performance or (ii) elect to terminate this Agreement and receive the return of its Deposit held by Escrow Agent.  Notwithstanding the foregoing, if Seller is not able to obtain specific performance due to an act or omission of Seller, then Purchaser shall have all of its rights and remedies at law or in equity.[3]

42.    <u>Escrow</u>.      The Escrow Agent receiving funds is authorized and agrees by acceptance thereof to promptly deposit and to hold same in escrow and to disburse same subject to clearance thereof in accordance with terms and conditions of this Agreement.  In the event of doubt as to its duties or liabilities under the provisions of this Agreement, the Escrow Agent may, in its sole discretion, continue to hold the monies which are the subject of this escrow until the parties mutually agree to the disbursement thereof, or until a judgment of a court of competent jurisdiction shall determine the rights of the parties thereto, or it may deposit all the monies then held pursuant to this Agreement with the Clerk of the Superior Court of the geographic area having jurisdiction of the dispute, and upon notifying all parties concerned of such action, all liability on the part of the Escrow Agent shall fully terminate,

---

[3] NTD:  Consider whether to include provision providing that Purchaser can recover deal costs as damages.

except to the extent of accounting for any monies theretofore delivered out of escrow.  In the event of any suit between the Purchaser and the Seller wherein the Escrow Agent is made a party by virtue of acting as such Escrow Agent, interpleads the subject matter of this escrow, the Escrow Agent shall be entitled to recover a reasonable attorney's fee and costs incurred, said fee and costs to be charged and assessed as court costs to be paid by the non-prevailing party.  All parties agree that the Escrow Agent shall not be liable to any party or person whomsoever for mis-delivery to the Purchaser or the Seller of monies subject to this escrow, unless such mis-delivery shall be due to willful breach of this Agreement or gross negligence on the part of the Escrow Agent.

43.   Notices.

(a)   Any notice or consent required to be given pursuant to this Agreement or otherwise desired to be delivered by one party to the other, shall be effective only if in a writing which is either: (i) personally delivered to such party at its address set forth in the introductory paragraph of this Agreement (or to such other place as the party to receive such notice shall have specified by notice in advance thereof) or (ii) via UPS Overnight or other commercial message service, fees and costs prepaid of such service, and all notices shall be deemed to be received upon the date of signing of the receipt for delivery by said service (or refusal of such delivery).  Notwithstanding the foregoing, if a party gives notice to the other party by fax or by email, and the other party acknowledges in writing receipt of that notice, such notice by fax or email shall be deemed effective notice.

(b)   A copy of every notice shall be given to the Escrow Agent at its address set forth in Section 5(a) above in the same manner as above provided for Seller and Purchaser.

44.   Assignment.  Provided Purchaser is not in breach or default hereunder, not less than three (3) business days prior to Closing, with written notice from Purchaser to Seller, Purchaser shall have the right to assign its interest in this Agreement among its affiliates, who will assume in writing all duties, obligations, covenants and conditions of Purchaser. In the event that an assignment of this Agreement may be subject to the imposition of realty transfer tax or other applicable taxes, then the party so assigning the Agreement shall be liable for the payment of the same.  In furtherance of the foregoing, Seller agrees to execute and deliver to Purchaser a novation agreement, in form and content satisfactory to Purchaser and Seller, in order to novate this Agreement to Purchaser's designees, so long as (a) Seller's rights and obligations hereunder shall not be affected, and (b) the same shall be at the cost and expense of Purchaser.[4]

45.   Interpretation.   For all purposes of this Agreement except as otherwise expressly provided or unless the context otherwise requires, this Agreement and all questions of interpretation, construction and enforcement hereof, and all controversies arising hereunder, shall be governed by and adjudicated in accordance with the internal laws of the State of Texas.

46.      (a) <u>Post Closing Liabilities</u>. Purchaser hereby agrees that it alone shall be liable for the payment of all costs and expenses, liabilities, obligations and claims arising out of its ownership of the Property and in connection with the Leases and Contracts on **Exhibit "B"** which arise and are payable subsequent to the Closing Date (collectively the "**Post-Closing Liabilities**").  Purchaser shall not have any liability for any payments related to the Leases and Contracts, installment payments, utilities and the like which arise prior to Closing, even if billed subsequent to Closing.  Purchaser agrees to defend, indemnify and hold Seller and the other Seller Indemnified Parties harmless from any and all loss, cost or damage, including reasonable attorney's fees, arising from any of the Post-Closing Liabilities.  The provisions of this <u>Section 31(a)</u> shall survive Closing.

(b) <u>Pre-Closing Liabilities</u>. Seller shall make payment of all costs and expenses, liabilities, obligations and claims arising out of its ownership of the Property which fall due prior to the Closing Date (collectively the "**Pre-Closing Liabilities**"), however, Seller shall not have any liability for payments or obligation under any contracts, leases, installment payments, utilities and the like which continue from and after Closing for any portion accruing after the Closing.  Seller agrees, to the extent permitted by law, to defend, indemnify and hold Purchaser harmless from any and all loss, cost or damage, including reasonable attorney's fees, arising from any of the Pre-Closing Liabilities.  The provision of this <u>Section 31(b)</u> shall survive Closing.

47.   <u>Counterparts; Facsimiles.</u>   This Agreement may be executed in one or more counterparts, each of which when taken together shall constitute one and the same instrument. Facsimiles and other electronic copies of this Agreement shall serve as originals for all purposes to the extent permitted by law.

48.   <u>Enforcement Costs</u>. If any legal action or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees, court costs (including, without limitation, all such fees, costs and expenses incident to any appeals), incurred in that action or proceeding, in addition to any other relief to which such party may be entitled.

49.   <u>Time; Dates</u>.  Time is important to the parties hereto and shall be of the essence in the performance of this Agreement, and they have agreed that strict compliance is required as to any date or time periods set forth or described herein. All references to days herein (unless otherwise specified) shall include Saturdays, Sundays and legal Holidays. If the final date of any period which is set forth or described in this Agreement falls upon a Saturday, Sunday or legal Holiday under the laws of the United States or the State of Texas, then, in such event, the time of such period shall be extended to the next day which is not a Saturday, Sunday or legal Holiday.

50.   <u>Number and Gender</u>   Whenever the context so requires, words of one gender

shall include other genders and the singular shall include plural.

51.   SCOPE OF LIABILITIES     Except as otherwise provided in this Agreement, all obligations of the Seller with regard to this Agreement and the transactions contemplated by this Agreement shall be deemed to be fully discharged and satisfied upon the consummation of the Closing, except for those provisions which specifically provide that they survive the Closing.

Except as otherwise provided in this Agreement, all obligations of the Purchaser with regard to this Agreement and the transactions contemplated by this Agreement shall be deemed to be fully discharged and satisfied upon the consummation of the Closing, except for those provisions which specifically provide that they survive the Closing or which by the terms of this Agreement are intended to be applicable after the Closing, including, but not limited to, those referred to in Section 31 above.

52.   NO RECORDATION          The Purchaser agrees that it shall not record this Agreement or any memorandum thereof, and that any attempt on the part of the Purchaser or its agents to record this Agreement or any memorandum thereof shall constitute a breach of this Agreement by Purchaser.  In the event of such breach, the Seller shall be entitled to declare this Agreement to be in default, to terminate this Agreement, to cause the Deposit to be disbursed to the Seller as agreed to liquidated damages and not as a penalty, it being agreed by the parties that actual damages would be difficult to ascertain, and any other remedy available at law or at equity.

53.  INDEMNITY
(a)     Purchaser agrees, to the extent permitted by law, that it shall hold harmless, defend and indemnify Seller and the other Seller Indemnified Parties from and against any and all suits, claims, judgments, lawsuits, losses, damages, costs and expenses Seller or the Seller other Indemnified Parties may sustain or have asserted against them as a result of (i) operation of the Hotel by Purchaser and accruing or occurring from and after the Closing Date and (ii) any breaches of the representations and warranties of Purchaser set forth in Section 7.2.   This provision shall survive the Closing and termination of this Agreement.

(b)     Seller agrees that it shall hold harmless and indemnify Purchaser from any and all suits, claims, judgments, lawsuits, losses, damages, costs and expenses Purchaser may sustain as a result of (i) operation of the Hotel by Seller and accruing or occurring before the Closing Date.  This provision shall survive the Closing and termination of this Agreement and (ii) subject to the limitations set forth herein, including without limitation those set forth in Section 9 above, any breaches of the representations and warranties of Seller set forth in Section 7.1.

54.     1031 EXCHANGE.  If either party intends to effectuate the sale of the Property pursuant to a "like-kind" exchange in accordance with Section 1031, or such other pertinent provisions, of the Internal Revenue Code of 1986, as amended, each party agrees to cooperate with the other party and execute such documentation as may be reasonably necessary for such party to effectuate such exchange.  In no event shall either party be obligated to incur any cost

in connection with the other party's exchange nor shall the Closing Date be extended in connection with same.

### 55. SELLER'S ACCEPTANCE AND AGREEMENT TO PAY COMMISSION

The undersigned Seller and Lender accepts the foregoing offer and agrees to sell the Property to Purchaser for the price and on the terms and conditions stated herein.  Seller acknowledges receipt of an executed copy of this Agreement and authorizes Agent to deliver an executed copy to Purchaser.

Seller reaffirms its agreement to pay Marcus & Millichap, Three point seven five Percent (3.50%)  real estate brokerage commission of the purchase and sales price and one point five Percent (1.50%) to Viral Amin of Amin Realty calculated on a full purchase price of $11.8 Million.  Said commission is payable in full on the Closing Date and shall be paid in cash through escrow.  Escrow Holder is directed to make such payment to Agent from Seller's proceeds of sale.  The provisions of this paragraph may not be amended or modified without the written consent of Agent.

56. The parties shall negotiate and agree on the form of and attach all exhibits to this Agreement during the first 30 days of the Due Diligence period. Seller shall cause the Escrow Agent to prepare all exhibits that are documents intended to be executed at Closing. The New Closing Date Has been established to MAY11,2021

**[Remainder of Page Left Intentionally Blank]**

    **IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be signed the day and year first above written. **DATED May 3, 2021**

**Purchaser:**

**Crowne Plaza Suites Houston, LLC**
**a Delaware limited liability company**

By:_____
      **Name: Alberto Benamu**
      **Title:   Managing Member**

**Seller**

a  limited liability company **Dated May3, 2021**

Name:  **Michael S Udayan**
Title:   **Court appointed Receiver**
**Dongtan Investment GroupLLC**

## **Joinder by Escrow Agent**

**The undersigned, having been named as Escrow Agent by the parties to the foregoing agreement hereby joins in the execution of the agreement for the purpose of confirming its agreement to act as Escrow Agent hereunder and to abide by all terms and conditions applicable to the duties and obligations of the Escrow Agent.**

_____

_____

_____

**By:** _____ **Name:**
**Title:** _____ **Phone:**

**Date:** _____

Exhibit "A"