EXHIBIT
4

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| **XIONGEN JIAO, an individual, QIANJU JIAO, an individual, ZHONGHUA YU, an individual, JIATONG YU, an individual, PENGFEI ZHOU, an individual, XUANMEI ZHOU, an individual,**<br><br>    **Plaintiffs,**<br><br>**vs.**<br><br>**NINGBO XU, an individual, and LCL COMPANY LLC, a Texas Limited Liability Company,**<br><br>    **Defendants,**<br><br>**And**<br><br>**DONGTAI INVESTMENT GROUP, LLC, a Texas Limited Liability Company.**<br><br>    **Nominal Defendant.** | **THE RECIEVER AND PLAINTIFFS' EXPEDIATED JOINT APPLICATION FOR APPROVAL OF DONGTAI'S ALLOCATION OF INSURANCE PROCEEDS AGREEMENT**<br><br><br>**Case No.: 4:19-CV-01848**<br><br>**Judge: Hon. Keith P. Ellison** |

Dongtai's Court-Appointed Receiver, MICHAEL UDAYAN and Plaintiffs, QIANJU JIAO ("Jiao"), JIATONG YU ("Yu"), XUANMEI ZHOU ("XZ"), all of whom collectively own 100% interest in Dongtai ("Members"), file the instant expedited joint application requesting the Court to approve Dongtai's allocation of any and all insurance proceeds it may receive from its Hurricane Harvey insurance claim as set forth in the Allocation of Insurance Proceeds Agreement (attached hereto as Ex. A), and would respectfully show the Court as follows:

1.      Dongtai is a limited liability corporation formed under the laws of the State of Texas. Dongtai's rightful members QJ, JY, and XZ own 100% interest in Dongtai. [*See* Doc. #s

21, 55, 56, 99, 100, 136].

2.      In December 2018, and again in June 2019, this Court appointed Michael Udayan as Dongtai's Receiver [Doc. #s 19 and 25].

3.      On or around August 26, 2017, the Crowne Plaza Hotel ("the Hotel"), owned and operated by Dongtai, sustained substantial storm-related damage and loss as a result of Hurricane Harvey.  The loss was covered under Dongtai's insurance policy ("Policy") which was in effect from May 30, 2017 to May 30, 2018.  On September 18, 2017, Dongtai filed an insurance claim with insurance company ("Insurers") as a result of the covered losses under the Policy.

4.      On January 10, 2018, the Insurers sent correspondence to Dongtai wrongfully denying Dongtai's insurance claim in its entirety.  As a result of the Insurers' conduct and refusal to issue full and fair payment for the covered loss as rightly owed under the Policy, Dongtai has and continues to sustain damages and injury.

5.      In the Spring of 2018, Dongtai commenced an arbitration action against the Insurers under the Policy's arbitration clause ("Claim"). [*See* CLAIMANT'S FIRST AMENDED STATEMENT OF CLAIM, attached hereto as Ex. B].   While the arbitration hearing was scheduled for February 2019, former counsel for the Insurers obtained an unwarranted TRO delaying the hearing based on an untruthful affidavit from Defendant Xu. [*See* NY STATE COURT ORDER DISSOLVING THE TRO, attached hereto as Ex. C].

6.       As a result of this unscrupulous delay tactic, and due to the COVID-19 pandemic, the Tribunal was not able to reschedule the hearing date until March 19, 2021, at which time the Tribunal set September 27, 2021 as the date the hearing would commence in New York City [*See* THE TRIBUNAL'S SCHEDULING ORDER NO. 2, attached hereto as Ex. D].

7.      Indeed, justice for Dongtai has been delayed for almost three years as a result of the Insurers' delay tactic.

8.      As a result of Defendants Xu and LCL's wrongful conduct as set forth in the pleadings, Plaintiff's Emergency Application for Injunctive and Declaratory Relief, Plaintiff's Order to Show Cause for Contempt, the Court's findings and relevant Orders [*see* Doc. #s 21, 30, 33, 56, 62, 99, 100, 125, 136]; and the Insurers' wrongful conduct and refusal to issue full and fair payment for the covered loss as rightly owed under the Policy as alleged in the Amended Statement of Claim [*see* Ex. B] (both collectively referred to as "wrongful conduct"), Dongtai and its rightful members have and continue to sustain substantial injury despite the Court's best efforts, which the Receiver and Plaintiffs greatly appreciate and are thankful for.

9.      As a result of the aforementioned wrongful conduct, Dongtai, despite all efforts, was forced to sell its most valuable asset, the Hotel for a loss in order to prevent foreclosure of the property by the Lender.  More specifically, on January 11, 2021, Dongtai via the Receiver, entered into a Purchase Sale Agreement ("PSA") with Crown Plaza Suites Houston, LLC ("Buyer") in which Dongtai would sell the Hotel at a sizeable loss at the price of $11.8 million dollars. [*See* PSA, attached hereto as Ex. E].   The second highest offer for the Hotel was around $9.9 million.

10.     On March 8, 2021, upon the Receiver's application, the Court authorized the sale of the Hotel in order to avoid foreclosure. [*See* Doc. #155].

11.     Despite numerous obstacles, the Receiver was able to accomplish the completion of the sale as the deal closed on or about May 27, 2021. [*See* CLOSING DOCUMENTS, attached hereto as Ex. F].

12.     Unfortunately, the sale proceeds were only enough to pay off the secured

creditors, namely the Lender which on May 28, 2021 issued a Release of Liens Letter to Dongtai. [*see* RELEASE OF LIENS LETTER, attached hereto as Ex. G; RECEIVER'S ACCOUNTING SPREADSHEET attached to Ex. A]. Following the Receiver's exhaustion of and distribution of the sale proceeds to creditors, Dongtai still owes a little under $1 million to its remaining creditors (all of which are unsecured), and adding insult to injury is the fact that Plaintiffs still have yet to receive a penny to compensate them for their millions of dollars in loss as a result of the aforementioned wrongful conduct. [*See* Ex. A and Ex. F].

13.     Following the sale of the Hotel, Dongtai's only remaining asset is its Hurricane Harvey insurance claim currently pending in arbitration, in which Dongtai has claimed over $10 million in damages.

14.     As this is the only possible means from which Dongtai will be able to pay all of its outstanding creditors and attempt to compensate Plaintiffs for their millions of dollars in loss it is imperative that Dongtai is successful in either settling or prosecuting the insurance claim.

15.     In order for Dongtai's Members and the Receiver to determine how much of a recovery (whether via settlement or an award) from the insurance claim Dongtai needs to fully pay off all remaining valid creditors, compensate the Receiver of his services, and reduce the millions of dollars in loss the Plaintiffs have already sustained, Dongtai's members and the Receiver negotiated and entered into an Allocation of Insurance Proceeds Agreement (Agreement) [*see* Ex. A] based upon the Receiver's accurate accounting of Dongtai's remaining outstanding liabilities [*see id.*], should Dongtai receive any proceeds from the insurance claim whether via a settlement or a judgment/arbitral award.

16.     Specifically, as set forth in the Allocation Agreement,  Dongtai's Receiver and Dongtai's members have agreed to the following allocation:

"A.      Payment shall first be fully made to attorneys McClenny Moseley & Associates and Nguyen & Chen, LLC in accordance with each firm's respective Engagement/Retainer Agreements;

B.      The Receiver shall use up to $930,000.00 of the Claim proceeds to make timely payment to all remaining creditors of Dongtai including payment to Michael Udayan for services rendered as Receiver ("Remaining Creditors") as set forth in Exhibit "A". The Receiver affirms and warrants that there are no other creditors of Dongtai other than those set forth in Exhibit "A". The Receiver shall defend and indemnify the Members from any and all creditors if the Receiver fails to carry out his duties in timely rendering payment under 1A and 1B. The Receiver shall defend and indemnify the Members from any and all creditors if the amount Dongtai owes to its Remaining Creditors exceeds $930,000.00; and

C.      After Payment is rendered under 1A and 1B, the Receiver shall then tender payment of the remaining Claim Proceeds to the Members by wiring said proceeds to Members' counsel's IOLTA account where said funds shall be disbursed to Dongtai's designated in writing company bank account.  Said disbursement shall not occur until Members' counsel receives a properly executed written designation from the Members."

[Ex. A].

17.      At the recent July 28, 2021 pre-hearing conference with the Tribunal, the Tribunal indicated to the Parties that the hearing date is set in stone and will not be moved unless the Parties reach a settlement agreement in writing.

18.      Knowing full well that nothing is guaranteed in litigation, Dongtai has entered into serious and productive settlement discussions with the Insurers.  As the hearing looms on the horizon,  time is of the essence in getting the matter settled as soon as possible as the Parties will have to begin accruing additional attorneys' fees and costs to prepare for the hearing including the retainment of expert witnesses.   Another major factor in necessitating an expedited ruling on the instant application is that there is a high probability that the Insurers will pull/withdraw or drastically reduce any offer it has made to Dongtai if a settlement is not reached soon.

19.      Significantly in order for Dongtai's Receiver and Dongtai's members to make a

fully informed and competent decision as to the amount that can be accepted on Dongtai's behalf to fully pay off all remaining valid creditors, compensate the Receiver for his services, and reduce the millions of dollars in loss the Plaintiffs have already sustained as a result of the aforementioned wrongful conduct, Dongtai's Receiver and the Plaintiffs jointly and respectfully request that the Court approve the Allocation Agreement-Ex A as said approval will provide Dongtai with assurance, certainty, and protection as the Court previously did in authorizing the sale of the Hotel..

20.    Notably, neither the Receiver nor Plaintiffs believe that any other person or entity other than those set forth in the Receiver's spreadsheet-Ex. A[1] have any legally sufficient claims to assert against any of the insurance proceeds Dongtai may recover.

21.    Attached hereto is Dongtai's Receiver's Declaration attesting to the facts set forth in this Application and certifying and warranting under oath as to the validity and accuracy of Dongtai's accounting as it relates to Dongtai's remaining creditors (which are all unsecured) as set forth in Ex A.

## PRAYER

WHEREFORE, for the foregoing reasons, Dongtai's Receiver and Plaintiffs jointly and respectfully request the Court to expedite its consideration of the instant motion, hold a hearing as soon as possible if necessary on the application, and grant Dongtai's instant application by approving the Allocation of Insurance Proceeds Agreement, along with any and all other relief Dongtai's Receiver and Plaintiffs are justly entitled to.

---

[1] Detailing the list of all remaining creditors with legally sufficient claims against any insurance proceeds Dongtai may recover.

DATED: August 5, 2021

Respectfully submitted,

NGUYEN CHEN LLP

By: /s/ *Brian M. Gargano*
    Brian M. Gargano (Attorney-in-Charge)
    State Bar No. 24102898
    bgargano@nguyen-chen.com
    Yaou Li
    Federal Bar No. 3435471
    State Bar No. 24102093
    yli@nguyen-chen.com
    11200 Westheimer Ste 120
    Houston, Texas 77042
    Telephone: (832) 767-0339
    Fax: (832) 767-0669

**ATTORNEY FOR PLAINTIFFS**

DONGTAI'S COURT-APPOINTED RECEIVER

By: /s/ *Michael Udayan*-with permission
    Michael Udayan on Behalf Dongtai

### CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of the foregoing has been forwarded to all parties and counsel of record on August 5, 2021 in accordance with the Federal Rules of Civil Procedure and the Local Rules for the U.S. District Court for the Southern District of Texas.

        /s/ *Brian M. Gargano*
        Brian M. Gargano

## ALLOCATION OF INSURANCE PROCEEDS AGREEMENT

THIS ALLOCATION OF INSURANCE PROCEEDS AGREEMENT ("AGREEMENT") is made and entered into as of this [date] (the "Effective Date") by and between MICHAEL UDAYAN as the Court-Appointed Receiver of Dongtai Investment Group, LLC ("RECIEVER") and DONGTAI INVESTMENT GROUP, LLC'S MEMBERS- Qianju Jiao ("QJ"), Jiatong Yu ("JY"), and Xuanmei Zhou ("XZ"), (collectively "MEMBERS"), via said MEMBERS' authorized Agent/Member Representative QJ ("MEMBERS' AGENT").  Receiver and Members' Agent shall each be individually referred to as a ("Party"), and collectively referred to as the ("Parties").

# W I T N E S S E T H

**WHEREAS**, Dongtai is a limited liability corporation formed under the laws of the State of Texas. Dongtai's rightful members QJ, JY, and XZ own 100% interest in Dongtai.  In SDTX Civil Action No. 4:19-CV-01848,  U.S. District Court Judge Hon. Keith P. Ellison appointed Michael Udayan as Dongtai's Court-Appointed Receiver as set forth in the Court's Orders;

**WHEREAS**,  On or around August 26, 2017, the Crowne Plaza Hotel ("the Hotel"), owned and operated by Dongtai, sustained substantial storm-related damage and loss as a result of Hurricane Harvey.  The loss was covered under Dongtai's insurance policy ("Policy") which was in effect from May 30, 2017 to May 30, 2018.  On September 18, 2017, Dongtai filed an insurance claim with insurance company ("Insurers") as a result of the covered losses under the Policy;

**WHEREAS,** On January 10, 2018, the Insurers sent correspondence to Dongtai wrongfully denying Dongtai's insurance claim in its entirety.  As a result of the Insurers wrongful conduct and refusal to issue full and fair payment for the covered loss as rightly owed under the Policy, Dongtai has and continues to sustain damages and injury;

**WHEREAS,** In the Spring of 2018, Dongtai commenced an arbitration action against the Insurers under the Policy's arbitration clause ("Claim").  The hearing for the arbitration is set for late September 2021;

**WHEREAS,** The Receiver and the Members anticipate either settling the Claim with Insurers or receiving an award from the arbitrators for the Claim, the Parties hereby enter into this Agreement to govern the allocation of any settlement or award proceeds associated with the Claim;

**NOW, THEREFORE,** The Receiver and the Members via Member's Agent, intending to be legally bound, agree as follows as to the allocation of any and all Claim proceeds:

1. **Allocation of any and all Claim proceeds:**

    A.    Payment shall first be fully made to attorneys McClenny Moseley & Associates and Nguyen & Chen, LLC in accordance with each firm's respective Engagement/Retainer Agreements;

    B.    The Receiver shall use up to $930,000.00 of the Claim proceeds to make timely payment to all remaining creditors of Dongtai including payment to Michael Udayan for services rendered as Receiver ("Remaining Creditors") as set forth in Exhibit "A".[1] The Receiver affirms and warrants that there are no other creditors of Dongtai other than those set forth in Exhibit "A". The Receiver shall defend and indemnify the Members from any and all creditors if the Receiver fails to carry out his duties in timely rendering payment under 1A and 1B. The Receiver shall defend and indemnify the Members from any and all creditors if the amount Dongtai owes to its Remaining Creditors exceeds $930,000.00[2]; and

    C.    After Payment is rendered under 1A and 1B, the Receiver shall then tender payment of the remaining Claim Proceeds to the Members by wiring said proceeds to Members' counsel's IOLTA account where said funds shall be disbursed to Dongtai's designated in writing company bank account. Said disbursement shall not occur until Members' counsel receives a properly executed written designation from the Members.

2. **Time of the Essence**

Time is of the essence to the performance of the Parties' obligations under this Agreement.

3. **Multiple Counterparts**

This AGREEMENT may be executed in several counterparts, all of which taken together shall constitute one single AGREEMENT between the Parties.

4. **Agreement Binding on Successors**

This AGREEMENT shall be binding upon and shall inure to the benefit of the Parties hereto, their heirs, administrators, successors and assigns.

---

[1] In the event the Receiver is able to negotiate favorable terms with the unsecured creditors and is able to certify and warrant that the amount of the Claim proceeds used to make timely payment to all remaining creditors of Dongtai including payment to Michael Udayan for services rendered as Receiver ("Remaining Creditors") as set forth in Exhibit "A" is $750,000.00 or less, the Shareholders agree to pay the Receiver $50,000.00 out of the $180,000.0 saved as a bonus with the remaining $130,000.00 going to the Shareholders as set forth in Paragraph 1C.

[2] Neither the Receiver nor the Members believe that the Lender, the Buyer, Ningbo Xu or his attorney have any viable or rightful claims to assert against any of the potential insurance proceeds.

5.     **<u>Waiver</u>**

No waiver by either party of any default shall be deemed as a waiver of any prior or subsequent default of the same or other provisions of this AGREEMENT.

6.     **<u>Severability</u>**

If any provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other provision and such invalid provision shall be deemed to be severed from the AGREEMENT.

7.     **<u>Integration</u>**

This AGREEMENT and the attached Exhibits contains the entire understanding between the Parties with respect to its subject matter and supersedes all previous negotiations, agreements or understandings between the Parties, whether written or verbal. This AGREEMENT may not be amended or modified, except in writing and executed by duly authorized representatives of the Parties.

8.     **<u>Authority</u>**

The Parties acknowledge they have read this AGREEMENT and its attendant exhibits and executed it for the stated consideration as their free and voluntary act. The Parties further expressly represent the signatories to the AGREEMENT and its attendant exhibits are fully authorized to enter into and execute this AGREEMENT and bind the Parties to its terms and conditions. The Parties have had the opportunity to be represented by competent, experienced counsel in regard to this AGREEMENT including throughout all negotiations which preceded the execution of this AGREEMENT, and this AGREEMENT is made and entered into by the Parties knowingly and willingly.

## [SIGNATURES ON NEXT PAGE]

**Signatures**

EXECUTED as of the date first listed above.

IN WITNESS WHEREOF, this Agreement has been duly executed by or on behalf of the Parties as of its Effective Date.

**Dongtai's Court-Appointed Receiver**

Date: 7/4/21

By: MICHAEL S. UDAYAN

Title: DONGTAI COURT APPOINTED RECIEVER

Signature:

_____

**Members' Agent on Members behalf**

Company: DONGTAI INVESTMENT GROUP, LLC

Date:

By:

Title:

**Signature:** _____

**Signatures**

EXECUTED as of the date first listed above.

IN WITNESS WHEREOF, this Agreement has been duly executed by or on behalf of the Parties as of its Effective Date.

**DONGTAI'S COURT-APPOINTED RECEIVER**

Date:

By:

Title:

Signature:

_____

**MEMBERS' AGENT ON MEMBERS BEHALF**

Company: DONGTAI INVESTMENT GROUP, LLC

Date:  8/5/21

By:  Qianju Jiao

Title:  Member

**Signature:**  _____

**Total outstanding expenses due for Dongtai Investments to I**

**Name of Vendor**
Property Care Services
Total American Express payment past due
Loans From FMH Investment Through August 28, 2020
*Dongtai Court Appointed receiver expenses ( Michael expens*
City of Houston Water past dues
Centerpoint Gas
Capital Hospitality & Accounting Services
Amerisafe Security June 16-July31 2020
Elevator Fix (2 of them)
Juan Vargas United Air Services

| Total |
| --- |

**Total outstanding expenses due for Dongtai Investments to I**

**Name of Vendor**
NG Energy Current Electricity Provider
IHG Franchise & other bills bill by IHG current with late fees
Satisfaction services professional fees
MP2 Electricity Bill past due January & February 2020
Green Mountain Energy Electricity until 9/16/2020
PPP FEDERAL GOVERNMENT LOAN
Royal Cup Coffee
Supply Works
Guest supply
HD Supply
Mueller Water ( contract water sofetening February-July 20
Comcast phone hotel
Comcast sales office and front desk Internet and fax phone
ATT Global Internet opera
Republic Waste ( Garbage  Waste Removal)
Plant Interscape
Ecolab Pest control
US Foodservice
Golden Malted Waffle
Booking.com
Agoda Commission reservations
United Imaging ( Front desk ink catridge)
HP Computer leases ( Feb & July 2020)
Safety Net Access
Oracle contract fees (June 28 2020  renewal)
Dongtan Innvestment Group Receiver Salary
Reiubursement Of Associate payroll & expense reports subr
Suretech (plastic room  keys)
Liquid Waste Solutions ( Grease trap and lint removal)

EXHIBIT A to AGREEMENT

| Primary Fire Services (Inspection alarm, smoke detector & A |
|---|
| Airgas |
| **Total** |

EXHIBIT A to AGREEMENT

| be paid from Sale Proceeds | Final Payoff on closing date | Disbursement from Sale proceeds | Disbursement from Insurance proceeds |
|---|---|---|---|
| | $14,500 | $14,500 | $0 |
| | $78,148.81 | $ 78,148.81 | $0.00 |
| | $501,000.00 | $443,919 | $157,081.00 |
| ses property) | $91,055.23 | $ 41,055.23 | $50,000.00 |
| | $57,180.51 | $25,000 | $32,180.51 |
| | $13,491.00 | $ - | $13,491.00 |
| | $30,255.69 | $30,256 | $0.00 |
| | $7,250.00 | $7,250 | $0.00 |
| | $100,000.00 | $ 75,000.00 | $25,000.00 |
| | $5,700.00 | $ 5,700.00 | $0.00 |
| | $898,581.24 | $ 706,328.73 | $277,752.51 |

| be paid from the insurance claim | Final Payoff on closing date | Disbursement from Sales Proceeds | Disbursement from Insurance proceeds |
|---|---|---|---|
| | $36,000 | | $20,000 |
| | $130,943.57 | $ - | $120,943.00 |
| | $1,427.28 | $142 | $0.00 |
| | $29,059.11 | | $20,059.00 |
| | $72,048.00 | | $35,000 |
| | $335,835.00 | $ - | $336,236.27 |
| settled @ 10% | $2,013.56 | $210.00 | $0.00 |
| | $4,610.78 | $0 | $0.00 |
| | $12,500.00 | $2,500 | $0.00 |
| | $13,071.00 | $1,307 | $0.00 |
| 20) | $2,505.20 | $ 2,505.00 | $0.00 |
| | $2,278.81 | $ - | $0.00 |
| | $2,408.04 | $ - | $0.00 |
| | $694.74 | $ - | $694.74 |
| | $1,682.14 | $ - | $1,682.14 |
| | $13,438.00 | $1,343.80 | $0.00 |
| | $5,032.61 | $ - | $0.00 |
| | $6,058.84 | $1,514 | $0.00 |
| | $3,753.25 | $ - | $3,752.00 |
| | $8,055.97 | $ - | $8,055.99 |
| | $1,046.16 | $ - | $1,046.00 |
| | $412.97 | $ - | $0.00 |
| | $3,740.19 | $ - | $0.00 |
| | $2,580.39 | $ - | $0.00 |
| The Hotel Closed March 25 | $11,457.90 | $ - | $0.00 |
| | $150,000.00 | $ - | $150,000.00 |
| mitted | $4,900.00 | $ 4,900.00 | $0.00 |
| | $219.50 | $ 219.50 | $0.00 |
| | $1,161.47 | $0.00 | $1,161.47 |

EXHIBIT A to AGREEMENT

| | | | |
|---|---:|---:|---:|
| nsol) | $6,704.50 | $ - | $2,500.00 |
| | $861.40 | $ - | $861.00 |
| | $866,500.38 | $14,641.45 | $701,991.61 |
| | $848,581 | $656,128.00 | $277,752.51 |
| | $1,715,081.62 | $670,759.45 | $979,744 |

Made settlement offer through attorney No response          **Reserved**

Made settlement offer through attorney No response          **Reserved**
**Made Settlement Offer Repeatedly via Phone and email No response**

**Made settlement offer through attorney No response**          **Reserved**
**Made settlement offer through attorney No response**          **Reserved**
**final number as of 6192021**
**Settled with Vendor**
**Account has been witten off by Vendor**
**Settled with Vendor**
**Settled with Vendor**

**The Account has been Wriiten off**
**The Account has been Wriiten off**
**Unable To Reach anyone despiterepeated attempts**          **Reserved**
**Unable To Reach anyone despiterepeated attempts**          **Reserved**
**Settled Paid ACH have all Documentation**
**Account has sbeen written off**
**Settled mailed Check**
**Repeaedly tried to get a hold of someone with no esonse**          **Reserved**
**Repeaedly tried to get a hold of someone with no esonse**          **Reserved**
**Repeaedly tried to get a hold of someone with no esonse**          **Reserved**

**No lease was ever signed so we do not owe this mon**
**Cannot get a hold of anyone. The account is most likely written off. This was a monthly se**
**This Renewal lease was never signed since hotel closed on March 25th 2020**

**Reached out AR and they wantd me to write this leeter of explanation with backups. Sent everythin**

EXHIBIT A to AGREEMENT

**Offered a sttlement but have had no response**        Reserved    **Amount In I**

               **Called and left several messages**        Reserved    **Amount In I**

EXHIBIT A to AGREEMENT

**Amount In Insurance Proceeds**

**Amount In Insurance Proceeds**

**Reserved**   **Amount In Insurance Proceeds**

**Amount In Insurance Proceeds**
**Amount In Insurance Proceeds**

**Amount In Insurance Proceeds**
**Amount In Insurance Proceeds**

**Amount In Insurance Proceeds**
**Amount In Insurance Proceeds**
**Amount In Insurance Proceeds**

**ey**
**rvice**
**We Do not owe this**

**g. No response**                    Reserved

**nsurance Proceeds**
**nsurance Proceeds**



| | | |
|---|---|---|
| **DONGTAI INVESTMENT GROUP, LLC D/B/A CROWNE PLAZA SUITES** | § § § | |
| *Claimant,* | § § | |
| **v.** | § § § | |
| **UNDERWRITERS AT LLOYD'S LONDON; INDIAN HARBOR INSURANCE COMPANY; QBE SPECIALTY INSURANCE COMPANY; STEADFAST INSURANCE COMPANY; GENERAL SECURITY INDEMNITY COMPANY OF ARIZONA; UNITED SPECIALTY INSURANCE COMPANY; LEXINGTON INSURANCE COMPANY; PRINCETON EXCESS AND SURPLUS LINES INSURANCE COMPANY; INTERNATIONAL INSURANCE COMPANY OF HANNOVER SE; OLD REPUBLIC UNION INSURANCE COMPANY,** | § § § § § § § § § § § § § § § § § § § § § | **IN ARBITRATION** |
| *Respondents.* | § | |

---

## CLAIMANT'S FIRST AMENDED STATEMENT OF CLAIMS

---

**TO THE PANEL OF ARBITERS:**

Claimant, Dongtai Investment Group, LLC d/b/a Crown Plaza Suites, (hereinafter sometimes referred to as "Claimant" or "Dongtai"), tender its First Amended Statement of Claims complaining of Underwriters at Lloyd's London, Indian Harbor Insurance Company, QBE Specialty Insurance Company, Steadfast Insurance Company, General Security Indemnity Company of Arizona, United Specialty Insurance Company, Lexington Insurance Company,

---

Princeton Excess and Surplus Lines Insurance Company, International Insurance Company of Hannover SE, and Old Republic Union Insurance Company (hereinafter sometimes referred to as "Respondents" or "Insurers") and would respectfully show unto this Panel as follows:

## BACKGROUND FACTS

1. This matter involves a property insurance dispute regarding damages sustained to Dongtai's property, Crowne Plaza Suites, a hotel in Houston, as a result of Hurricane Harvey on or around August 26, 2017.

2. Dongtai purchased a policy from Insurers, (hereinafter referred to as "the Policy"), which was in effect at the time of loss. The Policy was effective from May 30, 2017 to May 30, 2018.

3. The Policy was purchased to insure Dongtai's property, (hereinafter referred to as "the Property"), which is located at 9090 Southwest Freeway, Houston, Texas 77074.

4. On or about August 26, 2017, Dongtai experienced a severe weather-related event attributable to Hurricane Harvey which caused substantial damage to the Property and surrounding homes and businesses in the area. The Property's damage constitutes a covered loss under the Policy issued by Insurers. Dongtai subsequently opened a claim on September 18, 2017 and Insurers assigned VeriClaim, Inc. to adjust the claim.

5. Following his inspection of the Property, Mr. Westwood of VeriClaim determined that he could not confirm the source of the water damage to the interior of the building. Due to this, Insurers engaged the services of JS Held to conduct an inspection and provide an engineering opinion as to the cause and extent of the property damages.

6. Following its inspection on October 27, 2017, JS Held concluded that here was "no obvious physical damage to the roof system or any roof components," and that "there was not storm-related damage to the roof that would have caused the interior water damage."

7. Thereafter, on January 10, 2018, Insurers wrongfully denied Dongtai's claim and refused to issue a full and fair payment for the covered loss as was rightfully owed under the Policy. To date, Insurers have failed to issue any payment whatsoever on the claim.

8. Insurers failed to perform its contractual duties to adequately compensate Dongtai under the terms of the Policy.  Specifically, Insurers refused to pay the full proceeds owed under the Policy. Due demand was made by Dongtai for proceeds to be in an amount sufficient to cover the damaged Property.

9. It is important to note that Insurers' extended coverage subsequent to their initial denial of the insurance claim. However, these damages were below Dongtai's deductible and no payment was issued.

10. Insurers and/or Insurers' assigned agent sold the Policy to Dongtai, making various statements and representations to Dongtai that the Property would be covered. Relying on the promises and representations made by Insurers and/or Insurers' assigned agent, Dongtai filed a claim under the Policy with the belief that the Property would be covered after a severe weather event – such as the one that damaged the Property.

11. Because its claim was wrongfully denied, Dongtai retained legal counsel and a letter of representation was sent to Insurers on December 28, 2018. Further, on February 6, 2018, Insurers were provided notice of the claim by Dongtai's counsel.

12. All conditions precedent to recovery under the Policy had, and have, been carried out and accomplished by Dongtai.

## CAUSES OF ACTION

### BREACH OF CONTRACT

---

13. Dongtai hereby incorporates by reference all facts and circumstances set forth under the foregoing paragraphs.

14. Insurers' conduct constitutes a breach of the insurance contract made between Insurers and Dongtai. According to the Policy, which Dongtai purchased, Insurers had the absolute duty to investigate Dongtai's damages and pay Dongtai policy benefits for the claim made due to the extensive storm-related damages. The damage to the Property constitutes a covered loss under the applicable Policy.

15. As a result of the Hurricane Harvey weather event, Dongtai suffered extreme weather-related damages. Despite objective evidence of weather-related damages provided by Dongtai and its representatives, Insurers breached its contractual obligations under the Policy by failing to pay Dongtai cost related benefits to properly repair the Property and restore it to its pre-loss condition.  As a result of this breach, Dongtai has suffered actual damages in the amount of the reasonable and necessary costs to restore the property to its pre-loss condition. Additionally, as a result of Insurers' breach of the insurance contract, Dongtai will incur business interruption losses incident to the restoration of the Property to its pre-loss condition for the entire period of restoration. These business interruption losses constitute covered losses under the Policy and, therefore, Dongtai is entitled to seek and recover these damages.

16. As opined by Dongtai's retained professional engineer, Brian Johnson, P.E., the upper roofs must be completely replaced, including tear off of structural (roof substrate/sheathing) and non-structural elements (coping, membrane, cover boards, rigid insulation). A roof recover is not a viable option as there is at least one roof membrane already existing on the Property's roofs as well as moisture saturation within the roofing system that would additionally disallow a recover. Further, due to the water intrusion within the building envelope, the outlined interior

damages, including elevators, must be addressed because they are directly correlated with the subject storm and associated water intrusion. Based upon a reasonable degree of engineering certainty, it is more likely than not that the observed damage is a result of the subject storm event. Additionally, as Mr. Johnson notes, on the reported date of loss, there was sufficient wind and rain to cause damage to the structural elements, fenestrations, HVAC ducts, and the roof membranes.

**BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**

17. Dongtai hereby incorporates by reference all facts and circumstances set forth under the foregoing paragraphs.

18. Although Dongtai concedes that the Arbitration Provision contained in the Policy specifically prohibits the Arbitration Tribunal from awarding "exemplary, punitive, multiple, consequential, or other damages of a similar nature," what the Provision does not exclude is the award of attorney's fees incurred by Dongtai.

19. Pursuant to the laws and statutes of the State of New York, a narrow exception exists to the general rule that an insured may not recover the legal fees incurred in bringing an action to settle its rights in an insurance policy. The exception is applicable where the insured can prove that the carrier had no arguable basis to challenge its claim and can further show that no reasonable carrier would, under the facts, challenge the claim. *D.K. Property Inc. v. National Union Fire Ins. Co. of Pittsburgh, PA*, 2018 NY Slip Op 28097, 2018 WL 1599486 (N.Y. April 2, 2018); *Sukup v. State of New York*, 19 N.Y.2d 519, 522 (N.Y. 1967).

20. Therefore, since attorney's fees do not constitute "exemplary, punitive, multiple, consequential, or other damages of a similar nature," – in fact, attorney's fees are not considered "damages" at all, as that term is applied in the legal context – the Arbitration

Tribunal is permitted to consider Dongtai's evidence regarding Insurers' breach of the duty of good faith and fair dealing in order to justify an award of attorney's fees to Dongtai.

21. From and after the time Dongtai's claim was presented to Insurers, the liability of Insurers to pay the full claim in accordance with the terms of the Policy was more than reasonably clear. However, Insurers has refused to pay Dongtai in full, despite there being no basis whatsoever on which a reasonable insurance company would have relied on to deny full payment. Insurers' conduct constitutes a breach of the duty of good faith and fair dealing.

## **PRAYER**

Dongtai prays it be awarded all such relief to which it is due as a result of the acts of Insurers, and for all such other relief to which Dongtai may be justly and rightfully entitled. In addition, Dongtai requests the award of the reasonable and necessary attorney's fees incurred, and for any other and further relief, either at law or in equity, to which Dongtai may show the itself to be justly entitled.

Respectfully submitted,


*/s/Heather E. Hall*
**McCLENNY   MOSELEY   &   ASSOCIATES, PLLC**
James M. McClenny
State Bar No. 24091857
J. Zachary Moseley
State Bar No. 24092863
Heather E. Hall
State Bar No. 24089909
411 N. Sam Houston Parkway E., Suite 200
Houston, Texas 77060
Principal Office No. 713-334-6121
Facsimile: 713-322-5953
James@mma-pllc.com
Zach@mma-pllc.com

Heather@mma-pllc.com

**ATTORNEYS FOR CLAIMANT**

Case 4:19-cv-01848   Document 166-3   Filed on 08/05/21 in TXSD   Page 1 of 3

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT:  __HON. DEBRA A. JAMES__

_Justice_

-----------------------------------------------------------------------------X

CERTAIN UNDERWRITERS AT LLOYDS, LONDON, INDIAN HARBOR INSURANCE COMPANY, QBE SPECIALTY INSURANCE COMPANY, STEADFAST INSURANCE COMPANY, GENERAL SECURITY INDEMNITY COMPANY OF ARIZONA, UNITED SPECIALTY INSURANCE COMPANY, LEXINGTON INSURANCE COMPANY, PRINCETON EXCESS AND SURPLUS LINES INSURANCE COMPANY, INTERNATIONAL INSURANCE COMPANY OF HANNOVER SE, and OLD REPUBLIC UNION INSURANCE COMPANY,

Petitioners,

- v -

DONGTAI INVESTMENT GROUP, LLC,

Respondent.

-----------------------------------------------------------------------------X

| | |
|---|---|
| PART | IAS MOTION 59EFM |
| INDEX NO. | 151569/2020 |
| MOTION DATE | 03/24/2020 |
| MOTION SEQ. NO. | 001 |

## DECISION + ORDER ON MOTION

The following e-filed documents, listed by NYSCEF document number (Motion 001) 32, 35, 42, 43, 44, 45, 46, 47, 48, 49, 50

were read on this motion to/for          INJUNCTION/RESTRAINING ORDER          .

ORDER

Upon the foregoing documents, it is

ORDERED and ADJUDGED that the cross motion of respondent Dongtai Investment Group, LLC to dismiss the petition herein is granted and the proceeding is dismissed in its entirety, with costs and disbursements to such respondent as taxed by the Clerk of the Court, and the Clerk is directed to enter judgment accordingly in favor of such respondent; and it is further

ORDERED that the application of petitioners for a preliminary injunction is DENIED, and the temporary restraining order issued

151569/2020  CERTAIN UNDERWRITERS AT LLOYDS vs. DONGTAI INVESTMENT GROUP
Motion No.  001

Page 1 of 3

1 of 3

on February 13, 2020 staying the arbitration (Masley, J.) is hereby

vacated.

## DECISION

A review of the affidavit/declaration, signed on February

12, 2020 by Qianju Jiao, a member of respondent limited

liability corporation and submitted in support of respondent's

cross motion to dismiss the petition at bar, establishes that

none of the contingencies on which petitioners base their cause

for relief in their unverified petition have transpired.  To

wit, respondent refutes that (1) "respondent Dongtai Investment

Group, LLC d/b/a Crown Plaza Suites (Dongtai) did not grant

actual authority to McClenny Moseley Associates, PLLC (sic) on

December 26, 2017 or at any other relevant time to pursue claims

under the policy"; (2) "a lawsuit pending in the United States

District Court, Southern District of Texas entitled Xiongen Jiao

v Ningo Xu and Dongtai Investment Group, LLC, Docket No. 4:19-

cv-01848 (fraud action) result[ed] in findings or evidence that

Dongtai made material misrepresentations in its policy

application or that show that alleged continued harm and

economic loss to a Dongtai-owned hotel were, in whole or part,

the result of causes other than an August 28, 2017 weather

event"; or (3) "there is no dispute or matter in difference

between Dongtai and the insurers concerning the policy's

coverage, and therefore no basis for an arbitration."  Nor have

151569/2020  CERTAIN UNDERWRITERS AT LLOYDS vs. DONGTAI INVESTMENT GROUP        Page 2 of 3
Motion No.  001

2 of 3

petitioners provided any notice to the court of the status of

the fraud action and their motion to intervene by February 28,

2020, as directed in the Show Cause Order issued on February 13,

2020.  Therefore, assuming arguendo that petitioners' claim is

meritorious, none of the grounds upon which petitioners state

their claim has been established, and therefore there is no

basis for a stay of arbitration.

20210303174811DJAMES3372654C6E25455E84FA2A0308068E8D

| **3/3/2021** | | | | | |
|---|---|---|---|---|---|
| **DATE** | | | | **DEBRA A. JAMES, J.S.C.** | |
| CHECK ONE: | X | CASE DISPOSED | | NON-FINAL DISPOSITION | |
| | | GRANTED | X DENIED | GRANTED IN PART | OTHER |
| APPLICATION: | | SETTLE ORDER | | SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | FIDUCIARY APPOINTMENT | REFERENCE |

**151569/2020   CERTAIN UNDERWRITERS AT LLOYDS vs. DONGTAI INVESTMENT GROUP**      **Page 3 of 3**
Motion No.  001

3 of 3

| DONGTAI INVESTMENT GROUP, | § | |
|---|---|---|
| LLC, D/B/A CROWNE PLAZA | § | |
| SUITES, | § | |
| Claimant, | § | |
| | § | |
| V. | § | **ARBITRATION** |
| | § | |
| UNDERWRITERS AT LLOYD'S | § | |
| LONDON, ET AL., | § | |
| Respondents | § | |

## <u>SCHEDULING ORDER NO. 2</u>

On March 3, 2021, the Honorable Debra A. James of the Supreme Court of the State of New York issued an order which vacated that court's February 13, 2020 stay of this arbitration and dismissed the case.  Therefore, on March 16, 2012 and without objection from the parties, the Tribunal conducted a video conference with counsel for the parties and now issues this Scheduling Order No. 2.

1.     <u>Next Status Conference:</u>

There will be a mandatory Status Conference to be held by Zoom at **<u>10:00am Eastern / 9:00am Central on Wednesday, July 28, 2021</u>**.  Since that entire week was available for counsel for a final hearing (just not the Tribunal), presumably it works for this status conference.

2.     <u>Hearing Date:</u>

By agreement, the hearing on the merits shall be held on **<u>September 27, 2021 through September 30, 2021</u>** at a location to be agreed upon in New York and arranged by the parties at the parties' expense. The location should be in Manhattan and appropriate for the conduct of the proceeding without interruption. The parties will report to the Tribunal the July 28 status conference on the agreed location. The parties are reminded that a large hearing room will be needed, as well as comfortable convenient rooms for each party and for the Tribunal.

3.     <u>Other Deadlines and Matters from Scheduling Order No. 1:</u>

Unless otherwise addressed in this Scheduling Order No. 2 or by subsequent order of the Tribunal, all provisions of Scheduling Order No. 1 remain in effect,

including deadlines. Thus, if a deadline had expired as of the date of the February 13, 2020 stay order, such deadline remains expired.

4.   <u>Hearing Procedure and Deadlines</u> (except for providing dates and adding a deadline for motions *in limine*, these are consistent with Scheduling Order No. 1):

(a)   Motions *in Limine* shall be exchanged and provided to the Tribunal by **<u>Wednesday, September 15, 2021.</u>**

(b)   The parties shall exchange and furnish the Tribunal with pre-arbitration statements or memoranda not exceeding 10 double-spaced pages by **<u>Wednesday, September 8, 2021</u>**.

(c)   Counsel shall stipulate to uncontested or agreed upon facts and provide a joint stipulation to the Tribunal **<u>Wednesday, September 15, 2021</u>**.

(d)   All exhibits shall be pre-marked, exchanged by counsel, and furnished to the Tribunal **<u>Wednesday, September 15, 2021</u>**, either electronically or in hard copy.

(e)   Counsel shall be responsible for arranging for demonstrative exhibits or visuals, and shall notify the Tribunal and opposing counsel of the nature of the demonstrative **<u>Wednesday, September 15, 2021</u>**.

(f)   A party that intends to use a court reporter will notify the other party and make arrangements for the services of such reporter.

(g)   Percipient witnesses shall be allowed to testify by Zoom, with advance notice of Zoom participation to all parties and the Tribunal no later than **<u>Wednesday, September 15, 2021</u>**.

(h)   No direct or rebuttal testimony shall be permitted solely via declaration, affidavit, or report.

(i)   The Tribunal shall address evidentiary issues by permitting the parties the latitude, within reason, of offering the evidence they desire to support their cases, mitigating unnecessary legal expenses or inconvenience of witnesses, and avoiding unnecessary exposure to clearly immaterial or unfairly prejudicial evidence. Counsel agree that non-privileged evidence offered by any party will be received and traditional objections (hearsay, foundation, etc.) will go only to the weight of the evidence and will not

preclude it provided the Tribunal finds the information reliable and probative of a material issue.

(j)     Subpoenas may be issued only for the production of documents or the presentation of testimony at the arbitration hearing on the merits. All subpoenas shall comply with CPLR §§ 2302 and 7505.

SO ORDERED:

_____

Paul J. Van Osselaer, Chair

FOR THE TRIBUNAL

April 9, 2021

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

XIONGEN   JIAO, *et al*,            §
                                    §
        Plaintiffs,                 §
VS.                                 §    CIVIL ACTION NO. 4:19-CV-1848
                                    §
NINGBO  XU, *et al*,                §
                                    §
        Defendants.                 §

## **ORDER AUTHORIZING SALE**

The Court-appointed Receiver, Michael Udayan, is authorized to take all necessary actions to convey title to the Houston Crown Plaza Suites—located at 9090 Southwest Freeway, Houston, Texas, and described in the attached Contract for Purchase and Sale ("the Subject Property")—to Crown Plaza Suites Houston, LLC. The Receiver may execute all necessary title documents, provide appropriate assurances as to the condition of the Subject Property, agree on division of responsibilities for taxes, insurance, wages, and utilities, and received agreed-upon proceeds from Crown Plaza Suites Houston, LLC.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 8th day of March, 2021.

_____
HON. KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

1

# CONTRACT FOR PURCHASE AND SALE
## OF CROWNE PLAZA SUITES
## HOUSTON, TEXAS

_____

THIS DOCUMENT IS MORE THAN A RECEIPT FOR MONEY.  IT IS INTENDED TO BE A LEGALLY BINDING AGREEMENT.  READ IT CAREFULLY.

**Crowne Plaza Suites, Houston, Texas**
**9090 Southwest Freeway**
**Houston, Texas [hereinafter collectively, the "Hotel") together with all related items to the Property as set forth in Section 1 below.]**

**TERMS AND CONDITIONS**
Seller's Court appointed Receiver Michael S Udayan agrees to sell the Property on behalf of Seller, and Purchaser agrees to purchase the Property, on the following terms and conditions: Herein all reference in the PSA 'Seller' is referred as "Seller's Court appointed Receiver

**THIS CONTRACT FOR PURCHASE AND SALE** ("**Agreement**" or "**Contract**"), made and entered into as of January 11, 2021, by and between Crowne Plaza Suites Houston, LLC having an address at 207 West 25th Street, New York, New York (hereinafter the "**Purchaser**") and **Dongtai Investment Group, LLC,**(hereinafter collectively, the "**Seller**") **Or its rightful lenders** having a mailing address at 9090 Southwest Freeway, Houston Texas 77074. The powers entrusted in Michael S Udayan, the Court appointed Receiver assigned to Dongtai Investment to protect and serve all parties, including Lenders, creditors both State and Federal, has decided to authorize the Purchase and Sale agreement after carefully evaluating all present circumstances. The receiver has provided all the Accounts Payable information available to the buyer to the  best of his ability, knowledge, however, since the Property has been closed for two months and  the Property Management System has been shut down, Receiver will be unable to calculate  any additional levies or Fines primarily on Property Taxes and City & State Taxes etc. If any, and Receiver Indemnifies and holds himself harmless for any such unforeseen errors. The Receiver shall provide the final accurate numbers during the Due diligence period.
The receiver will also diligently negotiate reduced payments from several vendors.

**NOW, THEREFORE**, for and in consideration of the deposit hereinafter referred to, as well as the mutual covenants, conditions and undertakings hereinafter contained, it is agreed by and between the parties hereto as follows:

      1.   <u>Recitals and</u> <u>Description of Property</u>.  The foregoing recitals are true and correct and are a part of this Agreement as if set forth herein at length. The Seller's Receiver

agrees to sell and convey to Purchaser, and the Purchaser agrees to purchase from Seller all of Seller's right, title and interest in and to the following (collectively, the "**Property**"):

(a)      The land and improvements upon which the Hotel is located more particularly described on Exhibit "A" attached hereto and made a part hereof (the "Land");

(b)      the Hotels;

(c)      the Leases and Contracts (as defined below);

(d)      any and all trade names used by Seller solely in connection with the Hotel, to the extent the same can be transferred, excluding the following and any variation thereof, which are not transferred or assigned to Purchaser: (i) Crowne Plaza Suites, Houston, Texas Purchaser acknowledges and agrees that the Seller's Intercontinental Franchises for the Hotel (the "**Franchise**"), is not assignable and that Seller will be terminating such Franchise at or prior to Closing, at Seller's sole cost and expense;

(e)      All fixtures (other than those which constitute Improvements), furniture, furnishings, equipment, machinery, tools, vehicles, appliances, art work and other items of tangible personal property which are located at the Hotel, or ordered for future use at the Hotel as of the Closing, other than the Supplies, IT Systems, F&B, Retail Merchandise, Books and Records and Plans and Specifications and expressly excluding any personal property owned by Hotel guests or otherwise listed on **Exhibit "B"** attached hereto (the "**FF&E**");

(f)      All china, glassware and silverware, linens, uniforms, engineering, maintenance, cleaning and housekeeping supplies, matches and ashtrays, soap and other toiletries, stationery, menus, directories and other printed materials, and all other similar supplies and materials, which are located at the Hotel or ordered for future use at the Hotel as of the Closing (the "**Supplies**");

(g)      All computer hardware, telecommunications and information technology systems located at the Hotel, including all telephone exchanges located at the Hotel, and all computer software used at the Hotel, subject to the terms of the applicable license agreement(s), to the extent the same are transferable or Seller obtains any consent necessary to effectuate such a transfer (the "**IT System(s)**");

(h)      All food and beverages (alcoholic and non-alcoholic) which are located at the Hotel, whether opened or unopened, or ordered for future use at the Hotel as of the Closing, including, without limitation, all food and beverages located in the guest rooms, but expressly excluding any alcoholic beverages to the extent the sale or transfer of the same is not permitted under applicable law (the "**F&B**");

(i)      All merchandise located at the Hotel and held for sale to guests and customers of the Hotel or ordered for future sale at the Hotel as of the Closing, including, without limitation, the inventory held for sale in any gift shop or newsstand operated by or on behalf of Seller at the Hotel, but expressly excluding the F&B (the "**Retail Merchandise**");

(j)      Any/all lease(s) and/or purchase money security agreement(s) for any equipment, machinery, vehicles, furniture or other personal property located at the Hotel which are held by or on behalf of Seller and used exclusively at the Hotel, together with any/all deposit(s) made by or on behalf of Seller, to the extent the same and such deposits are transferable or the Seller obtains any consent necessary to effectuate such a transfer (the "**Equipment Lease(s)**");

(k)      All licenses, permits, consents, authorizations, approvals, registrations and certificates issued by any Governmental Authority which are held by or on behalf of Seller or Operating Tenant with respect to any/all Hotel(s), including, without limitation, the construction, use or occupancy of any/all Hotel(s) or the Business, together with any deposits made by or on behalf of Seller or Operating Tenant thereunder, to the extent the same and such deposits are transferable or the Parties obtain any consent necessary to effectuate such a transfer (the "**Licenses and Permits**");

(l)      All books and records located at the Hotel which relate exclusively to the Hotel, (i) including, without limitation, all (A) internal financial analyses, appraisals, tax returns, financial statements, (B) corporate or other entity governance records, (C) employee personnel files, and (D) any work papers, memoranda, analysis, correspondence and similar documents and materials prepared by or for Seller, but (ii) expressly excluding (x) all guest or customer profiles, contact information (e.g., addresses, phone numbers, facsimile numbers and/or email addresses), histories, preferences, and any other guest or customer information in any database of Seller, whether obtained or derived by Seller from guests or customers of the Hotel, and (y) all documents and other materials which (1) are legally privileged or constitute attorney work product, (2) are subject to an applicable law or a confidentiality agreement prohibiting their disclosure, or (3) constitute confidential internal assessments, reports, studies, memoranda, notes or other correspondence prepared by or on behalf of any officer or employee of Seller (the "**Books and Records**");

(m)      All plans and specifications, blueprints, architectural plans, engineering diagrams and similar items located at the Hotel and/or which relate exclusively to the Hotel, to the extent the same are transferable (the "**Plans and Specifications**");

(n)      All warranties and guaranties held by Seller with respect to the Hotel or any other Property, to the extent the same are transferable or Seller obtains any consent necessary to effectuate such a transfer (the "**Warranties**");

(o)      All bookings and reservations for guest, conference and banquet rooms or other facilities at the Hotel as of the Closing, together with all deposits held by or on behalf of Seller with respect thereto (the "**Bookings**"); and

(p)     All amounts which Seller is entitled to receive from the lodging business and all activities related thereto at the Hotel which are not paid as of Closing, including, without limitation, charges for the use or occupancy of any guest, conference or banquet rooms or other facilities at the Hotel, any restaurant, bar or banquet services, or any other goods or services provided by or on behalf of Seller at the Hotel (the "**Accounts Receivable**"), including all charges accrued to the open accounts of any guests or customers at the Hotel as of the Cut-Off Time (as defined below) for the use or occupancy of any guest, conference or banquet rooms or other facilities at the Hotel, any restaurant, bar or banquet services, or any other goods or services provided by or on behalf of Seller at the Hotel.

2.     <u>Subject Clauses</u>.  Such Property is sold and is to be conveyed and transferred in fee simple, subject to the following (collectively, the "**Permitted Exceptions**"):

(a)     State of facts as shown on an accurate survey.

(b)     To covenants, easements, rights-of-way, conditions, and tenancies as set forth in **<u>Exhibit "C"</u>**, annexed hereto and made a part hereof.

(c)     Zoning and building regulations and ordinances of the town, county and other governmental agency or division of Texas, as now or hereafter in force.

(d)     Real estate taxes for the current year (or portion of a year if tax bills are payable in more than one annual payment) and subsequent years, subject to adjustment as provided in <u>Section 6(a)</u> hereof.

(e)     Leases, contracts and agreements set forth in **<u>Exhibit "B"</u>** ("**Leases and Contracts**") that are to be assigned by Seller to and assumed by Purchaser at Closing (subject to the provisions of <u>Section 4</u>).  Purchaser will also assume all reservations for guest rooms and events at the Hotel made through the Hotel's reservation system and any other written contracts for guest rooms or banquet events booked by Seller.[1]

3.     (a) The "**Effective Date**" of this Agreement is defined as the date that the last of the Purchaser and Seller have signed this Agreement.

(b). Seller agrees to cancel its management agreement with its current manager as of the date of Closing.

(c) Purchaser shall have the obligation, at its sole cost and expense, to update any existing survey (or obtain a new survey), and Purchaser shall, at its sole cost and expense, obtain a title insurance commitment and title insurance policy, as may be needed by Purchaser. Seller shall, if it has not already done so, furnish Purchaser with copies of any of the following it may have in its possession, if any, within five (5) days from the date of this Agreement: (i)

---

[1] Note:  Items on Exhibit "C" should capture anything set forth on a title commitment that is not objected to by Purchaser.

a prior existing title insurance policy or commitment in favor of Seller's Receiver on behalf of Dongtai Investment Group  and (ii) a prior existing survey. Purchaser shall arrange with its surveyor the wording of any certification to appear on the new survey, which shall include the name of the Seller as well as the names of  title insurer and the Purchaser. Seller is conveying title subject to the Permitted Exceptions and any agreements or matters created by Purchaser in connection with the Closing. If there is any other matter of record affecting title which prevents use of the property as a hotel as currently existing or which renders title unmarketable, Purchaser shall give Seller written notice of the same Ten (10) days prior to the expiration of the Due Diligence Period, Due to the Present financial situation, Seller will need Buyers assistance in curing all Liens from any City , State or Mechanics liens. to expedite the Closing process and a clean title Any such amount will be prorated and returned to Buyer at the close of the sale if applicable. Purchaser shall have the right as its sole remedy to terminate the Agreement prior to the expiration of the Due Diligence Period and receive a full refund of the entire Deposit.

(d) The provisions of this <u>Section 3</u> shall not survive the Closing.

(e) Due Diligence Period. Purchaser is hereby granted a due diligence period commencing on the Effective Date through 5:00 PM local time in Houston, Texas on the date which is Thirty (30)   days after the Effective Date, (the "**Due Diligence Period"),** within which to inspect the Property and make whatever investigations it deems necessary, at Purchaser's sole cost and expense, without damage to the Property or interference with the business of the Seller and on a lien free basis, to determine if Purchaser desires to proceed with the Closing or to terminate this Agreement for any reason by written notice from Purchaser to Seller. Seller shall furnish to Purchaser such information in Seller's possession which Purchaser may reasonably request. The Deposit thereon shall be fully refundable to Purchaser during the Due Diligence Period.  In the event Purchaser determine in its sole discretion that it does not wish to complete and Close the transaction, it may terminate the Agreement by written notice to Seller to be received by Seller before the expiration of the Due Diligence Period. Within five (5) business days thereafter, Escrow Agent (as such term is hereafter defined) shall make a refund to Purchaser of the Deposit received from Purchaser, in which event the Agreement shall be terminated except for any terms and conditions set forth herein to survive the Closing or termination of the Agreement. If Seller does not receive any notice of termination from Purchaser prior to the end of the Due Diligence Period as set forth in this <u>Section 3(e)</u>, subject to the further terms hereof, the right of Purchaser to terminate the Agreement and receive a refund of its Deposit shall be deemed to have expired and waived by Purchaser and,  Deposit shall be "hard" and non-refundable to Purchaser and Purchaser shall be required to Close the transaction pursuant to this Agreement.

4.     <u>Delivery of Supporting Documents</u>.  The Leases and Contracts shall be provided to Purchaser at least Ten (10) days from the Effective Date of this Agreement prior to the expiration of the Due Diligence Period which shall, at Closing of the transaction contemplated by this Agreement, be assigned by the Seller and be assumed by the Purchaser, as of the Date of Closing. If the consent to any such assignment and assumption

is required by any party to such Leases and Contracts, such application for consent and/or the obtaining of such consents may, at the option of Seller, be treated on a post-closing basis and shall not delay the closing, however, from and after closing, with title to the Hotel and Land passing to Purchaser, the Purchaser shall be solely responsible for all payments and other obligations under the Leases and Contracts it has assumed for amounts due for events or actions occurring subsequent to Closing, and Purchaser agrees, to the extent permitted by law, to indemnify, save harmless and defend Seller and its affiliates and their employees, partners, members, officers, managers, licensors, consultants, lenders, successors and assigns (collectively, the "**Indemnified Parties**" or "**Seller Indemnified Parties**") from and against any and all claims for damages, payments, costs, expenses, liabilities, including, but not limited to, reasonable attorneys' fees, paralegal fees, costs and expense related thereto. Seller agrees, to the extent permitted by law, to indemnify, save harmless and defend Purchaser, and its affiliates and their employees, partners, members, officers (collectively, the "**Purchaser Indemnified Parties**") from and against any and all claims for damages, payments, costs, expenses, liabilities, including reasonable attorneys' fees, paralegal fees and costs and expenses, related to the Leases and Contracts and events which were due or took place during the time the Seller was the owner of the Hotel prior to Closing but not for any events or actions occurring thereafter. The provisions of this Section 4 shall survive the Closing.   Seller shall use commercially reasonable effort to provide to Purchaser all documents and information reasonably requested by Purchaser which are in the possession of Seller in order for Purchaser to conduct its due diligence on the Property.

5.    **Purchase Price        The purchase price is Eleven Million Eight Hundred Thousand Dollars ($11,800,000.00) ("Purchase Price") was determined based on the Documents provided by the Receiver that included all Creditors, including the  Lenders portion. The Court appointed receiver for he Seller will instruct and endorse distribution to all creditors after providing all backup documents Due to the additional fines that may have been levied, the Receiver openly discloses that these numbers, especially the tax burden may not be fully accurate.  The Purchase Price shall be paid by Purchaser to Seller as follows. The Seller Receiver & agrees to pay Three point seven five( 3.75) Percent commission to Marcus and Millichap or its affiliates and One Point Seven five( 1.75) percent to Viral Amin with Amin Reality Group based on the total purchase price of $11.8 Milion**

6.    Escrow & Deposit     Within  (5) calendar days after the Effective Date (as defined in Paragraph 37 below) Purchaser   shall open escrow with


Fidelity National Title
Attn: Kristy Tomasello,
Manager, National Commercial Underwriter
601 Riverside Avenue, Building 5, 7th Floor
Jacksonville, Florida  32204

Tel: (904) 701-6084
Email: kristy.tomasello@fnf.com

(the "Escrow Holder") by the deposit of a copy of this Agreement with the Escrow Holder. Purchaser agrees to wire directly to escrow a deposit in the amount of Two Hundred Thousand and 00/100 Dollars ($200,000.00) and will be held in an escrow. Seller's Receiver and Purchaser agree to prepare and execute such escrow instructions as may be necessary and appropriate to close the transaction.  Should said instructions fail to be executed as required, Escrow Holder shall and is hereby directed to close escrow pursuant to the terms and conditions of this Agreement. Close of escrow (or the "Closing Date", which shall mean the date on which the deed transferring title is recorded) shall occur on or before and Sixty (60)days from the conclusion of the Due Diligence Period.  Escrow fee shall be paid by Seller and Purchaser (50/50 split), with an extension period as hereinafter defined and agreed to in paragraph 37.  All other closing costs shall be paid in accordance with the custom in the county in which the Property is located. Because Purchaser and seller are not placing the funds with the broker and the earnest money or other funds are being placed with someone other than the broker, the broker hereby advises all parties in writing that (1) the broker has not receipted for any funds, (2) the broker has no control over the funds, (3) the transaction is being handled in a manner contrary to standard practice, and (4) the parties are fully responsible for the deposit and access to the funds.  The Escrow Agent has fiduciary duties with respect to the Deposit and if a dispute results hereafter as to entitlement to the Deposit, the Escrow Agent agrees to release or disburse the said escrowed funds as provided herein. Purchaser hereby gives Escrow Agent the irrevocable direction to release the Deposit to Seller in the event Seller is entitled to receive same pursuant to this Agreement as liquidated damages in the event of a breach or default by Purchaser.  Subject to the further terms hereof, the Deposit (including without limitation the Second Deposit which the Purchaser is obligated to deposit as set forth above) will be "hard" and be non-refundable to Purchaser on the expiration of the Due Diligence Period.  If the Purchaser has not exercised its right to terminate this Agreement prior to the expiration of the Due Diligence Period by giving written notice of such termination to Seller, then, within five (5) days of the expiration of the Due Diligence Period, Purchaser shall deliver to Escrow Agent an additional sum of Two Hundred Thousand Dollars ($200,000.00), thereby making the Deposit Four Hundred Thousand Dollars ($400,000.00), which sum remain in Escrow with Escrow Agent until Closing, as a credit towards the Purchase Price.

Purchaser understands that it shall rely entirely upon its own due diligence in completing the purchase. Purchaser shall be afforded until the expiration of the Due Diligence Period as set forth in Section 3(e) to complete its inspection of the Property. If no such notice of termination is given, the Due Diligence Period shall expire and subject to the further terms hereof, the Deposit (including without limitation the Second Deposit which the Purchaser is obligated to deposit as set forth above) shall be "hard" and non-refundable and shall serve as agreed to liquidated damages to Seller in the event of a breach or default by Purchaser, including any failure to Close as required by this Agreement on the Closing Date (as such term is hereafter defined).

(B) After applying the Deposit, the balance of the Purchase Price, subject to proration and closing adjustments, shall be paid by Purchaser, without contingencies, at Closing, by wire transfer of funds immediately available to Escrow Agent, pursuant to written wire instructions given by Seller's receiver to Escrow Agent.

The sum referred to in <u>Section 5(a)</u> hereof shall be held in escrow by the Escrow Agent and shall be invested in an interest bearing, federally insured bank account. Said funds and any interest earned thereon shall be paid to the party entitled to finally retain the same in accordance with the provisions elsewhere set forth herein.

7.      TITLE: Within  FIFTEEN (15) business days after the Effective Date of this Agreement, Purchaser shall procure and cause to be delivered to Purchaser a preliminary title report issued by Fidelity National Title (the "Title Company") on the Property.  Within TEN (10) calendar days following receipt thereof, Purchaser shall either approve in writing the exceptions contained in said title report or specify in writing any exceptions to which Purchaser reasonably objects.  If Purchaser objects to any exceptions, Seller shall, within FIFTEEN  (15) calendar days after receipt of Purchaser's objections, deliver to Purchaser written notice that either (i) Seller will, at Seller's expense, attempt to remove the exception(s) to which Purchaser has objected before the Closing Date or (ii) Seller is unwilling or unable to eliminate said exception(s).  If Seller fails to so notify Purchaser or is unwilling or unable to remove any such exception by the Closing Date, Purchaser may elect to terminate this Agreement and receive back the entire Deposit, in which event Purchaser and Seller shall have no further obligations under this Agreement; or, alternatively, Purchaser may elect to purchase the Property subject to such exception(s).  Purchaser shall provide Seller with written notification of Purchaser's election within THREE (3) calendar days of receipt of Seller's notice.  Purchaser's failure to provide any written notification of election within such time shall be deemed an election by Purchaser to purchase Property, subject to such exception(s).

Seller shall convey by warranty deed to Purchaser (or to such other person or entity as Purchaser may specify) marketable fee title subject only to the exceptions approved by Purchaser in accordance with this Agreement.  Title shall be insured by a standard owner's policy of title insurance issued by the Title Company in the amount of the purchase price with premium paid by Seller.

8.      <u>Apportionments and Additional Payments</u>.  The following apportionments and payments are to be made as of 11:59 p.m. on the day preceding the Closing Date (the "**Cut-Off Time**") and shown on the Settlement Statement. Final readings will be made in all instances where applicable and available. Any amounts that would be payable by the Seller pursuant to the following shall be credited to Purchaser as a reduction of the Purchase Price at Closing, such that the Seller shall have no obligation to advance funds to satisfy any of the following obligations.

(a)      Taxes on the basis of the fiscal year for which assessed.  If the Closing of title shall occur before the real estate and personal property tax rate is fixed, the

apportionment of such taxes shall be upon the basis of the tax rate of the year preceding applied to the latest assessed valuation and shall be readjusted by the parties after Closing when the tax rate for the current tax period is fixed. Taxes for the day of Closing shall be a Purchaser expense.

(b)     Water and sewer charges on the basis of the current calendar year.  If there is a water meter on the Property, the unpaid meter charge and the unpaid sewer rents for the time intervening between the date of the last reading thereof and the date of  Closing hereunder shall be apportioned on the basis of such last reading.

(c)     All rents and charges payable under the Leases and Contracts.

(d)     Intentionally Omitted

(e)     At the Closing the Purchaser shall pay to the Seller, in cash or by certified check, over and above the Purchase Price, a sum equivalent to all monies in cash registers (however, Purchaser is not required to purchase any IOUs or payment slips). Such cash registers shall be counted jointly by representatives of the Seller and the Purchaser on the day of the Closing.

(f)     Postage meter rental, and unused meter postage.

(g)     Tour agents' commissions, if any.

(h)     Diners Club commissions, and commissions of other credit organizations, if applicable.

(i)     Hotel Revenues.

(i)     Room revenues for the night prior to the day of the Closing Date shall be divided equally between Purchaser and Seller pursuant to the closing statement to be mutually approved in writing by the Seller and Purchaser.  Other revenues for the night of the Closing Date shall belong solely to Purchaser.

(ii)     Purchaser will honor, for its account, the terms and rates of all pre-closing reservations confirmed by Seller for dates after the Closing Date. Purchaser authorizes Seller to continue to accept reservations for periods after the Closing Date in the ordinary course of Seller's business. Purchaser shall receive a credit for all prepaid deposits for Bookings scheduled to occur on or after the Closing Date, except to the extent such deposits are transferred to Purchaser.  Any post-Closing Date deposits received by Seller with respect to confirmed reservations for dates after the Closing Date will be forwarded to Purchaser upon receipt.

Purchaser will honor, for its account, all of Seller's room allocation agreements, events and banquet facility and service agreements which have been granted to groups, persons or other customers for periods after the Closing Date at the rates and terms provided in such agreements.

(iii)     Seller shall receive a credit for all Retail Merchandise and unopened items of F&B (including, without limitation, all F&B in any "mini bars" in the guest rooms) based on the applicable Seller's cost for such items.

(iv)     Seller shall close out the transactions in the restaurants and bars in the Hotel as of the regular closing time for such restaurants and bars as of the day immediately prior to the Closing Date and retain all monies collected as of such closing, and Purchaser shall be entitled to any monies collected from the restaurants and bars thereafter.

(v)     Seller shall remove all monies from all vending machines, laundry machines, pay telephones and other coin operated equipment as of the Cut-Off Time and shall retain all monies collected therefrom as of the Cut-Off Time, and Purchaser shall be entitled to any monies collected therefrom after the Cut-Off Time.

(vi)     Except to the extent an adjustment or proration is made under another subsection of this Section 6.1, (i) Seller shall pay in full prior to the Closing all amounts payable to vendors or other suppliers of goods or services for the Hotel (the "**Trade Payables**") which are due and payable as of the Closing Date for which goods or services have been delivered to the Hotel prior to Closing, and (ii) Purchaser shall receive a credit for the amount of such Trade Payables which have accrued, but are not yet due and payable as of the Closing Date, and Purchaser shall pay all such Trade Payables accrued as of the Closing Date when such Trade Payables become due and payable; provided, however, Seller and Purchaser shall re-prorate the amount of credit for any Trade Payables and pay any deficiency in the original proration to each Party to which such deficiency is owed promptly upon receipt of the actual bill for such goods or services. Seller shall receive a credit for all advance payments or deposits made with respect to FF&E, Supplies, F&B and Retail Merchandise ordered, but not delivered to the Hotel prior to the Closing Date, and Purchaser shall pay the amounts which become due and payable for such FF&E, Supplies, F&B and Retail Merchandise which were ordered prior to Closing but are delivered to the Hotel on or after the Closing Date.  This Section 6(i)(vi) shall survive the Closing.

(vii)     Revenues from conferences, receptions, catering, meetings and other functions occurring in any conference, banquet or meeting rooms in the Hotel, or in any adjacent facilities owned or operated by Seller, including usage charges and related taxes, food and beverage sales, valet parking charges, equipment rentals and telecommunications charges (collectively, "**Function Revenues**"), shall be allocated between Seller and Purchaser, based on when the function therein commenced, with (x) one-day functions commencing prior to the Cut-Off Time being allocable to Seller, (y) one-day functions commencing after the Cut-Off Time being allocable to Purchaser and (z) multi-day functions being allocated between Seller and Purchaser according to the number of days of the function occurring before the Cut-Off Time and the number of days of the function occurring after the Cut-Off Time.

(viii)    Accounts Receivable.

(A)    At Closing, Seller shall receive a credit in an amount equal to: (i) all amounts charged to the Guest Ledger for all room nights up to (but not including) the night during which the Cut-Off Time occurs, and (ii) one half (½) of all amounts charged to the Guest Ledger for the room night which includes the Cut-Off Time (other than any restaurant or bar charges on the Guest Ledger, which shall be prorated in accordance with Section 6(i)(iv), and any Function Revenues, which shall be prorated in accordance with Section 6(i)(vii)), and Purchaser shall be entitled to retain all deposits made and amounts collected with respect to such Guest Ledger.

(B)    At Closing, Seller shall receive a credit for all Accounts Receivable (other than the Guest Ledger which is addressed in the preceding clause (A)), and Purchaser shall be entitled to all amounts collected for such Accounts Receivable.

(k)  All prepaid unapplied room rentals, and all deposits for advance reservations, banquets, or future services shall be delivered to the Purchaser. The Purchaser shall then expressly assume liability therefor and, to the extent permitted by law, defend, save harmless and indemnify the Seller and other Seller Indemnified Parties from all claims arising with respect to such prepaid amounts after the Closing. This provision shall survive the Closing.

(l) Utilities; Meter Readings. At closing, the parties shall cause meter readings to be taken for the consumption of electricity, steam, water, gas, and telephone services. Charges for such items prior to Closing shall be paid for by Seller and charges for such items after closing shall be the responsibility of the Purchaser.

During the period after the Due Diligence Period through the Closing Date, the parties and their respective accountants shall cooperate to review all proration made under this Section 6 as more accurate data becomes available, and the Seller and the Purchaser shall prepare a final accounting of proration and adjustments as of the date of the Closing. Within ten (10) days after the accounting is completed, the Seller or the Purchaser, as the case may be, shall pay to the other the amount as may be required by the final accounting. The final accounting shall re-calculate and re-apportion any items that (i) were not apportioned on the settlement statement because of the unavailability of information, (ii) which were apportioned on the settlement statement based upon estimated or incomplete information, or (iii) for which errors existed on the settlement statement. The final accounting shall be final, and there shall be no further adjustment between the Seller and the Purchaser for apportionment items.

9.    Warranties.

9.1     The Seller hereby represents and warrants that the following are true and will be true as of the Closing Date:

(a)     Seller has good and marketable title to the Land and the Hotel, and title to all of the other Property to be purchased, sold and assigned under the terms of this Agreement, and the same are not subject to any liens, charges or encumbrances of any type, except for Permitted Exceptions;

(b)   To the best of Seller's Receivers knowledge there are no outstanding written notices or written orders from any governmental authority with respect to the condition of the Land, buildings and improvements comprised as part of the Property or the repair of the same, or with respect to any claim to violation of laws, ordinances, statutes, building codes, regulations and orders applicable thereto.  Any written notices of violation issued by any governmental authority prior to closing shall not be deemed an objection to title provided, however, that if the cost of correction (in excess of any penalties levied against the Seller) exceeds $10,000.00  and the Seller is unwilling to cure such violation without a corresponding increase in the purchase price, then the Purchaser may elect, as its sole and exclusive remedy, either: (i) to terminate this Agreement whereupon the Deposit held by the Escrow Agent shall be returned to the Purchaser and neither party shall have any further recourse or legal rights against the other, other than those obligations which specifically survive termination of this Agreement, or (ii) close the purchase of the Property subject to the above described violation and reduce the purchase price by the cost of the cure of the violation up to a maximum of $10,000.00  If the cost to cure any violations is less than $10,000.00, the Seller will cure such violation or credit the amount needed to cure such violation to the Purchase Price, at Purchaser's option. Seller has no knowledge of any pending or threatened actions or proceedings regarding condemnation of or encumbrances on the ownership, use or possession of the Property or any part thereof; Seller has received no written notice from any insurance company terminating or threatening to terminate any policy of hazard or public liability insurance, or increasing or threatening to increase the premiums therefor, as a result of defects or inadequacies in the Property;

(c)     To the best of Seller's and Receiver's knowledge, there are certain legal actions, such as liens on the property or other legal or administrative proceedings pending or threatened against the Property or the Seller not covered by insurance, copies of which proceedings will be delivered to Purchaser with the title report.  In the event there is information to Seller's or Receiver's knowledge that may not be within the title report, Receiver shall deliver copies of all relevant documents for such legal or administrative proceedings within five (5) days of receipt of the title report.

(d)     Seller' Receiver has the full power, legal right and authority to enter into, execute, and deliver this Agreement and to consummate the transactions contemplated in this Agreement, and that this Agreement has been duly executed and delivered by Seller's Receiver and is a valid and legally binding obligation of Seller, enforceable in accordance with its terms except as its validity and enforceability may be limited by bankruptcy,

insolvency, or similar laws of general application affecting the enforcement of creditors' rights generally. For ease of reference, Seller's Receiver shall deliver the relevant documents to Purchaser evidencing their legal right and authority. To the best of Seller's knowledge and except for termination of Seller's existing franchise and any consents or approval with respect to the Leases and Contracts, neither the execution and delivery nor the performance of this Agreement by Seller will violate the terms of any agreements between Seller and third parties, or would with the passage of time or giving of notice constitute a default under any judgment, order, law, regulation or agreement of any nature.

(e) There are no labor or union contracts or bargaining agreements in effect with respect to the Hotel. As of Closing, Seller shall terminate (i) except as otherwise approved by Purchaser in writing in Purchaser's sole and absolute discretion, the coverage of all employees (whether Retained Employees, as hereinafter defined, or otherwise) as active participating employees of Seller, in all of Seller's retirement plans, welfare plans, supplemental retirement plans, deferred compensation plans and severance plans, if any, and (ii) all employment contracts between all employees, whether Retained Employees or otherwise.

(f) Seller's Receiver is a "United States person" (as defined in Section 7701(a)(30)(B) or (C) of the Internal Revenue Code of 1986 (the "**Code**")) for the purposes of the provisions of Section 1445(a) of the Code.

7.2 The Purchaser hereby represents and warrants, which shall be effective as of the Closing Date, that:

(a) Purchaser has the full power, legal right and authority to enter into, execute, and deliver this Agreement and to consummate the transactions contemplated in this Agreement, and that this Agreement has been duly executed and delivered by Purchaser and is a valid and legally binding obligation of Purchaser, enforceable in accordance with its terms except as its validity and enforceability may be limited by bankruptcy, insolvency, or similar laws of general application affecting the enforcement of creditors' rights generally. To the best of Purchaser's knowledge and except for termination of Seller's existing franchise and any consents or approval with respect to the items referred to on **Exhibit "B"** hereof, neither the execution and delivery nor the performance of this Agreement by Purchaser will violate the terms of any agreements between Purchaser and third parties, or would with the passage of time or giving of notice constitute an default under any judgment, order, law, regulation or agreement of any nature.

(b) Purchaser will carry out and perform all of its obligations under the Agreement in a prompt and diligent manner, including, but not limited to, payment when due of all costs and expenses of Purchaser under this Agreement.

(c) Purchaser represents and warrants to the best of its knowledge that Purchaser has the funds necessary to Close the sale pursuant to this Agreement.

(d) Purchaser does intend to obtain a mortgage loan in connection with Closing, however, the obligations of the Purchaser under this Agreement are not in any manner contingent upon the Purchaser's loan arrangements.

(e)  The representations and warranties of Purchaser in this Section 7.2 shall survive the Closing.

10.     DUE DILIGENCE/CONDITION OF PROPERTY:

(a)     Subject to Section 17(b) hereof, at the time of Closing, the Property shall be in the same condition as it is now, reasonable use and wear thereof excepted.  Purchaser acknowledges and agrees that Purchaser shall have full opportunity to investigate each and every aspect of the Condition of the Property during the Due Diligence Period (provided that the Purchaser shall not conduct any soil tests or sampling or any boring, digging, drilling or other physical intrusion of the Property without the express written consent of Seller, which may be withheld in Seller's sole discretion) including:

(i)     All matters relating to title, together with all governmental and other legal requirements such as taxes, assessments, zoning, use permit requirements and building codes.

(ii)     The physical condition of the Real Property and other assets being acquired hereunder, including without limitation, the interior, exterior, the size of any improvements, the paving, the utilities and all other physical and functional aspects of the Real Property. Such examination may include an examination for the presence or absence of Hazardous Materials, as such term is listed or regulated in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended to date and other related federal or state laws, statutes or regulations relating to environmental contamination.

(b)     Except as otherwise specifically set forth in this Agreement, Purchaser acknowledges that Seller has not made and Seller specifically disclaims any warranty, guaranty or representation, oral or written relating to (i) the nature and condition of the Real Property and other assets or (ii) compliance of the Real Property or Improvements with any law, ordinance or other order, rule or regulation of any governmental body.

(c)     Purchaser acknowledges that it is and will rely solely on its own investigation of the Property made before and during the Due Diligence Period and therefore will accept the Property in an "as is, where is and with all faults basis" existing on the Closing Date.

(d)     Purchaser hereby agrees to protect, defend, indemnify and hold harmless Seller, its employees, agents, successors and assigns from and against any and all loss, cost, injury, damage, lien (including, but not limited to, mechanics' liens), suit, action, proceeding, investigation, claim, demand, counterclaim, judgment, liability, fine, penalty, and

expense, including, but not limited to, reasonable attorneys' fees, court costs, costs of investigation, remediation costs and disbursements (collectively, "**Losses**") of any nature whatsoever suffered or incurred by or made against Seller (including without limitation for property damages or bodily and/or personal injuries), its employees, agents, successors or assigns, arising out of or in any way relating to the acts or omissions of Purchaser or its Affiliates, employees, contractors, subcontractors, engineers and agents in conducting the Purchaser's due diligence, the inspection, investigation, testing and/or any other activities by or on behalf of Purchaser its affiliates, employees, contractors, subcontractors, engineers and agents in connection with the Property.  In no event shall Purchaser be liable hereunder for Losses arising from the gross negligence or willful misconduct of Seller or its affiliates, agents, contractors, representatives or employees or for any Losses resulting from the mere discovery of a pre-existing condition.  Any inspection, investigation and/or Testing shall be at Purchaser's sole cost and expense.  Purchaser shall promptly restore at Purchaser's sole cost and expense any physical damage to the Property caused by any such inspection, investigation and/or testing of the Property.  Purchaser shall, upon completion of any inspection, investigation, or testing, restore promptly, at Purchaser's sole cost and expense, the Property to substantially the same condition as existed prior to such inspection, investigation, or testing.

(e)     In conducting any inspections, tests, investigations or studies of the Property, Purchaser and its agents and representatives shall:  (i) not unreasonably disturb the tenants or guests  or interfere with their use of the Property; (ii) not interfere with the operation and maintenance of the Property; (iii) not damage any part of the Property or any personal property owned or held by any tenant or any third party; (iv) not injure or otherwise cause bodily harm to Seller, the tenant under the Lease, or their agents, guests, invitees, contractors and employees or any tenants or their guests or invitees; (v) comply with all applicable laws; (vi) promptly pay when due the costs of all inspections, tests, investigations, and studies done with regard to the Property; (vii) not permit any liens to attach to the Property by reason of the exercise of its rights hereunder; (viii) promptly repair any damage to the Property and restore any areas disturbed resulting directly or indirectly from any such inspections, tests, investigations or studies to their condition prior to the performance of such tests or studies; and (ix) not reveal or disclose any information obtained concerning the Property and the certain items and information pertaining to the Property.

(f)     In the event the Closing does not occur for any reason, Purchaser shall return to Seller all materials, documents, information, or items made available or otherwise disclosed in writing with respect to the Property provided to Purchaser by Seller or Seller's agents or which were prepared for Purchaser by third parties, including any photocopies thereof.  In any event, Purchaser shall, until the Closing, (i) maintain the confidentiality, of (x) all materials delivered by Seller or an affiliate or representative of Seller and (y) the results of Purchaser's due diligence investigation including, but not limited to, all drafts or final engineering and architectural reports, environmental reports and lab analyses, appraisals, construction and renovation estimates, as applicable, commissioned and received from third parties by Purchaser, and (ii) disclose such materials only (A) to its employees, agents, affiliates, prospective investors, partners, prospective lenders, attorneys, consultants and advisors who need to review such materials in connection with the transaction contemplated

hereby, (B) to any governmental authority in connection with any judicial, administrative or other legal proceedings, suits or actions, to the extent Purchaser is advised by counsel that it is required to do so; *provided*, that Purchaser or its counsel shall deliver notice to Seller as to the nature and scope of such disclosure prior to it making such disclosure.

11.   Seller's Covenants.  After the date hereof and prior to Closing, Seller covenants (which covenants shall not survive closing except as expressly indicated below) that:

(a)      During the period between the date hereof and the Closing, the Seller shall continue to operate the Property in the same manner as previously operated including maintaining operating inventory levels, advertising programs and maintenance. It is the intention of the parties that the general operation of the Property shall not be changed in any material respect between the date hereof and the Closing Date other than the termination of the Franchise.

(b)      All taxes, with the exception of sales tax obligations to the applicable governmental agencies of the State of Texas for the month of Closing, have been paid.  The Seller shall remain responsible after Closing for the sales taxes due through the date of Closing, but not paid at the time of Closing.

(c)      Seller shall terminate the Franchise any management agreement in effect for the Hotel at or prior to the closing without liability to Purchaser.

(d)       Seller shall not amend or modify any of the Leases and Contracts without the prior written consent of Purchaser, which may be given or withheld in its sole discretion, other than to have Seller (and its principals, if guarantors) released from liability upon Closing.

12.   Survival and Limitation.  The representations, warranties and covenants of Seller set forth in or made pursuant to this Agreement shall survive the Closing for a period of three months and shall not be deemed merged into any instrument of conveyance delivered at the Closing; *provided*, that no action or proceeding thereon shall be valid or enforceable, at law or in equity, if not commenced on or before three months after Closing; and *provided*, *further* that (i) Seller shall in no event have any liability for any consequential, indirect, exemplary or punitive damages, (ii) in no event shall the total liability of Seller under this Agreement exceed, in the aggregate,  $50,000.00 (the **"Cap Limitation"**), and (iii) Seller shall have no liability for any claims by Purchaser unless such claims, in the aggregate, are in excess of $50,000.00 and in such case, liability is from first dollar; provided, however, that the Cap Limitation shall not be applicable to any liability that Purchaser may have with respect to Seller's power and authority (or lack thereof) to enter into and perform this Agreement and each other agreement contemplated hereby to which it is a party.   Notwithstanding the foregoing, if, prior to the Closing, Purchaser obtains actual knowledge that any representation and/or warranty of Seller is inaccurate or incorrect or breach of any covenant and Purchaser nonetheless proceeds with the Closing, then Seller shall have no liability for any such inaccurate or incorrect representation or warranty or such breached covenant.

13.     <u>Employees</u>.    Seller or its affiliate will terminate the employment of all employees at the Hotel as of the Closing. If this Agreement has not been terminated prior to the expiration of the Due Diligence Period, the Seller shall provide to Purchaser within five (5) business days after the expiration of the Due Diligence Period, a list of all persons employed by the Seller or its affiliate in connection with the Hotel which sets forth their name, position, salary/wages, employment date, average hours of scheduled work per week, none of which is pursuant to an employment contract or other agreement for ongoing employment obligations.

The Seller also hereby agrees to indemnify and hold the Purchaser harmless from any and all claims arising out of employment contracts in effect prior to the Closing, except for claims arising out of any such contracts which have been assumed by Purchaser and which claims first arise after the date any such contracts are so assumed, including reasonable attorneys' fees incurred in connection therewith.

Purchaser hereby covenants and agrees to make offers to a sufficient number of employees at the Hotel to avoid applicability of the Worker Adjustment Retraining and Notification Act and any so-called state mini-WARN Acts (collectively, the "**WARN Act**"). Purchaser agrees to indemnify, defend and hold harmless Seller and its affiliates from and against any loss, damage, liability, claim, cost or expense (including reasonable attorneys' fees, and also including any amounts payable by Seller or its affiliates, whether by contractual indemnity or otherwise) that may be incurred by, or asserted against, Seller or its affiliates arising out of or relating to Purchaser's failure, if any, to comply with the WARN Act with respect to the employees working at or for the Hotel.

14.     <u>Safe Deposit Boxes</u>.  The Seller shall send written notice to guests who have safe deposit boxes advising of the sale of the Property to the Purchaser and requesting the removal and verification of the contents not later than five (5) days prior to Closing.  All boxes shall be opened on the Closing Date in the presence of representatives of Seller and Purchaser and the contents thereof shall be recorded.  On the Closing Date, Seller shall deliver to Purchaser all keys for such safe deposit boxes.  Any property contained in the safe deposit boxes and so recorded and thereafter remaining in such safe deposit box shall be the responsibility of Purchaser, and Purchaser hereby agrees to indemnify and save and hold Seller and the manager of the Hotel harmless from and against any claim or obligation with respect to such property.  Any claim with respect to property that is not recorded and that was allegedly in the safe deposit boxes prior to the recording of the inventory shall be the sole responsibility of Seller, and Seller hereby agrees to indemnify and save and hold Purchaser harmless from and against any such claim.

15.     <u>Baggage Inventory</u>.  On the Closing Date, employees, agents or representatives of Seller and Purchaser jointly shall make a written inventory of all baggage, boxes and similar items checked in or left in the care of Seller at the Hotel, and Seller shall deliver to Purchaser the keys to any secured area which such baggage and other items are stored (and thereafter such baggage, boxes and other items inventoried shall be deemed the "**Inventoried**

**Baggage**"). Purchaser shall be responsible for, and shall indemnify and hold harmless the Seller Indemnified Parties in accordance with Section 39 from and against any loss incurred by the Seller Indemnified Parties with respect to any theft, loss or damage to any Inventoried Baggage from and after the time of such inventory, and any other baggage, boxes or similar items left in the care of Purchaser which was not inventoried by Seller and Purchaser. Seller shall be responsible for, and shall indemnify and hold harmless the Purchaser Indemnified Parties in accordance with Section 39 from and against, any loss incurred by any Purchaser Indemnified Party with respect to any theft, loss or damage to any Inventoried Baggage left in the care of Seller prior to the time of such inventory and any other baggage, boxes or similar items left in the care of Seller which was not inventoried by the Seller and Purchaser..

     16.    <u>Security Deposits</u>.  At the Closing, the Seller shall turn over to the Purchaser any security deposits, if any, (where not prohibited by the terms of the lease) and in connection with the receipt thereof, the Purchaser agrees that after the receipt thereof it will hold and apply the security for the purposes set out in the lease and indemnify the Seller against any liability in connection therewith.

     17.    <u>Special Assessments</u>.  If, at the time of the Closing, the Property, or any part thereof, shall be or shall have been affected by a special real estate tax or assessment or assessments, any installments that may be due prior to closing shall be paid for by Seller and any installments that may be due after closing shall be paid for by Purchaser.  If at the time of closing there are any past due assessment that relate to the period prior to Closing, those past due assessments shall be paid by Seller, at its cost and expense.

     18.    <u>Conveyance</u>.  Seller shall convey insurable title to the Land and the Hotel pursuant to the  Deed (as defined below) and the other Property pursuant to the Bill of Sale and Assignment (as such terms are defined below) so as to vest Seller's title to the Property in the Purchaser or Purchaser's nominee. Seller and Purchaser shall each pay one-half of:  (a) any transfer tax, documentary stamp tax, conveyance tax, sales tax or any other similar taxes relating to the conveyance of the Property to Purchaser; and (b)  any escrow fees charged by Escrow Agent in connection with the consummation of the transaction contemplated by this Agreement.  Purchaser shall pay expenses, fees, recording, survey and other costs due from and after the Closing related to the transfer and assumption of the Leases and Contracts (including closing costs and lease transfer costs incident to the transfer of any title to any motor vehicle) and for recording of the Deed, any title and survey charges.  Seller shall pay any transfer or assignment fees assessed by the third parties with respect to the Leases and Contracts, and the costs of recording of any documents required to convey title to the Property as required hereunder. The parties agree to reasonably cooperate with each other to bring about the transfer and shall execute any vendor forms, provided they do not change the intent of the parties for the transaction which is the subject to this Agreement.

     19    <u>Reserved</u>. [2]

---

[2] NTD:  Now covered in definition of "Property" and covered by Section 15 above.

20.     Risk of Loss; Destruction or Taking of Property by Casualty and/or Eminent Domain.

(a)     Notice to Purchaser.  The Seller agrees to give the Purchaser prompt notice of any fire or other casualty costing more than $50,000.00  to repair and occurring at the Property between the Effective Date of this Agreement and the Closing Date, and of any written notice received by Seller's officers or directors of any actual or threatened condemnation of all or any part of the Property.

(b)     Casualty or Taking.  If, prior to the Closing, there shall occur: (i) damage to or destruction of the Property caused by fire or other casualty which would cost $1,000,000.00 or more to repair, or (ii) a taking by condemnation or eminent domain proceedings of a material part of the land and/or improvements, then, and in either such event, the Purchaser may terminate its obligations under this Agreement (other than those obligations which survive any termination of this Agreement) by written notice given to the Seller within five (5) days after the Seller has given the Purchaser the notice referred to in Section 17(a) hereof or at the Closing, whichever is earlier and receive a full refund of the  Deposit held by Escrow Agent.  If the Purchaser does not so elect to terminate its obligations under this Agreement, then the Closing shall take place as herein provided without abatement of the purchase price, and the  Seller shall assign to the Purchaser at the Closing, by written instrument, all of Seller's interest in any insurance proceeds (except use and occupancy insurance and business interruption insurance for the period ending with the Closing Date) and any deductible for the loss or condemnation awards which may be payable to the Seller on account of any such fire, casualty or condemnation, or the amount thereof not expended for or required to reimburse the Seller for reasonable expenditures made by the Seller on account of obtaining such proceeds or awards or on account of paying for such restoration shall be credited against the Purchase Price.  If, prior to Closing, there shall occur: (i) damage to or destruction of the Property caused by fire or other casualty which would cost less than Six Million and 00/100 Dollars ($6,000,000.00) to repair, or (ii) a taking pending or threatened by condemnation or eminent domain proceeding of any part of the Property which does not include a material part of the land and/or improvements, then, and in any such event, neither party shall have the right to terminate its obligations under this Agreement by reason thereof and the Closing shall take place without abatement of the Purchase Price, but the Seller shall assign to Purchaser at the Closing, by written instrument all of Seller's interest in any insurance proceeds (except use and occupancy insurance and business interruption insurance for the period ending with the Closing Date) and any deductible for the loss or condemnation awards which may be payable to Purchaser by Seller on account of any such fire, casualty or condemnation, or the amount thereof not previously expended for or required to reimburse Seller for reasonable expenditures made by Seller on account of obtaining such proceeds or awards or on account of paying for such restoration shall be credited against the Purchase Price.

      (c)    Definition of Material Taking.  For purposes of this <u>Section 17</u>, a taking by condemnation or eminent domain proceedings of a material part of the land and/or improvements shall mean any taking by condemnation which is more than $6,000,000.00.

22.    OTHER BROKERS: Purchaser and Seller agree that, in the event any broker other than Agent or a broker affiliated with Agent is involved in the disposition of the Property, Agent shall have no liability to Purchaser or Seller for the acts or omissions of such other broker, who shall not be deemed to be a subagent of Agent.

23.    LIMITATION OF LIABILITY:  Except for Agent's gross negligence or willful misconduct, Agent's liability for any breach or negligence in its performance of this Agreement shall be limited to the greater of $25,000 or the amount of compensation actually received by Agent in any transaction hereunder.

24.    SCOPE OF AGENT'S AUTHORITY AND RESPONSIBILITY:  Agent shall have no authority to bind either Purchaser or Seller to any modification or amendment of this Agreement.  Agent shall not be responsible for performing any due diligence or other investigation of the Property on behalf of either Purchaser or Seller, or for providing either party with professional advice with respect to any legal, tax, engineering, construction or hazardous materials issues.  Except for maintaining the confidentiality of any information regarding Purchaser or Seller's financial condition and any future negotiations regarding the terms of this Purchase Agreement, Purchaser and Seller agree that their relationship with Agent is at arm's length and is neither confidential nor fiduciary in nature.

25.    BROKER DISCLAIMER:  Purchaser and Seller acknowledge that, except as otherwise expressly stated herein, Agent has not made any investigation, determination, warranty or representation with respect to any of the following:  (a) the financial condition or business prospects of any tenant, or such tenant's intent to continue or renew its tenancy in the Property;  (b) the legality of the present or any possible future use of the Property under any federal, state or local law; (c) pending or possible future action by any governmental entity or agency which may affect the Property; (d) the physical condition of the Property, including but not limited to, soil conditions, the structural integrity of the improvements, and the presence or absence of fungi or wood-destroying organisms; (e) the accuracy or completeness of income and expense information and projections, of square footage figures, and of the texts of leases, options, and other agreements affecting the Property; (f) the possibility that lease, options or other documents exist which affect or encumber the Property and which have not been provided or disclosed by Seller; or (g) the presence or location of any hazardous materials on or about the Property, including, but not limited to, asbestos, PCB's, or toxic, hazardous or contaminated substances, and underground storage tanks.  Agent has no expertise with respect to hazardous or contaminated substances.  Purchaser is strongly advised by Agent to seek advice and inspections from competent hazardous materials experts.

Purchaser agrees that investigation and analysis of the foregoing matters is Purchaser's sole responsibility, and that Purchaser shall not hold Agent responsible therefor.  Purchaser

further agrees to reaffirm its acknowledgment of this disclaimer at close of escrow and to confirm that it has relied upon no representations of Agent in connection with its acquisition of the Property.

26.    ARBITRATION OF DISPUTES AND WAIVER OF JURY TRIAL:  All disputes arising between the Parties with respect to the subject matter of this Purchase Agreement or the transaction contemplated herein (including but not limited to the parties' rights to the Deposit or the payment of commissions as provided herein) shall be settled exclusively by final, binding arbitration.  The judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction.

The arbitration will proceed in the county where Agent's office is located and be conducted by the American Arbitration Association ("AAA"), or such other administrator as the parties shall mutually agree upon, in accordance with the AAA's then-applicable Commercial Arbitration Rules (the "Rules"). Any party who fails or refuses to submit to arbitration following a demand by the other party shall bear all costs and expenses, including attorneys' fees, incurred by such other party in compelling arbitration.

Any arbitration will be decided by a single arbitrator selected according to the Rules. The arbitrator will decide any pre-hearing motions which are similar to motions to dismiss for failure to state a claim or motions for summary adjudication and may grant any remedy or relief that a court could order or grant on similar motions.  The arbitrator shall apply the provisions of this Purchase Agreement without varying therefrom, and shall not have the power to add to, modify, or change any of the provisions hereof.

In any arbitration proceeding discovery will be permitted only in accordance with the terms of this paragraph.  Discovery by each party shall be limited to:  (i) a maximum number of five (5) depositions limited to four hours each; (ii) requests for production of documents; (iii) two interrogatories:  one inquiring into the amount of damages sought by the other party and another into the calculation of those damages; and (iv) subpoenas upon third parties for production of documents, depositions, and to appear at a hearing.  The scope of discovery may be expanded only upon the mutual consent of the parties. Discovery not set forth in this paragraph shall not be permitted.

The Parties understand and agree that they are entering into this arbitration agreement voluntarily, and that by doing so they are waiving their rights to a jury trial or to have their claims otherwise litigated in court.

27.    SUCCESSORS & ASSIGNS:  This Agreement and any addenda hereto shall be binding upon and inure to the benefit of the heirs, successors, agents, representatives and assigns of the parties hereto

28.     Intentionally Deleted.

29.     NOTICES:  All notices required or permitted hereunder shall be given to the parties in writing (with a copy to Agent) at their respective addresses as set forth below. Should the date upon which any act required to be performed by this Agreement fall on a Saturday, Sunday or holiday, the time for performance shall be extended to the next business day.

30.     FOREIGN INVESTOR DISCLOSURE:  Seller's Receiver and Purchaser agree to execute and deliver any instrument, affidavit or statement, and to perform any act reasonably necessary to carry out the provisions of this Foreign Investment in Real Property Tax Act and regulations promulgated thereunder.  Seller's Receiver hereby declares that he is not a foreign person as that term is defined by the United States Internal Revenue Code.

31.     ADDENDA:  Any addendum attached hereto and either signed or initialed by the parties shall be deemed a part hereof.  This Agreement, including addenda, if any, expresses the entire agreement of the parties and supersedes any and all previous agreements between the parties with regard to the Property.  There are no other understandings, oral or written, which in any way alter or enlarge its terms, and there are no warranties or representations of any nature whatsoever either express or implied, except as set forth herein. Any future modification of this Agreement will be effective only if it is in writing and signed by the party to be charged.

32.     ACCEPTANCE AND EFFECTIVE DATE:  Purchaser's signature hereon constitutes an offer to Seller to purchase the Property on the terms and conditions set forth herein.   Delivery shall be effective upon personal delivery to Purchaser or Purchaser's agent or, if by mail, on the next business day following the date of postmark.  The "Effective Date" of this Agreement shall be the later of (a) the date on which Seller executes this Agreement, or (b) the date of or written acceptance (by either Purchaser or Seller) of the final counter-offer submitted by the other party.

33.     GOVERNING LAW:  This Agreement shall be governed by and construed in accordance with the laws of the State of Texas.

34.     Responsible Broker:  Responsible broker in this transaction shall be Marcus & Millichap Real Estate Investment Services of Texas and Viral Amin of Amin Realty.

35.     Waiver, Change, or Modification.  This Agreement may not be changed orally, but only by an agreement in writing signed by both parties.

36.     Entire Agreement.  This Agreement and Exhibits attached hereto constitutes the entire agreement between the parties hereto and shall survive closing except as expressly provided herein to the contrary.  At Closing the Property shall be conveyed "as is" and the Seller is not liable or bound in any manner by expressed or implied warranties, guaranties, promises, statements, or representations pertaining to the Property or to the personal property,

the condition thereof, the rentals, or any other matter whatsoever, made or furnished by any real estate broker, agent, employee, servant, or other person representing or purporting to represent the Seller, unless such warranties, guaranties, promises, statements, or representations are expressly and specifically set forth herein.

37.    Closing.  The closing ("**Closing**") of the transaction which is the subject of this Agreement shall take place by mail or at the office of the Escrow Agent set forth in Section 5(a) above at 11:00 am local time in Houston, Texas, or such other place as the parties may mutually agree, or via mail with an escrow letter of instructions mutually acceptable in writing by both parties, on the date that set forth within this Agreement, which is One Hundred Twenty (120) days after the expiration of the Due Diligence Period, subject to the extensions to be delivered, if necessary, as provided for in the paragraph below (the "**Closing Date**").

Seller and Seller's Court Appointed Receiver agree to give Purchaser Two (2), Thirty (30) Day extensions to close, only if Purchaser experiences delays in acquiring approvals from the local municipality.   Purchaser shall deliver to Seller an additional non-refundable deposit in the amount of Ten Thousand ($10,000.00) for each such 30-day extension period, which  additional deposit will then be applied to the Purchase Price as a credit to Purchaser at Closing.

38.    Seller's Documents at Closing.  At the Closing the Seller shall deliver to the Purchaser, the following:

(a)    Special Warranty Deed to Property in the form attached hereto as **Exhibit "I"** (the "**Deed**")

(b)    Bill of Sale for the FF&E and any other articles of personal property to be conveyed in the form attached hereto as **Exhibit "J"** (the "**Bill of Sale**")

(c)    Assignment of Leases, Contracts, Permits and Licenses and Warranties in the form attached hereto as **Exhibit "K"** (the "**Assignment**").

(d)    Owners' Affidavit in the form attached hereto as **Exhibit "L"**.

(e)    Any transfer tax affidavits and/or forms required in connection with the Deed;

Intentionally Omitted.

(f)    Seller's entity resolution authorizing the sale of the Hotel to Purchaser.

(g)    Certificates of Good Standing for Seller and Lender

(h)    Affidavit required by the Foreign Investment in Real Property Tax Act in the form attached hereto as **Exhibit "M"**.

.

(i)     Such other documents as Purchaser or Escrow Agent may reasonably request in order to carry out the terms hereof.

39.     <u>Purchaser Documents at Closing</u>.   At the closing, the following shall be delivered and paid by the Purchaser:

(a)     The consideration set forth in <u>Section 5</u> hereof, including the balance of the Purchase Price.

(b)     The Assignment.

(c)      Intentionally Omitted..

(d)     Intentionally Omitted.

(e)     Purchaser's entity resolution authorizing the purchase of the Hotel from Seller.

(e)     Certificates of Good Standing for Purchaser.

(f)     Such other documents as Escrow Agent may reasonably request in order to carry out the terms hereof.

39.     <u>Expenses</u>.

(a) The following expenses are to be paid by Seller:

(i)     One-half of any escrow fees charged by Escrow Agent in connection with the consummation of the transaction contemplated by this Agreement; and

(ii)     preparation of the Special Warranty Deed and Seller transfer documents

(iii)     Any transfer tax, documentary stamp tax, conveyance tax, sales tax or any other similar taxes relating to the conveyance of the Property to Purchaser.

(b) The following expenses are to be paid by Purchaser:

(i)     One-half of any escrow fees charged by Escrow Agent in connection with the consummation of the transaction contemplated by this Agreement;

(ii)     deed recording;

(iii)      The costs of and related to an owner's and lender's title insurance commitment, policy (and endorsements, if any required by Purchaser) and the costs related to title searches, abstracts, and continuations;

(iv)      Purchaser shall have bonds or security deposits in an adequate amount to transfer all utilities as of the date of Closing; and

The agreements set forth in this <u>Section 35</u> shall survive Closing or any termination of this Agreement.

40.    <u>Titles</u>.  The titles of the sections in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, or describe the scope of this Agreement or the intent of any provision hereof.

41.    <u>Default</u>.    If Purchaser fails to close within the time specified and defaults, the Deposit shall be retained by or for the account of the Seller as agreed to liquidated damages and not as a penalty and this shall be the Seller's sole remedy at law or in equity. The parties agree that actual damages for such breach would be difficult to ascertain and hereby agree that the mutually agreed to liquidated damages provisions of this Agreement are fair and reasonable and should apply.

If the Seller refuses to perform this Agreement (provided Purchaser is not in default and is ready, willing and able to close this transaction) the Purchaser may have any one of the following remedies: (i) seek specific performance or (ii) elect to terminate this Agreement and receive the return of its Deposit held by Escrow Agent.  Notwithstanding the foregoing, if Seller is not able to obtain specific performance due to an act or omission of Seller, then Purchaser shall have all of its rights and remedies at law or in equity.[3]

42.    <u>Escrow</u>.      The Escrow Agent receiving funds is authorized and agrees by acceptance thereof to promptly deposit and to hold same in escrow and to disburse same subject to clearance thereof in accordance with terms and conditions of this Agreement.  In the event of doubt as to its duties or liabilities under the provisions of this Agreement, the Escrow Agent may, in its sole discretion, continue to hold the monies which are the subject of this escrow until the parties mutually agree to the disbursement thereof, or until a judgment of a court of competent jurisdiction shall determine the rights of the parties thereto, or it may deposit all the monies then held pursuant to this Agreement with the Clerk of the Superior Court of the geographic area having jurisdiction of the dispute, and upon notifying all parties concerned of such action, all liability on the part of the Escrow Agent shall fully terminate,

---

[3] NTD:  Consider whether to include provision providing that Purchaser can recover deal costs as damages.

except to the extent of accounting for any monies theretofore delivered out of escrow. In the event of any suit between the Purchaser and the Seller wherein the Escrow Agent is made a party by virtue of acting as such Escrow Agent, interpleads the subject matter of this escrow, the Escrow Agent shall be entitled to recover a reasonable attorney's fee and costs incurred, said fee and costs to be charged and assessed as court costs to be paid by the non-prevailing party. All parties agree that the Escrow Agent shall not be liable to any party or person whomsoever for mis-delivery to the Purchaser or the Seller of monies subject to this escrow, unless such mis-delivery shall be due to willful breach of this Agreement or gross negligence on the part of the Escrow Agent.

43. <u>Notices</u>.

(a) Any notice or consent required to be given pursuant to this Agreement or otherwise desired to be delivered by one party to the other, shall be effective only if in a writing which is either: (i) personally delivered to such party at its address set forth in the introductory paragraph of this Agreement (or to such other place as the party to receive such notice shall have specified by notice in advance thereof) or (ii) via UPS Overnight or other commercial message service, fees and costs prepaid of such service, and all notices shall be deemed to be received upon the date of signing of the receipt for delivery by said service (or refusal of such delivery). Notwithstanding the foregoing, if a party gives notice to the other party by fax or by email, and the other party acknowledges in writing receipt of that notice, such notice by fax or email shall be deemed effective notice.

(b) A copy of every notice shall be given to the Escrow Agent at its address set forth in <u>Section 5(a)</u> above in the same manner as above provided for Seller and Purchaser.

44. <u>Assignment</u>. Provided Purchaser is not in breach or default hereunder, not less than three (3) business days prior to Closing, with written notice from Purchaser to Seller, Purchaser shall have the right to assign its interest in this Agreement among its affiliates, who will assume in writing all duties, obligations, covenants and conditions of Purchaser. In the event that an assignment of this Agreement may be subject to the imposition of realty transfer tax or other applicable taxes, then the party so assigning the Agreement shall be liable for the payment of the same. In furtherance of the foregoing, Seller agrees to execute and deliver to Purchaser a novation agreement, in form and content satisfactory to Purchaser and Seller, in order to novate this Agreement to Purchaser's designees, so long as (a) Seller's rights and obligations hereunder shall not be affected, and (b) the same shall be at the cost and expense of Purchaser.[4]

45. <u>Interpretation</u>. For all purposes of this Agreement except as otherwise expressly provided or unless the context otherwise requires, this Agreement and all questions of interpretation, construction and enforcement hereof, and all controversies arising hereunder, shall be governed by and adjudicated in accordance with the internal laws of the State of Texas.

46.      (a) <u>Post Closing Liabilities</u>. Purchaser hereby agrees that it alone shall be liable for the payment of all costs and expenses, liabilities, obligations and claims arising out of its ownership of the Property and in connection with the Leases and Contracts on **<u>Exhibit "B"</u>** which arise and are payable subsequent to the Closing Date (collectively the "**Post-Closing Liabilities**").  Purchaser shall not have any liability for any payments related to the Leases and Contracts, installment payments, utilities and the like which arise prior to Closing, even if billed subsequent to Closing.  Purchaser agrees to defend, indemnify and hold Seller and the other Seller Indemnified Parties harmless from any and all loss, cost or damage, including reasonable attorney's fees, arising from any of the Post-Closing Liabilities.  The provisions of this <u>Section 31(a)</u> shall survive Closing.

(b)  <u>Pre-Closing Liabilities</u>. Seller shall make payment of all costs and expenses, liabilities, obligations and claims arising out of its ownership of the Property which fall due prior to the Closing Date (collectively the "**Pre-Closing Liabilities**"), however, Seller shall not have any liability for payments or obligation under any contracts, leases, installment payments, utilities and the like which continue from and after Closing for any portion accruing after the Closing.  Seller agrees, to the extent permitted by law, to defend, indemnify and hold Purchaser harmless from any and all loss, cost or damage, including reasonable attorney's fees, arising from any of the Pre-Closing Liabilities.  The provision of this <u>Section 31(b)</u> shall survive Closing.

47.   <u>Counterparts; Facsimiles.</u>   This Agreement may be executed in one or more counterparts, each of which when taken together shall constitute one and the same instrument. Facsimiles and other electronic copies of this Agreement shall serve as originals for all purposes to the extent permitted by law.

48.   <u>Enforcement Costs</u>. If any legal action or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees, court costs (including, without limitation, all such fees, costs and expenses incident to any appeals), incurred in that action or proceeding, in addition to any other relief to which such party may be entitled.

49.   <u>Time; Dates</u>.  Time is important to the parties hereto and shall be of the essence in the performance of this Agreement, and they have agreed that strict compliance is required as to any date or time periods set forth or described herein. All references to days herein (unless otherwise specified) shall include Saturdays, Sundays and legal Holidays. If the final date of any period which is set forth or described in this Agreement falls upon a Saturday, Sunday or legal Holiday under the laws of the United States or the State of Texas, then, in such event, the time of such period shall be extended to the next day which is not a Saturday, Sunday or legal Holiday.

50.   <u>Number and Gender</u>   Whenever the context so requires, words of one gender

shall include other genders and the singular shall include plural.

51.   <u>SCOPE OF LIABILITIES</u>     Except as otherwise provided in this Agreement, all obligations of the Seller with regard to this Agreement and the transactions contemplated by this Agreement shall be deemed to be fully discharged and satisfied upon the consummation of the Closing, except for those provisions which specifically provide that they survive the Closing.

Except as otherwise provided in this Agreement, all obligations of the Purchaser with regard to this Agreement and the transactions contemplated by this Agreement shall be deemed to be fully discharged and satisfied upon the consummation of the Closing, except for those provisions which specifically provide that they survive the Closing or which by the terms of this Agreement are intended to be applicable after the Closing, including, but not limited to, those referred to in Section 31 above.

52.   <u>NO RECORDATION</u>         The Purchaser agrees that it shall not record this Agreement or any memorandum thereof, and that any attempt on the part of the Purchaser or its agents to record this Agreement or any memorandum thereof shall constitute a breach of this Agreement by Purchaser.  In the event of such breach, the Seller shall be entitled to declare this Agreement to be in default, to terminate this Agreement, to cause the Deposit to be disbursed to the Seller as agreed to liquidated damages and not as a penalty, it being agreed by the parties that actual damages would be difficult to ascertain, and any other remedy available at law or at equity.

53.  <u>INDEMNITY</u>
(a)     Purchaser agrees, to the extent permitted by law, that it shall hold harmless, defend and indemnify Seller and the other Seller Indemnified Parties from and against any and all suits, claims, judgments, lawsuits, losses, damages, costs and expenses Seller or the Seller other Indemnified Parties may sustain or have asserted against them as a result of (i) operation of the Hotel by Purchaser and accruing or occurring from and after the Closing Date and (ii) any breaches of the representations and warranties of Purchaser set forth in <u>Section 7.2</u>.  This provision shall survive the Closing and termination of this Agreement.

(b)     Seller agrees that it shall hold harmless and indemnify Purchaser from any and all suits, claims, judgments, lawsuits, losses, damages, costs and expenses Purchaser may sustain as a result of (i) operation of the Hotel by Seller and accruing or occurring before the Closing Date.  This provision shall survive the Closing and termination of this Agreement and (ii) subject to the limitations set forth herein, including without limitation those set forth in <u>Section 9</u> above, any breaches of the representations and warranties of Seller set forth in <u>Section 7.1</u>.

54.    1031 EXCHANGE.  If either party intends to effectuate the sale of the Property pursuant to a "like-kind" exchange in accordance with Section 1031, or such other pertinent provisions, of the Internal Revenue Code of 1986, as amended, each party agrees to cooperate with the other party and execute such documentation as may be reasonably necessary for such party to effectuate such exchange.  In no event shall either party be obligated to incur any cost

in connection with the other party's exchange nor shall the Closing Date be extended in connection with same.

### 55. SELLER'S ACCEPTANCE AND AGREEMENT TO PAY COMMISSION

The undersigned Seller and Lender accepts the foregoing offer and agrees to sell the Property to Purchaser for the price and on the terms and conditions stated herein.  Seller acknowledges receipt of an executed copy of this Agreement and authorizes Agent to deliver an executed copy to Purchaser.

Seller reaffirms its agreement to pay Marcus & Millichap, Three point seven five Percent (3.75%)  real estate brokerage commission of the purchase and sales price and one point seven five Percent (1.75%) to Viral Amin of Amin Realty calculated on a full purchase price of $11.8 Million.  Said commission is payable in full on the Closing Date and shall be paid in cash through escrow.  Escrow Holder is directed to make such payment to Agent from Seller's proceeds of sale.  The provisions of this paragraph may not be amended or modified without the written consent of Agent.

56. The parties shall negotiate and agree on the form of and attach all exhibits to this Agreement during the first 30 days of the Due Diligence period. Seller shall cause the Escrow Agent to prepare all exhibits that are documents intended to be executed at Closing.

**[Remainder of Page Left Intentionally Blank]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be signed the day and year first above written.

<u>**Purchaser:**</u>

Crowne Plaza Suites Houston, LLC
a Delaware limited liability company

By:_____
          Name: Alberto Benamu
          Title:   Managing Member

<u>**Seller:**</u>

**Dongtai Investment Group, LLC ,**

a  limited liability company

*Michael S Udayan*

          Name:  Michael Udayan
          Title:   Court appointed Receiver

## <u>Joinder by Escrow Agent</u>

**The undersigned, having been named as Escrow Agent by the parties to the foregoing agreement hereby joins in the execution of the agreement for the purpose of confirming its agreement to act as Escrow Agent hereunder and to abide by all terms and conditions applicable to the duties and obligations of the Escrow Agent.**

_____

_____

_____

**By:** _____

**Name:**_____

**Title:** _____

**Phone:**_____

**Date:** _____

Exhibit "A"

**Fidelity National Title Insurance Company**
4111 Executive Parkway, Suite 304
Westerville, OH 43081
Phone: (614)865-1562 Fax: (614)865-1565

**Fidelity National Title**

### Settlement Statement

| | |
|---|---|
| **Settlement Date:** | May 27, 2021 |
| **Disbursement Date:** | May 27, 2021 |
| **Order Number:** | GLW2100040 |
| **Buyer:** | LW HOUSTON VIII, LLC, a Delaware limited liability company |
| | 207 West 25th Street |
| | New York, NY 10001 |
| **Seller:** | Dongtai Investment Group, LLC, a Texas limited liability company |
| | 9090 Southwest Freeway |
| | Houston, TX 77074 |
| | See Loan Disbursement Statement GLW2100898 |
| **Lender:** | BLUE TORCH FINANCE LLC, a Delaware limited liability company, as Administrative Agent for the Lenders, together with its successors and/or assigns |
| **Property:** | 9090 Southwest Freeway |
| | Houston, TX 77074 |

| Seller Debit | Seller Credit | | Buyer Debit | Buyer Credit |
|---|---|---|---|---|
| | | **Total Consideration** | | |
| | 11,800,000.00 | Purchase Price | 11,800,000.00 | |
| | | Earnest Money Deposit wired in 2/19/21 | | 400,000.00 |
| | | Liquidated Damages Credit | | 500,000.00 |
| | | Termination of Crowne Plaza Brand paid for by purchaser | 500,000.00 | |
| | | **Payoffs** | | |
| 9,637,743.83 | | Payoff good through 5/21/21 Loan 60028 and 60029 to New Era Life Insurance Company and Philadelphia Am RELEASE POST CLOSING use per diem per lender 5/25/21 C5, 6 | | |
| | | Principal Balance       9,037,217.65 | | |
| | | Interest To               565,219.65 | | |
| | | Additional Interest (From 05/21/21 To 05/27/21 @ 1,443.440000 Per Diem)    8,660.64 | | |
| | | Late Fee                    26,505.89 | | |
| | | Bounced check                  140.00 | | |
| | | Total Payoff            9,637,743.83 | | |
| 58,962.94 | | Insurance Payment to New Era Life Insurance Company and Philadelphia Am C5, 6 | | |
| 12,000.00 | | ISC Professional Fee to New Era Life Insurance Company and Philadelphia Am C5, 6 | | |
| 65,334.11 | | Attorney Fees to New Era Life Insurance Company | | |



**Settlement Statement**

| | | | | Buyer | |
|---|---|---|---|---|---|
| Seller | | | | Debit | Credit |
| Debit | Credit | | | | |
| | | **Payoffs (continued)** | | | |
| | | and Philadelphia Am C5, 6 | | | |
| | | **Loan Charges $(12,192,000.00)** | | | 12,192,000.00 |
| | | Source of Funds from Lender | | | |
| | | **Closing Costs** | | | |
| 3,197.94 | | Lien for Fire Protection invoices 15596 and 156154 RELEASE BEING GIVEN POSTCLOSE to Fire Safe Protection Services, LP C7 | | | |
| 692,754.63 | | Real Estate Taxes Payoff 104-367-000-0005 Court Cause No.: 2020-52097 (See Litigation Payoff #55) to Harris County Tax Collector-Ann Harris Bennett NEED RELEASE Per Suit No. 2020-52097 May Payment C10, C11 | | | |
| 28,130.57 | | State Tax Lien Clerk File 2020-545537 confirmed SC 5/27/21 to Texas State Comptroller NEED RELEASE Clerk's File Number 2020-545537 C12 | | | |
| 25,045.00 | | Harris County Occupancy Tax to Harris County and Houston Sports Authority need payment information B13 | | | |
| 37,772.86 | | City of Houston Occupancy Tax to Houston First Corporation amount confrmed 5/27/21 B13 | | | |
| 24,955.00 | | Labor and Materials to Ameripride Construction Company invoice 173463 | | | |
| 7,500.00 | | Fogging to R & I Restoration Wizards, LLC invoice 5881 | | | |
| 36,631.75 | | Real Estate Taxes (See Litigation Payoff #55) to Southwest Mgmt Dist NEED RELEASE May C10 C11 | | | |
| 377.75 | | Court Costs (See Litigation Payoff #55) to District Clerk of Court | | | |
| 710.00 | | Title Fees / Court Fees (See Litigation Payoff #55) to Linebarger Goggan Blair & Sampson, LLP | | | |
| | | Legal Fee to Avi Weiss | | 19,913.93 | |
| | | **Commissions** | | | |
| 442,500.00 | | Broker Commission to Marcus & Millichap | | | |
| 177,000.00 | | Broker Commision to Viral Amin of Amin Realty | | | |
| | | Broker Commission to First National Realty need invoice | | 549,287.57 | |
| | | Broker Commission to Marcus & Millichap | | 20,000.00 | |



**Settlement Statement**

| Seller Debit | Seller Credit | | Buyer Debit | Buyer Credit |
|---|---|---|---|---|
| | | **Title and Escrow to Fidelity National Title** | | |
| 1,000.00 | | Escrow Closing Fee | 1,000.00 | |
| | | Title Insurance Premium Owner's $12,792,000.00 | 50,712.00 | |
| | | Exception to area and boundaries (Procedural Rule P-2 or P-8.a.(2) / Rate Rule R-16) | 7,606.80 | |
| | | Title Insurance Premium Loan $13,641,585.00 | 3,133.00 | |
| | | Standard exception relating to taxes (Procedural Rule P-20 / Rate Rule R-19) | 20.00 | |
| | | Standard exception relating to taxes not yet due (Procedural Rule P-20 / Rate Rule R-24) | 5.00 | |
| | | Title Out of Pockets | 500.00 | |
| | | **Transfer and Recording Charges** | | |
| | | Recording & Service Fees to Fidelity National Title Insurance Company | 950.00 | |
| | | **Prorations/Adjustments** | | |
| | 138,871.70 | 2021 ISD, Collegel, City, County, Port Authority, Taxes Annually 219 days @ 634.11737 per day at $231,452.84 05/27/21-12/31/21 | 138,871.70 | |
| 11,251,616.38 | 11,938,871.70 | **Subtotals** | 13,092,000.00 | 13,092,000.00 |
| | | **Balance Due FROM Buyer** | | 0.00 |
| 687,255.32 | | **Balance Due TO Seller** | | |
| 11,938,871.70 | 11,938,871.70 | **Totals** | 13,092,000.00 | 13,092,000.00 |

**See signature page to follow**

**Settlement Statement**

BUYER

LW HOUSTON VIII, LLC, a Delaware limited liability company

BY:_____

SELLER

Dongtai Investment Group, LLC, a Texas limited liability company

BY: _____

MICHAEL S. UDAYAN 5/27/2021
RECIEVER DONGTAI INVESTMENT GROUP

**No conveyance tax nor mortgage tax in Texas.**
**\*\*NOTE\*\* All prorations defined in the Contact for Purchase and Sale, except taxes shown on the closing statement, are to be handled by the parties outside of closing.**



**Fidelity National Title Insurance Company**
4111 Executive Parkway, Suite 304
Westerville, OH 43081
Phone: (614)865-1562 Fax: (614)865-1565

**Settlement Statement**

| | |
|---|---|
| **Settlement Date:** | May 28, 2021 |
| **Disbursement Date:** | May 28, 2021 |
| **Order Number:** | GLW2100040 |
| **Buyer:** | LW HOUSTON VIII, LLC, a Delaware limited liability company<br>207 West 25th Street<br>New York, NY 10001 |
| **Seller:** | Dongtai Investment Group, LLC, a Texas limited liability company<br>9090 Southwest Freeway<br>Houston, TX 77074 |
| | See Loan Disbursement Statement GLW2100898 |
| **Lender:** | BLUE TORCH FINANCE LLC, a Delaware limited liability company, as Administrative Agent for the Lenders, together with its successors and/or assigns |
| **Property:** | 9090 Southwest Freeway<br>Houston, TX 77074 |

| Seller | | | Buyer | |
|---|---|---|---|---|
| Debit | Credit | | Debit | Credit |
| | 11,800,000.00 | **Total Consideration** | | |
| | | Purchase Price | 11,800,000.00 | |
| | | Earnest Money Deposit wired in 2/19/21 | | 400,000.00 |
| | | Liquidated Damages Credit | | 500,000.00 |
| | | Termination of Crowne Plaza Brand paid for by purchaser | 500,000.00 | |
| | | **Payoffs** | | |
| 9,639,187.27 | | Payoff good through 5/21/21 Loan 60028 and 60029 to New Era Life Insurance Company RELEASE POST CLOSING use per diem per lender 5/25/21 C5, 6 | | |
| | | Principal Balance        9,037,217.65 | | |
| | | Interest To        565,219.65 | | |
| | | Additional Interest (From 05/21/21 To 05/28/21 @ 1,443.440000 Per Diem)        10,104.08 | | |
| | | Late Fee        26,505.89 | | |
| | | Bounced check        140.00 | | |
| | | Total Payoff        9,639,187.27 | | |
| 58,962.94 | | Insurance Payment to New Era Life Insurance Company C5, 6 | | |
| 12,000.00 | | ISC Professional Fee to New Era Life Insurance Company C5, 6 | | |
| 65,334.11 | | Attorney Fees to New Era Life Insurance Company C5, 6 | | |

**Settlement Statement**

| Seller | | | Buyer | |
|---|---|---|---|---|
| Debit | Credit | | Debit | Credit |
| | | **Loan Charges $(12,192,000.00)** | | |
| | | Source of Funds from Lender | | 12,192,000.00 |
| | | **Closing Costs** | | |
| 3,197.94 | | Lien for Fire Protection invoices 15596 and 156154 RELEASE BEING GIVEN POSTCLOSE to Fire Safe Protection Services, LP C7 | | |
| 692,754.63 | | Real Estate Taxes Payoff 104-367-000-0005 Court Cause No.: 2020-52097 (See Litigation Payoff #55) to Linebarger Goggan Blair & Sampson, LLP NEED RELEASE Per Suit No. 2020-52097 May Payment C10, C11 | | |
| 28,133.18 | | State Tax Lien Clerk File 2020-545537 confirmed SC 5/27/21 to Texas State Comptroller NEED RELEASE Clerk's File Number 2020-545537 C12 | | |
| 25,928.80 | | Harris County Occupancy Tax good through 5/31/21 Suit for Taxes Case 2020-69746 to Harris County Tax Office amount confirmed on 5/27/21 B13 C12 | | |
| 37,772.86 | | City of Houston Occupancy Tax to Houston First Corporation amount confrmed 5/27/21 B13 | | |
| 24,955.00 | | Labor and Materials to AmeriPride Construction invoice 173463 | | |
| 7,500.00 | | Fogging to R & I Restoration Wizards, LLC invoice 5881 | | |
| 36,631.75 | | Real Estate Taxes (See Litigation Payoff #55) to Linebarger Goggan Blair & Sampson, LLP NEED RELEASE May C10 C11 | | |
| 377.75 | | Court Costs (See Litigation Payoff #55) to Linebarger Goggan Blair & Sampson, LLP | | |
| 710.00 | | Title Fees / Court Fees (See Litigation Payoff #55) to Linebarger Goggan Blair & Sampson, LLP | | |
| | | Legal Fee to Avi Weiss | 9,802.34 | |
| 371.25 | | Court Costs Suit for Taxes Case 2020-69746 to Harris County District Clerk's Office C12 | | |
| 2,500.00 | | Attorneys Fees Suit for Taxes Case 2020-69746 to Harris County Attorney's Office C12 | | |
| | | **Commissions** | | |
| 442,500.00 | | Broker Commission to Marcus & Millichap Real Estate Investment Services | | |
| 177,000.00 | | Broker Commision to Amin Realty Inc. | | |

**Settlement Statement**

| Seller | | | Buyer | |
|---|---|---|---|---|
| Debit | Credit | | Debit | Credit |
| | | **Commissions (continued)** | | |
| | | Broker Commission to First National Realty need invoice | 549,287.57 | |
| | | Broker Commission to Marcus & Millichap Real Estate Investment Services | 20,000.00 | |
| | | **Title and Escrow to Fidelity National Title** | | |
| 1,000.00 | | Escrow Closing Fee | 1,000.00 | |
| | | Title Insurance Premium Owner's $12,792,000.00 | 50,712.00 | |
| | | Exception to area and boundaries (Procedural Rule P-2 or P-8.a.(2) / Rate Rule R-16) | 7,606.80 | |
| | | T19.1 Survey Amendment End | 5,071.20 | |
| | | T19.2 Mineral Surface End | 50.00 | |
| | | T23 Access End | 100.00 | |
| | | Title Insurance Premium Loan $13,641,585.00 | 3,133.00 | |
| | | Standard exception relating to taxes (Procedural Rule P-20 / Rate Rule R-19) | 20.00 | |
| | | Standard exception relating to taxes not yet due (Procedural Rule P-20 / Rate Rule R-24) | 5.00 | |
| | | Title Out of Pockets | 500.00 | |
| | | T14 First Loss End | 25.00 | |
| | | T16 Agregation End | 25.00 | |
| | | T19 Restrictions End | 5,374.50 | |
| | | T23 Acces Endo | 100.00 | |
| | | **Transfer and Recording Charges** | | |
| | | Recording & Service Fees to Fidelity National Title Insurance Company | 950.00 | |
| | | **Prorations/Adjustments** | | |
| | 138,237.59 | 2021 ISD, Collegel, City, County, Port Authority, Taxes Annually 218 days @ 634.11737 per day at $231,452.84 05/28/21-12/31/21 | 138,237.59 | |
| 11,256,817.48 | 11,938,237.59 | **Subtotals** | 13,092,000.00 | 13,092,000.00 |
| | | **Balance Due FROM Buyer** | | 0.00 |
| 681,420.11 | | **Balance Due TO Seller** | | |
| 11,938,237.59 | 11,938,237.59 | **Totals** | 13,092,000.00 | 13,092,000.00 |

**See signature page to follow**

**Settlement Statement**

BUYER

LW HOUSTON VIII, LLC, a Delaware limited liability company

BY: _____

SELLER

Dongtai Investment Group, LLC, a Texas limited liability company

BY: _____

**No conveyance tax nor mortgage tax in Texas.**
**\*\*NOTE\*\* All prorations defined in the Contact for Purchase and Sale, except taxes shown on the closing statement, are to be handled by the parties outside of closing.**

**Settlement Statement**

BUYER

LW HOUSTON VIII, LLC, a Delaware limited liability company

BY:_____

SELLER

Dongtai Investment Group, LLC, a Texas limited liability company

BY: _____

MICHAEL S. UDAYAN 5/27/2021
RECIEVER DONGTAI INVESTMENT GROUP

**No conveyance tax nor mortgage tax in Texas.**
**\*\*NOTE\*\* All prorations defined in the Contact for Purchase and Sale, except taxes shown on the closing
statement, are to be handled by the parties outside of closing.**



_Samuel E. Brown_

Name Printed:

Address: 12375 Bissonnet St. Ste G
Houston, Texas. 77099

Phone: 281-468-1287
Fax: 281-988-8455

SWORN TO AND SUBSCRIBED before me on the _26_ day of _May_, 202_1_  , by                      .

SAMUEL E. BROWN
Notary Public, State of Texas
Comm. Expires 04-25-2025
Notary ID 131102634

_Samuel E. Brown_

Notary Public, State of _Texas_

---

used in the construction of improvements or repairs on the Property have been fully paid and satisfied, except the following (if none, insert none below):

NONE

4.  There are no loans or liens (including federal tax liens, state tax liens and judgment liens), unpaid taxes (ad valorem, state or federal), assessments, and/or homeowners' association dues, or other charges of any kind on or against the Property, except the following (if none, insert none below):

NONE

AFFIANT UNDERSTANDS THAT THE PAYOFF AMOUNT(S) ON LOANS AND LIENS LISTED ABOVE ARE IN ACCORDANCE WITH STATEMENTS GIVEN BY THE SECURED PARTY AND SHOULD THE SECURED PARTY REQUIRE ANY ADDITIONAL AMOUNT IN ORDER TO RELEASE SAID LOANS, AFFIANT (AND OWNER/BORROWER IF OWNER/BORROWER IS AN ENTITY) AGREES TO PAY THAT ADDITIONAL AMOUNT AND HOLD ESCROW AGENT AND ITS UNDERWRITER HARMLESS FROM SUCH ADDITIONAL AMOUNT AND ANY OTHER LIEN NOT SPECIFICALLY REFERENCED ABOVE.

5.  There are no paving liens of any kind or character or paving claims outstanding against the Property, and no petitions have been signed for the paving of any street or alley adjoining the Property, and Affiant knows of no petitions being circulated for payment of the streets, alley or sidewalks adjacent to the Property.

6.  There are no lawsuits or claims pending against Owner/Borrower, except the following (if none, insert none below):

NONE

7.  Affiant realizes these representations are made to induce the Title Company and its underwriter to insure the title to the subject Property and that the Title Company and its underwriter are relying upon the truth of said statements.  In consideration thereof, Affiant/Owner/Borrower hereby agrees to indemnify and hold harmless Title Company and its underwriter, their successors and assigns, from any claims, costs, and damages, causes of action, expenses and attorney fees in any way arising from the inaccuracy of the above representations. Affiant further recognizes that any false or fraudulent representations knowingly made in this Affidavit may subject Affiant/Owner/Borrower to criminal liability.

8.  For the purposes of this affidavit, where the context requires: (i) the singular shall include the plural; (ii) the plural shall include the singular; and (iii) the use of any gender shall include all genders.

Name Printed:  MICHAEL S UDAYAN

Address: 7503 Northwoods Dr.
             Houston, TX 77074

Phone: 281-910-5856
Fax:    713-779-0709

# DEBTS, LIENS AND POSSESSION AFFIDAVIT

Date:  5/18/2021
File No.:
Title Company (including address):
FNF Family of Companies
601 Riverside Avenue, Building 5, 7th Floor
Jacksonville, Florida 32204


Underwriter (including address):
**Josephine "Jo" Signore**
Commercial Underwriter
FNF Family of Companies
601 Riverside Avenue, Building 5, 7th Floor
Jacksonville, Florida 32204

Owner:  Ameripride Construction Company
Affiant:
Property: Crowne Plaza Suites, 9090 Southwest Freeway Houston, TX 77074


Affiant on oath swears that the following statements are true:

☐   <u>Individual</u>.      I am the Owner/Borrower of the Property.  I am over the age of 18 years and I am fully
                      competent to execute this affidavit.

☐   <u>Entity</u>.         I am the of Owner of Ameripride Construction Company, a Limited Liability Company.
X                     I am over the age of 18 years and I am fully competent to execute this affidavit.  I am
                      executing this affidavit as an individual and in my representative capacity on behalf of
                      Owner of my construction Company

1.   There are no parties occupying, renting, leasing, residing or possessing the Property or any portion
     thereof, nor is Affiant aware of any parties claiming title to the subject Property or any portion thereof by
     reason of adverse possession, except the following who do not have an option to purchase or right of
     first refusal as to the Property (if none, insert none below):

     _____

2.   There are no unpaid debts for any personal property or fixtures that are located on the Property, and no
     such items have been purchased on time payment contracts, and there are no security interests on such
     property secured by financing statements, security agreements, or otherwise, except the following (if
     none, insert none below):

     NONE

3.   ☐   There have been no improvements or repairs constructed on the Property within the preceding
         five (5) months.

     ☐   There have been improvements or repairs constructed on the Property within the preceding five
     X   (5) months, but said improvements or repairs have been completed, and all labor and materials

in the North right-of-way line of Southwest Freeway;

THENCE, South 32°30'21" West, a distance 308.00 feet to the POINT OF BEGINNING and containing 2.9956 acres of land.

Reservations from and Exceptions to Conveyance and Warranty:

The herein described property is conveyed subject to any validly existing easements, rights-of-way, and prescriptive rights, whether of record or not; all presently recorded and validly existing restrictions, reservations, covenants, conditions, oil and gas leases, mineral interests, and water interests outstanding in persons other than Grantor, and other instruments, other than conveyances of the surface fee estate, that affect the Property.

**Conveyance:**

Grantor, for the Consideration and subject to the Reservations from Conveyance and the Exceptions to Conveyance and Warranty, grants, sells, and conveys to Grantee the Property, together with all and singular the rights and appurtenances thereto in any way belonging, to have and to hold it to Grantee and Grantee's heirs, successors, and assigns forever. Grantor binds Grantor and Grantor's heirs and successors to warrant and forever defend all and singular the Property to Grantee and Grantee's heirs, successors, and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof when the claim is by, through, or under Grantor but not otherwise, except as to the Reservations from Conveyance and the Exceptions to Conveyance and Warranty.

When the context requires, singular nouns and pronouns include the plural.

EXECUTED ON May 24, 2021

                              Michael S Udayan
                              Michael S. Udayan, Court Appointed Receiver
                              appointed by Judge Ellison of the Southern District
                              of Texas on behalf of Dongtai Investment Group,
                              LLC., a Texas Limited Liability Company


                    **(Acknowledgment)**

THE STATE OF TEXAS

COUNTY OF HARRIS

This instrument was acknowledged before me on the 21st day of May2021, by Michael S. Udayan, Court Appointed Receiver appointed by Judge Ellison of the Southern District of Texas on behalf of Dongtai Investment Group, LLC., a Texas Limited Liability Company

SAMUEL E. BROWN
Notary Public, State of Texas
Comm. Expires 04-25-2025
Notary ID 131102634

                              Notary Public, State of Texas

**AFTER RECORDING RETURN TO:**

SPECIAL WARRANTY DEED                                            Page 2 of 1

**SPECIAL WARRANTY DEED**

**NOTICE OF CONFIDENTIALITY RIGHTS:  IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS:  YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER**

Date:  May 20, 2021

**Grantor:**    Dongtai Investment Group, LLC. by and through Michael S. Udayan, Receiver appointed by court order on March 8 , 2021, in Cause No. 4:19-CV-1848, in the United State District Court of the Southern District of Texas, Texas, styled " Xiongen Jiao, *et al* v. Ningbo XU, et al", a copy of which order is attached hereto as Exhibit "A", and said Receiver acting under Order Authorizing Sale of Property by Receiver signed on March 8, 2021, a copy of which order is attached hereto as Exhibit "B".

**Grantor's Mailing Address:**

9090 Southwest Freeway,
Houston TX, 77074

**Grantee:**    Crown Plaza Suites Houston, LLC.

**Grantee's Mailing Address:**

207 West 25th Street
New York, NY

**Consideration:**

TEN AND NO/100 ($10.00) DOLLARS and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

**Property (including any improvements):**

A 2.9956 acres (130,489 sq. ft.) tract of land, being a portion of Reserve "A" of Commerce Park Section 1, as recorded in Volume 179, Page 111, Harris County Map Records, out of and a part of the James Wells Survey, Abstract No. 830 and the Willis Yates Survey, Abstract No. 1433, Harris County, Texas and being more particularly described by metes and bounds as follows:

Beginning, at a set 5/8-inch iron rod at the intersection of the Southwest Freeway (300-feet wide) (US 59) North right-of-way line and the east right-of-way line of Commerce Park Drive (60- feet wide) at the southeast end of the cutback line;

THENCE, South 79°57'38" West, along said cutback line, a distance of 13.52 feet to a set 5/8-inch iron rod in the east right-of-way line of Commerce Park Drive;

THENCE, North 52°34'52" West, along the east right-of-way line of Commerce Park Drive, a distance of 355.23 feet to a set "X" at a point of curvature to the right;

THENCE, along said curve to the right, a length of 79.90 feet, a radius of 150.00 feet, a delta of 30°31'14", and a chord bearing North 37°19'15" West, a distance of 78.96 feet, to set 5/8-inch iron rod also being the westerly corner of a called 3.8052 acres tract, as described by FCPT SW Properties, LLC, as recorded in H.C.C.F. No. 20150517038;

THENCE, North 32°30'10" East, along the south line of said 3.8052 acres and northwest line of herein described tract, a distance of 259.47 feet to a set 5/8-inch iron rod marking the northerly corner of herein described tract;

THENCE, South 57°29'50" East, along the southerly line of said 3.8052 acres and the northeast line of herein described tract, a distance of 438.00 feet to a set 5/8-inch iron rod

SPECIAL WARRANTY DEED                                                                                     Page 1 of 1

**3. Signature**

Claimant's Signature: **Michael S Udayan**

Claimant's Name: MICHAEL S UDAYAN

Date of Signature: 05/21/2021

**4. Notary**

County of Harris

State of Texas

*Samuel E. Brown*

Notary Public

NOTARY PUBLIC

Title (and Rank)

My commission expires   4-25-2025

SAMUEL E. BROWN
Notary Public, State of Texas
Comm. Expires 04-25-2025
Notary ID 131102634

# Contractor's (Mechanic's) COMPLETE Lien Release

**NOTICE TO CLAIMANT: THIS DOCUMENT MAY WAIVE AND RELEASE THE LIEN, STOP PAYMENT NOTICE, AND ANY PAYMENT BOND RIGHTS CONDITIONALLY OR UNCONDITIONALLY AND STATES THAT YOU HAVE BEEN PAID FOR GIVING UP THOSE RIGHTS. THIS DOCUMENT IS ENFORCEABLE AGAINST YOU IF YOU SIGN IT, EVEN IF YOU HAVE NOT BEEN PAID. IF YOU HAVE NOT BEEN PAID, CHECK THE CONDITIONAL WAIVER AND RELEASE CLAUSE.**

## 1. Identifying Information

Name of Claimant: Ameripride Construction Company

Name of Customer: Dongtai Investment Group LLC

Job Location:  9090 Southwest Freeway, Houston, Texas, 77074

Through Date: 05/21/2021

Owner: LW Houston VIII, LLC

 207 West 25th Street, New York, New York

NEW YORK, New York

10001

**Unconditional Waiver and Release** - This document waives and releases lien, stop payment notice, and payment bond rights the claimant has for labor and service provided, and equipment and material delivered, to the customer on this job through the Through Date of this document. Rights based upon labor or service provided, or equipment or material delivered, pursuant to a written change order that has been fully executed by the parties prior to the date that this document is signed by the claimant, are waived and released by this document, unless listed as an Exception below. The claimant has received the following progress payment of 43,789.00 dollars.

## 2. Exceptions

This document does not affect any of the following:

Retentions;

Extras for which the claimant has not received payment;

Contract rights, including (A) a right based on rescission, abandonment, or breach of contract, and (B) the right to recover compensation for work not compensated by the payment.

# EXHIBIT C

**List of Contractors providing labor or materials on the construction project who have not been paid**

**NONE**

# EXHIBIT B
## List of Contractors providing labor or materials on the construction project

**Ameripride Construction Company**

**R & I Restoration Wizards, LLC**

## EXHIBIT A
### Property

**Crowne Plaza Suites**
**9090 Southwest Freeway**
**Houston, TX 77074**
**https://www.ihg.com/crowneplaza/hotels/us/en/houston/houvr/hoteldetail**

OWNER'S CONSTRUCTION CERTIFICATION AND INDEMNITY- Texas

3



Notary Public, State of

The construction of improvements or repairs on the Property has commenced, but have not been fully completed;

☐ The construction of improvements or repairs on the Property have been fully completed on or
X 5/19/2021 in strict accordance with all plans, specifications and agreements agreed to by Contractor and Owner.

2. As of the date of this Certification, the only contractor(s) retained by Owner for the construction of improvements or repairs located on the Property are:

☐ Those set forth in Exhibit B, a copy of which is attached hereto and incorporated herein for all purposes

3. As of the date of this Certification, all bills or claims due contractor(s), for labor and materials used in the construction of the improvements or repairs have been fully paid and satisfied, except for (if none, check "None" below):

☐ X None

☐ Those set forth in Exhibit C, a copy of which is attached hereto and incorporated herein for all purposes

4. It is expressly understood that Escrow Agent and its underwriter are relying upon the truth of these statements for the purpose of issuing policies of title insurance on the above described Property without exception to mechanics' liens. In consideration thereof, Affiant/Contractor hereby agrees to indemnify and hold harmless Escrow Agent and its underwriter, their successors and assigns, from any claims, costs, and damages, causes of action, expenses and attorney fees in any way arising from the inaccuracy of the above representations. Affiant/Contractor further recognizes that any false or fraudulent representations knowingly made in this Affidavit may subject Affiant/Contractor to criminal liability.

5. For the purposes of this affidavit, where the context requires: (i) the singular shall include the plural; (ii) the plural shall include the singular; and (iii) the use of any gender shall include all genders.

AFFIANT

Michael S Udayan
Name Printed:  MICHAEL S UDAYAN
Address:  7503 Northwoods Dr. Sugar Land, TX 77479
Phone:  281-910-5856
Email:  michael.udayan@gmail.com

SWORN TO AND SUBSCRIBED before me on the 20th day of May, 2021, by Michael Udayan.

# OWNER'S CONSTRUCTION CERTIFICATION AND INDEMNITY

Date: 5/19/2021

File No.:

Escrow Agent (including address):
Date: 5/18/2021
File No.:
Title Company (including address):
FNF Family of Companies
601 Riverside Avenue, Building 5, 7ᵗʰ Floor
Jacksonville, Florida 32204


Underwriter (including address):
Underwriter (including address):
**Josephine "Jo" Signore**
Commercial Underwriter
FNF Family of Companies
601 Riverside Avenue, Building 5, 7ᵗʰ Floor
Jacksonville, Florida 32204


Owner:  Owner:  Ameripride Construction Company 7503 Northwoods Drive, Sugar Land TX 77479
Affiant:  General Construction Contractor
Property: Crowne Plaza Suites, 9090 Southwest Freeway Houston, TX 77074

77074

> See Exhibit A, attached hereto and incorporated herein for all purposes;

Affiant oath swears that the following statements are true:


☐   I.      I am the Owner of the Property  in connection with the construction of improvements or repairs located on the Property.

☐   X Entity.      I am the Owner,of Ameripride Construction LLC the Owner of the Company in connection with the construction of improvements or repairs located on the Property. I am executing this affidavit as an individual and in my representative capacity on behalf of Owner.

1.   As of the date of this Certification:

   *(Choose category below that applies)*

   ☐   There has been no commencement of construction of improvements or repairs on the Property or delivery of materials to the Property within the preceding 5 months;

---

Name Printed: _____

Address:

Phone:
Fax:

SWORN TO AND SUBSCRIBED before me on the *24ᵗʰ* day of *May*, 20*21*, by          .

Notary Public, State of *Texas*

SAMUEL E. BROWN
Notary Public, State of Texas
Comm. Expires 04-25-2025
Notary ID 131102634

paid and satisfied, except the following (if none, insert none below):

NONE

4. There are no loans or liens (including federal tax liens, state tax liens and judgment liens), unpaid taxes (ad valorem, state or federal), assessments, and/or homeowners' association dues, or other charges of any kind on or against the Property, except the following (if none, insert none below):

NONE

AFFIANT UNDERSTANDS THAT THE PAYOFF AMOUNT(S) ON LOANS AND LIENS LISTED ABOVE ARE IN ACCORDANCE WITH STATEMENTS GIVEN BY THE SECURED PARTY AND SHOULD THE SECURED PARTY REQUIRE ANY ADDITIONAL AMOUNT IN ORDER TO RELEASE SAID LOANS, AFFIANT (AND OWNER/BORROWER IF OWNER/BORROWER IS AN ENTITY) AGREES TO PAY THAT ADDITIONAL AMOUNT AND HOLD ESCROW AGENT AND ITS UNDERWRITER HARMLESS FROM SUCH ADDITIONAL AMOUNT AND ANY OTHER LIEN NOT SPECIFICALLY REFERENCED ABOVE.

5. There are no paving liens of any kind or character or paving claims outstanding against the Property, and no petitions have been signed for the paving of any street or alley adjoining the Property, and Affiant knows of no petitions being circulated for payment of the streets, alley or sidewalks adjacent to the Property.

6. There are no lawsuits or claims pending against Owner/Borrower, except the following (if none, insert none below):

NONE

7. Affiant realizes these representations are made to induce the Title Company and its underwriter to insure the title to the subject Property and that the Title Company and its underwriter are relying upon the truth of said statements. In consideration thereof, Affiant/Owner/Borrower hereby agrees to indemnify and hold harmless Title Company and its underwriter, their successors and assigns, from any claims, costs, and damages, causes of action, expenses and attorney fees in any way arising from the inaccuracy of the above representations. Affiant further recognizes that any false or fraudulent representations knowingly made in this Affidavit may subject Affiant/Owner/Borrower to criminal liability.

8. For the purposes of this affidavit, where the context requires: (i) the singular shall include the plural; (ii) the plural shall include the singular; and (iii) the use of any gender shall include all genders.

Michael S Udayan
Name Printed: MICHAEL S UDAYAN

Address: 7503 Northwoods Dr.
Houston, TX 77074

Phone: 281-910-5856
Fax: 713-779-0709

**DEBTS, LIENS AND POSSESSION AFFIDAVIT** 2
(Texas)

# DEBTS, LIENS AND POSSESSION AFFIDAVIT

Date: 5/18/2021
File No.:
Title Company (including address):
FNF Family of Companies
601 Riverside Avenue, Building 5, 7ᵗʰ Floor
Jacksonville, Florida 32204


Underwriter (including address):
**Josephine "Jo" Signore**
Commercial Underwriter
FNF Family of Companies
601 Riverside Avenue, Building 5, 7ᵗʰ Floor
Jacksonville, Florida 32204

Owner:  Ameripride Construction Company
Affiant:
Property: Crowne Plaza Suites, 9090 Southwest Freeway Houston, TX 77074


Affiant on oath swears that the following statements are true:

☐   <u>Individual.</u>   I am the Owner/Borrower of the Property.  I am over the age of 18 years and I am
fully competent to execute this affidavit.

☐
X   <u>Entity.</u>   I am the of Owner of Ameripride Construction Company, a Limited Liability Company.
I am over the age of 18 years and I am fully competent to execute this affidavit.  I am
executing this affidavit as an individual and in my representative capacity on behalf of
Owner of my construction Company

1.   There are no parties occupying, renting, leasing, residing or possessing the Property or any portion
thereof, nor is Affiant aware of any parties claiming title to the subject Property or any portion thereof
by reason of adverse possession, except the following who do not have an option to purchase or right
of first refusal as to the Property (if none, insert none below):

_____

2.   There are no unpaid debts for any personal property or fixtures that are located on the Property, and
no such items have been purchased on time payment contracts, and there are no security interests on
such property secured by financing statements, security agreements, or otherwise, except the
following (if none, insert none below):

NONE

3.   ☐   There have been no improvements or repairs constructed on the Property within the
preceding five (5) months.

☐
X   There have been improvements or repairs constructed on the Property within the preceding
five (5) months, but said improvements or repairs have been completed, and all labor and
materials used in the construction of improvements or repairs on the Property have been fully

---

<center>**Release of Liens**</center>

**Date**:      May 28, 2021

**Holder of Note and Liens**:  New Era Life Insurance Company and Philadelphia American Life
Insurance Company

**Notes**:

>   **Date**:  May 19, 2017

>   **Original principal amount**: $7,500,000.00

>   **Borrower**:   Dongtai Investment Group LLC, a Texas limited liability company

>   **Lender**:      New Era Life Insurance Company

and

>   **Date**:  May 19, 2017

>   **Original principal amount**: $2,000,000.00

>   **Borrower**:   Dongtai Investment Group LLC, a Texas limited liability company

>   **Lender**:      Philadelphia American Life Insurance Company

**Notes and Lien Are Described in the Following Documents**:

Deed of Trust and Security Agreement dated May 19, 2017, executed by Dongtai
Investment Group LLC, a Texas limited liability company, to Ted Wu, Trustee, for the
benefit of New Era Life Insurance Company and Philadelphia American Life Insurance
Company recorded under Harris County Clerk's File No. RP-2017-235094 of the Real
Property Records of Harris County, Texas and the vendor's lien retained in the Deed
recorded under Harris County Clerk's File No. RP-2017-235093 of the Real Property
Records of Harris County, Texas. Said Notes being further secured by Assignment of
Leases and Rents filed May 30, 2017, under Clerk's File No. 2017-235095 of the Real
Property Records of Harris County, Texas and the Financing Statement executed by
Dongtai Investments Group, LLC, Debtor, to New Era Life Insurance Company, Secured
Party, filed May 30, 2017, recorded under Clerk's File No. 2017-235096 and 2017-
235097 of the Real Property Records of Harris County, Texas.

<center>1</center>

Notice of Foreclosure Sale dated May 10, 2021 filed under Clerk's File Number 2021-255866 of the Real Property Records of Harris County, Texas.

**Property (including any improvements)**:  The property described on <u>Exhibit A</u> attached hereto.

Holder of Note and Lien is the owner and holder of the Note and the Liens described above.  For value received and in consideration of the full and final payment of the Notes, Holder of Notes and Lien releases the Property from all of the Liens described above.

When the context requires, singular nouns and pronouns include the plural.

NEW ERA LIFE INSURANCE COMPANY

By: _____
Print Name: _____ Bill S. Chen _____
Title: _____ President & CEO _____

PHILADELPHIA          AMERICAN          LIFE
INSURANCE COMPANY

By: _____
Print Name: ____ Bill S. Chen _____
Title: _____ President & CEO _____

2

STATE OF TEXAS                    §
                                 §
COUNTY OF HARRIS                 §

     This instrument was acknowledged before me on the 28th day of         May, 2021, by Bill S. Chen, President of NEW ERA LIFE INSURANCE COMPANY,  on behalf of said life insurance company.

(Seal)          _Melissa Segura_
                                    Notary Public, State of Texas

STATE OF TEXAS                    §
                                 §
COUNTY OF HARRIS                 §

     This instrument was acknowledged before me on the 28th day of May, 2021, by Bill S. Chen, President of PHILADELPHIA AMERICAN LIFE INSURANCE COMPANY, on behalf of said life insurance company.

(Seal)          _Melissa Segura_
                                    Notary Public, State of Texas

After recording return to:

Fidelity National Title Insurance Company
Columbus – National Commercial Services
Ms. Jana Vernese
580 Village Blvd., Suite 280
West Palm Beach, Florida 33409

3

11485.00003|1015116.1
5/21/2021 8:44 AM

## EXHIBIT "A"

### Legal Description

A 2.9956 acres (130,489 sq. ft.) tract of land, being a portion of Reserve "A" of Commerce Park Section 1, as recorded in Volume 179, Page 111, Harris County Map Records, out of and a part of the James Wells Survey, Abstract No. 830 and the Willis Yates Survey, Abstract No. 1433, Harris County, Texas and being more particularly described by metes and bounds as follows:

Beginning, at a set 5/8-inch iron rod at the intersection of the Southwest Freeway (300-feet wide) (US 59) North right-of-way line and the east right-of-way line of Commerce Park Drive (60- feet wide) at the southeast end of the cutback line;

THENCE, South 79°57'38" West, along said cutback line, a distance of 13.52 feet to a set 5/8-inch iron rod in the east right-of-way line of Commerce Park Drive;

THENCE, North 52°34'52" West, along the east right-of-way line of Commerce Park Drive, a distance of 355.23 feet to a set "X" at a point of curvature to the right;

THENCE, along said curve to the right, a length of 79.90 feet, a radius of 150.00 feet, a delta of 30°31'14", and a chord bearing North 37°19'15" West, a distance of 78.96 feet, to set 5/8-inch iron rod also being the westerly corner of a called 3.8052 acres tract, as described to FCPT SW Properties, LLC, as recorded in H.C.C.F. No. 20150517038;

THENCE, North 32°30'10" East, along the south line of said 3.8052 acres and northwest line of herein described tract, a distance of 259.47 feet to a set 5/8-inch iron rod marking the northerly corner of herein described tract;

THENCE, South 57°29'50" East, along the southerly line of said 3.8052 acres and the northeast line of herein described tract, a distance of 438.00 feet to a set 5/8-inch iron rod in the North right-of-way line of Southwest Freeway;

THENCE, South 32°30'21" West, a distance 308.00 feet to the POINT OF BEGINNING and containing 2.9956 acres of land.

11485.00003\1015116.1
5/21/2021 8:44 AM

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **XIONGEN JIAO, an individual, QIANJU JIAO, an individual, ZHONGHUA YU, an individual, JIATONG YU, an individual, PENGFEI ZHOU, an individual, XUANMEI ZHOU, an individual,** | **DECLARATION OF MICHAEL UDAYAN (COURT APPOINTED RECEIVER)** |
|       **Plaintiffs,** | **Case No.: 4:19-CV-01848** |
| **vs.** | **Judge: Hon. Keith P. Ellison** |
| **NINGBO XU, an individual, and LCL COMPANY LLC, a Texas Limited Liability Company,** | |
|       **Defendants,** | |
| **And** | |
| **DONGTAI INVESTMENT GROUP, LLC, a Texas Limited Liability Company.** | |
|       **Nominal Defendant.** | |

I, MICHAEL UDAYAN, as Dongtai Investment Group, LLC's Court-appointed Receiver hereby Declare as Follows:

1.      I am a Texas resident residing at 7503 Northwoods Dr, Sugarland TX 77479 and am over the age of 18, and have personal knowledge of all matters declared herein.

2.      I am the Court-Appointed Receiver for Dongtai Investment Group, LLC in this matter. [Doc. #s 19 and 25].

3.      I hereby affirm as truthful and accurate under the penalty of perjury the statements and representations set forth in the Expedited Joint Application For Approval of

Dongtai's Allocation Insurance Proceeds Agreement.

4.      As a result of Defendants Xu and LCL's wrongful conduct as set forth in the pleadings, Plaintiff's Emergency Application for Injunctive and Declaratory Relief, Plaintiff's Order to Show Cause for Contempt, the Court's findings and relevant Orders [*see* Doc. #s 21, 30, 33, 56, 62, 99, 100, 125, 136]; and the Insurers' wrongful conduct and refusal to issue full and fair payment for the covered loss as rightly owed under the Policy as alleged in the Claimants Amended Statement of Claim [*see* Ex. B attached to the Joint Application] Dongtai, despite all efforts, was forced to liquidate its most valuable asset, the Hotel in order to prevent foreclosure of the property by the Lender.

5.      At the time the Lender sent its notice of default in November 2020, Dongtai had only two valuable assets: 1) the Hotel and the attendant property as set forth in the Property Deed; and 2) Dongtai's pending Hurricane Harvey insurance claim which was contingent on Dongtai either reaching a settlement with the Insurers or Dongtai prevailing in the arbitration hearing which had yet to be rescheduled.

6.      In order to avoid default with Dongtai's secured creditors, and foreclosure by the Lender, Dongtai had no choice but to liquidate its most valuable asset-the Hotel.  This was not an easy task given the damage Defendants and the Insurers had done to Dongtai which severely impaired the Hotel's ability to operate and caused the Hotel's value to greatly diminish.

7.      Against all odds, I was able to locate a buyer for the best price I could sell the Hotel for.  As a result, on January 11, 2021, I entered into a Purchase Sale Agreement ("PSA") with Crown Plaza Suites Houston, LLC ("Buyer") in which Dongtai would sell the Hotel at a sizeable loss at the price of $11.8 million dollars.  The second highest offer for the Hotel was around $9.9 million.

8.      In early March 2021, I asked the Court to approve the sale which it did on March 8, 2021. [Doc. #155].

9.      Around that same time, Plaintiff's counsel asked me to conduct a thorough accounting of Dongtai's liabilities in order to ascertain the total amount Dongtai needed to pay all of its creditors, with the priority being Dongtai's secured creditors.  I did so and created a spreadsheet which I continually updated so that reliable and accurate forecasts could be made. [*See* Ex. 1 attached hereto].

10.      The hotel sale closed in May 2021, and unfortunately, the sale proceeds were only enough to pay off the secured creditors, namely the Lender which on May 28, 2021 issued a Release of Liens Letter to Dongtai.

11.      Following my  exhaustion of and distribution of the sale proceeds to creditors, Dongtai still owes a little under $1 million to its remaining creditors (all of which are unsecured). [*See* Ex. 1].   Adding further insult to injury, Plaintiffs still have yet to receive a penny to compensate them for their millions of dollars in loss as a result of Defendants and Insurers wrongful conduct.

12.      Fortunately, Dongtai has one valuable asset left, the Hurricane Harvey insurance claim currently pending in arbitration, in which Dongtai has claimed over $10 million in damages.

13.      As this is the only possible means from which Dongtai will be able to pay all of its outstanding creditors and attempt to compensate Plaintiffs for their millions of dollars in loss it is imperative that Dongtai is successful in either settling or prosecuting the insurance claim.

14.      In order for Dongtai's Members and I to determine how much of a recovery (whether via settlement or an award) from the insurance claim Dongtai needs to fully pay off all

remaining valid creditors, compensate me for my services, and reduce the millions of dollars in loss the Plaintiffs have already sustained, Dongtai's members and I negotiated and entered into an Allocation of Insurance Proceeds Agreement (Agreement) [*see* Ex. A] based upon my accounting of Dongtai's remaining outstanding liabilities as set forth in Ex. 1 should Dongtai receive any proceeds from the insurance claim whether via a settlement or a judgment/arbitral award.

15.     I hereby warrant and affirm that the information in Ex. 1, which serves as the basis for the Agreement, is accurate and complete and that I am not aware of any other persons or entities other than those set forth in Ex. 1 that would be a legitimate creditor of Dongtai.  In short, all legitimate creditors of Dongtai and the amounts currently owed are encapsulated in Ex. 1 and have been accounted for.

16.     As the arbitration hearing date is on the horizon and given the high probability that the Insurers will pull/withdraw or drastically reduce any offer it has made to Dongtai if a settlement is not reached soon, I jointly request with the Plaintiffs that the Court approve the Allocation Agreement [*see* Ex. A] as the Court's action in this regard, like it did with the approval of the sale, will provide Dongtai with assurance, certainty, and protection.

I declare under criminal penalty of the United States of America that the foregoing is true and correct.

Executed on this 2nd day of August, 2021.


                                                        *Michael S Udayan*
                                                        MICHAEL S UDAYAN

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **XIONGEN JIAO, an individual, QIANJU JIAO, an individual, ZHONGHUA YU, an individual, JIATONG YU, an individual, PENGFEI ZHOU, an individual, XUANMEI ZHOU, an individual,** | **ORDER APPROVING AND AUTHORIZING DONGTAI'S ALLOCATION OF INSURANCE PROCEEDS AGREEMENT** |
| **Plaintiffs,** | |
| **vs.** | **Case No.: 4:19-CV-01848** |
| **NINGBO XU, an individual, and LCL COMPANY LLC, a Texas Limited Liability Company,** | **Judge: Hon. Keith P. Ellison** |
| **Defendants,** | |
| **And** | |
| **DONGTAI INVESTMENT GROUP, LLC, a Texas Limited Liability Company.** | |
| **Nominal Defendant.** | |

The Court has reviewed and considered the instant Expedited Joint Application made by the Court-Appointed Receiver-Michael Udayan and Plaintiffs requesting the Court to approve and authorize Dongtai's allocation of any and all insurance proceeds it may receive from its Hurricane Harvey insurance claim as set forth in the Allocation of Insurance Proceeds Agreement. The Court, after considering the motion, response, argument of counsel, and other evidence submitted to the Court, finds that the Court should consider the Joint Application on an expedited basis, and that the Joint Application requesting approval of the Allocation of Insurance Proceeds Agreement should be GRANTED.

IT IS HEREBY ORDERED that the Court-Appointed Receiver, Michael Udayan is authorized to take all necessary actions to allocate and distribute any insurance proceeds Dongtai may receive from its pending insurance claim in accordance with the Allocation of Insurance Proceeds Agreement .

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the $^{th}$ day of Augst, 2021.

_____
HON. KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE